Pages 1 - 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE YVONNE GONZALEZ-ROGERS, JUDGE

```
J.P., et al.,              )
                           )
            Plaintiffs,    )
                           )
     v.                    )   NO. 4:17-cv-05679-YGR
                           )
County of Alameda, et al., )
                           )
            Defendants.    )
_____)
```

Oakland, California
Tuesday, February 13, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:          Law Offices of Darren J. Kessler
                         3060 El Cerrito Plaza, Suite 371
                         El Cerrito, California  94530
                  BY:    **DARREN J. KESSLER, ESQ.**


                         The Scott Law Firm
                         1388 Sutter Street, Suite 715
                         San Francisco, California  94109
                  BY:    **LIZABETH N. deVRIES, ESQ.**


For Defendant County of Alameda:

                         Haapala, Thompson & Abern, LLP
                         1939 Harrison Street, Suite 800
                         Oakland, California  94612
                  BY:    **REBECCA S. WIDEN, ESQ.**

          (Appearances continued on following page.)


Reported By:           Leo T. Mankiewicz, CSR 5297 RMR, CRR
                       Official Reporter

APPEARANCES:  (cont.)


For Defendant Triad Family Services:

              Matheny Sears Linkert Jaime LLP
              3638 American River Drive
              Sacramento, California  95864
      BY:  **RONALD EUGENE ENABNIT, ESQ.**


For Defendant Maria Refugio Moore:

              Gavin Cunningham & Hunter
              1530 The Alameda, Suite 210
              San Jose, California  95126
      BY:  **ELIZABETH GONG LANDESS, ESQ.**

              Wood Smith Henning & Berman
              1401 Willow Pass Road, Suite 700
              Concord, California  94520
      BY:  **EUGENE ZINOVYEV, ESQ.**

<u>Tuesday, February 13, 2018</u>

<u>2:38 p.m.</u>

P R O C E E D I N G S

**THE CLERK:**  We'll do the P. versus County of Alameda.  As counsel comes up, will you please hand me your business cards, as you come up to the podium.  And be sure you state your name for the court reporter, please, before you speak.

Calling civil action 17-5679, J.P. versus County of Alameda.  And counsel, please state your appearance.

**MR. KESSLER:**  Darren Kessler appearing for the plaintiff.

**MS. deVRIES:**  Good afternoon, your Honor.  Liza deVries, also appearing for plaintiff.

**MS. WIDEN:**  Good afternoon, your Honor.  Rebecca Widen appearing for the County defendants, County of Alameda.

**THE COURT:**  Okay, who else do I have?  There are three people behind you.

**MR. ENABNIT:**  Good afternoon, your Honor.  Ronald Enabnit for defendant Triad Family Services.

**THE COURT:**  Okay.

**MS. LANDESS:**  Good afternoon, your Honor.  Elizabeth Gong Landess, counsel for defendant Maria Moore.

**MR. ZINOVYEV:**  And good afternoon, your Honor.  Eugene Zinovyev, also co-counsel for defendant Moore.

1          **THE COURT:**  Okay.  A lot of people in the courtroom.

2     Who's in the courtroom?  Do you know?  On the plaintiff's side?

3          **MR. KESSLER:**  On the plaintiff's side is our

4     client's guardian ad litem.

5          **THE COURT:**  Who is that?

6          **MR. KESSLER:**  Shannon Villanueva.

7          **THE COURT:**  I know.  Would you raise your hand?

8     Okay.

9          **THE CLERK:**  Counsel -- turn and speak into the mike.

10          **THE COURT:**  You still need to speak in the mike.

11          **MR. KESSLER:**  Yes, sorry about that.

12          **THE COURT:**  Anybody else that you know on the

13     plaintiff's side?

14          **MS. deVRIES:**  A friend who's here for support.

15          **THE COURT:**  How about on the defense side, do you

16     know any of the other people in the courtroom?

17          **MS. WIDEN:**  I do not.

18          **MS. LANDESS:**  No, your Honor.

19          **THE COURT:**  Let me first say that this -- the

20     circumstances leading to this case are tragic.  There's no

21     other way to describe how horrible this could be.  But what

22     I need to figure out is if you have a constitutional claim.

23          So tragedy is one thing, the Constitution is

24     another, and we need to figure that out now, because we aren't

25     going to go through litigation, years of expense, only to find

```
 1    out that there isn't an articulated constitutional claim.  So
 2    I want to go through these because, as you know....
 3              Let me ask you, how many 1983 cases have you
 4    litigated?  And who is the lead, by the way?
 5              MR. KESSLER:  I am.
 6              THE COURT:  Mr. Kessler?
 7              MR. KESSLER:  Yes, I am.
 8              THE COURT:  All right.  So Ms. deVries, take the
 9    middle mike, then.
10              MS. deVRIES:  Okay.
11              THE COURT:  Mr. Kessler, how many 1983 cases have
12    you litigated?
13              MR. KESSLER:  Between five and ten.
14              THE COURT:  To trial?
15              MR. KESSLER:  Two.
16              THE COURT:  What were the nature of the claims?
17              MR. KESSLER:  One was a civil rights case relating
18    to the one that went to trial, related to unlawful restraint by
19    officers.
20              THE COURT:  Yes.
21              MR. KESSLER:  Another was relating to child --
22              THE COURT:  So a Fourth Amendment?
23              MR. KESSLER:  Yes.
24              THE COURT:  Okay.
25              MR. KESSLER:  Another was -- which I was co-counsel
```

1 with Ms. deVries, by the way --

2           **THE COURT:**  Okay.

3           **MR. KESSLER:**  -- another was a case involving the

4 expropriation of funds by the social service agency for foster

5 kids that was designated for their care but used by the County

6 for other reasons.

7           **THE COURT:**  Okay.

8           **MR. KESSLER:**  And it was actually certified as a

9 class action briefly, and then decertified after litigation,

10 and there, I represented multiple -- many claims in that one.

11 It was a multi-court litigation.

12           You want me to go through the rest of them?

13           **THE COURT:**  I'm trying to understand how much

14 experience you have.  Go ahead.

15           **MR. KESSLER:**  Okay.  There was another case

16 involving a -- about two years ago, involving a woman who --

17 involved her right to express an association where she was

18 arrested for the clothing she was wearing because they believed

19 she was a prostitute when, indeed, she was just walking to get

20 food for her disabled mother, and that was it.  That case

21 ultimately resolved in a settlement.

22           And I --

23           **THE COURT:**  Ms. deVries, how about you?

24           **MR. KESSLER:**  There was another one, but she'll

25 mention that.  She was happen to be in that one, as well.

1          **THE COURT:**  Use the mike.  How about you, how many

2     cases have you litigated, 1983?

3          **MS. deVRIES:**  It could be 200, I'm not sure.

4          **THE COURT:**  What were the general nature of those

5     1983 cases?

6          **MS. deVRIES:**  Sure, everything from excessive force

7     to punitive restraints under Fourteenth Amendment to equal

8     protection in a variety of settings, mostly employment, but

9     also in jail society also, sometimes that got combined when

10    there was a security guard who was the plaintiff.  Foster

11    children, danger creation cases, sort of ran the gamut, your

12    Honor, First Amendment retaliation.

13         **THE COURT:**  So as we --

14         **MR. KESSLER:**  Your Honor, may I supplement something

15    to you that might be of interest to the Court?  I purposely and

16    intentionally will get counsel to join with me on claims that

17    I believe have federal civil rights actions involved, and

18    I have had over close on 35 years' experience in juvenile

19    dependency-related cases.  I've had it for a hundred -- a

20    hundred-plus jury trials.  I've done numerous cases.  I used to

21    be a prosecutor for about five years in which I was lead

22    prosecutor and head of the Child Sexual Assault Unit.  So I've

23    had --

24         **THE COURT:**  Where?

25         **MR. KESSLER:**  In Contra Costa County.  So I've had

1    substantial litigation experience in other areas that

2    I purposely and intentionally will join with counsel that will

3    assist me with the federal civil rights arena.

4              THE COURT:  Okay.  This is not what I would call a

5    run-of-the-mill 1983 case, and that's one of the reasons why

6    I'm asking.  I find Section 1983 cases to be some of the most

7    difficult cases, and we frequently have some of the worst

8    lawyers in federal court bringing these claims on behalf of

9    people who sometimes have fairly significant claims.

10             MS. deVRIES:  I hear that.

11             THE COURT:  But qualified immunity is a big hump, as

12   you know, and unless there is a clearly articulated

13   constitutional right, the first case that articulates that

14   right never gets any relief, because that's the way the law

15   works.  If there isn't a constitutional right, then the

16   defendants couldn't have known.  If they couldn't have known,

17   then they get qualified immunity.

18             MS. deVRIES:  Unless it's so obvious they should

19   have known, as in *Hope v. Pelzer.*

20             MR. KESSLER:  Or shocks the conscience, based on

21   behavior.

22             THE COURT:  So I need to understand where the

23   constitutional right stems from, and at this point, I don't

24   think that the briefing adequately does it.  So we're going to

25   go through this, and I may ask for supplemental briefing.

1        **MS. deVRIES:**  Plaintiffs will be happy to provide

2    whatever you need, your Honor.

3        **THE COURT:**  This first claim for relief against --

4    is it Maas?  Is that how I say it?

5        **MS. WIDEN:**  It's Maas, yes.

6        **THE COURT:**  -- Maas and May, what is the case that

7    articulates the claim of a sibling for this state-created

8    danger where -- what's your case?

9        **MS. deVRIES:**  Your Honor, Mr. Kessler can describe,

10   J.P. has his own claim on his own behalf, not related to

11   whatever claims M.M., the sister M.M. would have, or her estate

12   would have.  We do not represent her estate, we do not

13   represent her, through -- well, her viable interest, we

14   represent her brother.

15       So I apologize for asking for clarification, your

16   Honor, but I wonder if perhaps the question is, what is the

17   case that secures a foster child case for damages while in the

18   exclusive of care and custody of the foster care system, and

19   there are several of them, starting with *Tomas* that is cited in

20   our brief, and I'll let Mr. Kessler describe for your Honor how

21   that would play out.  It's under the Fourteenth Amendment.

22       **MR. KESSLER:**  Your Honor, if I may, the way I see

23   it, that this case is -- there are two main areas.  The first

24   area is what the Court's asking about in whether there is a

25   constitutional right for J.P. that's separate --

1        **THE COURT:**  First of all, I didn't seal this

2   Complaint, right?  So everyone is fine with their use of the

3   first name, correct?

4        **MS. deVRIES:**  Yes, your Honor.

5        **MR. KESSLER:**  Yes.

6        **THE COURT:**  Okay.  What I want to do is, I want to

7   go through every cause of action.  I don't want generalities.

8   I cannot -- in a 1983 context, I cannot operate in

9   generalities.

10        **MR. KESSLER:**  All right.

11        **THE COURT:**  I have to operate in specifics.

12        **MS. deVRIES:**  Very well.

13        **THE COURT:**  So the first cause of action that is

14   alleged is the abridgment of civil rights.  That's how you've

15   titled it, state-created danger.

16        What case am I going to go to that is going to give

17   me the answer that says that the plaintiff has this

18   constitutional right, which emanates from what constitution- --

19   what amendment?  The Fourteenth?

20        **MR. KESSLER:**  It's under the Fourteenth Amendment.

21   It's the right -- it's even conceded by the defendant in this

22   case in their reply brief that they have a right to be free

23   from harm in foster care; that foster children have that right

24   to do that.

25        There is also a special relationship where there is

1    a duty of the social workers to care for foster children in

2    foster homes, and that is a specific right delineated by the

3    cases we cited in *Delaney (sic) v. Winnebago* and *Carlo v.*

4    *Chino.*

5              THE COURT:  Okay, so why doesn't *Delaney*, or -- do

6    you concede that, that the First Cause of Action survives?

7              MS. WIDEN:  No, we do not concede that, your Honor.

8              THE COURT:  So what is it about -- *Delaney*?

9              MR. KESSLER:  *Deshaney*, rather, *v. Winnebago.*

10             THE COURT:  Why doesn't that stand for the

11    proposition that the First Cause of Action survives?

12             MS. WIDEN:  Well, two reasons, your Honor.  First of

13    all, the type of claim, the type of Fourteenth Amendment claim

14    that's being asserted here, which is essentially a loss of care

15    and companionship of his sister M.M., who died in foster care,

16    that type of claim is not cognizable in the Ninth Circuit under

17    *Ward v. City of San Jose*, and the fact the claim --

18             THE COURT:  Is that an accurate statement of the

19    first claim?

20             MR. KESSLER:  No.

21             THE COURT:  All right, what is the relief sought

22    under the first claim?

23             MR. KESSLER:  The relief sought is for the harm to

24    J.P. for the harm he suffered when in the foster care

25    witnessing and experiencing the trauma related to his sister

1    being under the influence of methamphetamine twice in his

2    presence, and then dying in his care -- in his arms, and then

3    while he's watching her being revived, or being attempted to be

4    revived, and ultimately unsuccessfully.

5            So he has his own independent right to be protected

6    from such emotional trauma in that home, and that is the right

7    that we're claiming here that was violated.  That is separate

8    and apart from his sister's rights, and we carefully pled it

9    accordingly.

10           THE COURT:  Okay, based on that articulation, does

11   J.P. apply?

12           MS. WIDEN:  No, your Honor, I believe that the *Ward*

13   case still prevents that claim.  Also, if you look at the --

14           THE COURT:  Why does *Ward* not prevent it?

15           MR. KESSLER:  *Ward* did not involve the claims we're

16   alleging.  *Ward* involved a wrongful death claim.  That's not

17   what we're claiming here.  We specifically do not claim that,

18   and for elaboration, I could ask my co-counsel to cite the

19   authorities to support that whole proposition, because that's

20   very clearly what we've laid out in our briefs, and I think we

21   could supplement it right here.

22           MS. deVRIES:  And your Honor, I really appreciate

23   your careful attention to detail, because it's a very important

24   case, and the reason that we're here on this motion to dismiss

25   is because defendants' entire argument is that *Ward* precludes

1   this entire case, and that's based on a holding in the Ninth

2   Circuit that a basically wrongful death claim cannot be brought

3   by a sibling, and if we look at 1983 law, your Honor, and we

4   look at the loss of familial association under the Fourteenth

5   Amendment claim that derives, it's specific from the state law

6   wrongful death claims; of course, a sibling does not have a

7   wrongful death claim under the C.C.P.

8              Specifically in our Complaint, there is no such a

9   claim, and so what's happening here is the County would like

10  the Court to construe all of our claims as being wrongful

11  death, when they're not.

12             Instead, the First Cause of Action, which on the

13  first page of the Complaint gives you just a little cheat sheet

14  for your Honor's assistance of the eight claims, and the first

15  one is under 1983, the Fourteenth Amendment, for danger

16  creation, and that is the claim where a public entity or

17  officer or social worker puts somebody in a position where they

18  will be harmed and that would not have happened otherwise.

19             Here you have a little boy who was taken from his

20  home, and we're not questioning the initial detention and

21  taking from his birth home.  However, when he was placed in the

22  care of Ms. Moore, four days later, his sister ingested

23  methamphetamine.

24             THE COURT:  No, I understand the facts.

25             MS. deVRIES:  And the County had 10 days to

1    investigate this.  This was a mandatory duty.  This is not, you

2    know, something that maybe they could have just swept under the

3    carpet.  This was something that they had a slew of mandatory

4    duties that they needed to comply with, and Mr. Kessler could

5    enumerate those if you would like, and they didn't, and that

6    was putting J.P. in danger of emotional harm, and as your Honor

7    knows, emotional harm is certainly recoverable under 1983,

8    under *Carey v. Piphus*, 435 U.S. 247, 1978.

9         This is very old law that is supporting these types

10   of damages in this type of claim, and our Complaint is replete

11   with specific harm that J.P. suffered under his constitutional

12   right, under the Fourteenth Amendment.

13        **MR. KESSLER:**  Your Honor, if I may just add one more

14   thing, to accept the defendant's position in this, if M.M. did

15   not die, then we could have the same Complaint with the same

16   allegation, but we could go forward.

17        But their position is that because *Ward* is out there

18   and says that there is some case law that says that there's a

19   proposition that there's no wrongful death right to bring an

20   action by a sibling, therefore, all siblings in any situation

21   can't bring a right to the damages they suffer in a foster home

22   by virtue of the negligence and inaction of a social worker

23   that caused that harm, and that's absurd.

24        **THE COURT:**  All right.  The Second Cause of Action.

25        **MS. WIDEN:**  Your Honor, may I respond to that

1    briefly?

2            THE COURT:  Briefly.

3            MS. WIDEN:  I would argue that the Complaint -- the

4    damages that are claimed in this Complaint almost exclusively

5    flow from the -- from Jeremiah's loss of his sister.  That's a

6    loss of care, companionship and society claim.

7            I did not see very much in the Complaint that

8    articulated any loss separate from that, from the loss of his

9    sister.  So I think that that is not what's alleged in the

10   Complaint.

11           Also, the defendants have acknowledged that there's

12   a duty on the part of the County to protect foster children

13   from harm.  All of the cases that are cited by the plaintiff,

14   however, in their opposition, in those cases, the children were

15   actually physically harmed, and --

16           THE COURT:  Well, you're not suggesting that

17   emotional damage isn't recoverable, are you?

18           MS. WIDEN:  That's not in the cases.

19           THE COURT:  So that's what you think?

20           MS. WIDEN:  I think there has to be -- there has to

21   be an accompanying -- some type of other type of physical or --

22   molestation, or something like that.

23           THE COURT:  What authority do you have for that

24   proposition?

25           MS. WIDEN:  Well, my authority is that the cases

1   that have been cited don't address emotional harm, and I think

2   that *Ward* does address that.

3           THE COURT:  Well, that's one case.  Have you looked

4   at the....  Let me ask you the same question I asked them.  How

5   many 1983 cases have you tried?

6           MS. WIDEN:  Have I tried?

7           THE COURT:  ...have you tried?

8           MS. WIDEN:  I've only tried one, and -- but I've

9   handled probably close to a hundred.

10          THE COURT:  And you've never seen a claim for relief

11  for emotional distress?

12          MS. WIDEN:  I've seen it.  I've certainly seen a

13  claim for relief from emotional distress.  I have not

14  handled --

15          THE COURT:  And was it stricken?

16          MS. WIDEN:  No, where it's purely under Section

17  1983, it's not accompanied by any form of physical-type abuse.

18          THE COURT:  Have you found any case -- is there any

19  Ninth Circuit case that says that claims for emotional distress

20  must be accompanied by physical harm?  Are you aware of any

21  Ninth Circuit case --

22          MS. WIDEN:  No, your Honor, I'm not.  I'm happy to

23  brief that for you and do a little more research on it.  Maybe

24  I should state my position another way.

25          I believe what is happening here is the plaintiffs

```
1   are -- the plaintiff is trying to use the duty that the County

2   owed to M.M., the breach of that duty as the source as to the

3   liability in this case.  There was no breach of the duty to the

4   plaintiff.

5               THE COURT:  So the fact --

6               MS. WIDEN:  He was safe in the placement.

7               THE COURT:  He was safe in a house where there

8   was --

9               MS. WIDEN:  He wasn't harmed.  He wasn't -- wasn't

10  harmed.

11              THE COURT:  Just because someone is not harmed means

12  they're safe?

13              MS. WIDEN:  I think under the case law that I've

14  read, yes.

15              THE COURT:  Do you believe that having that child in

16  that house any day longer would have been a safe environment

17  for that child?

18              MS. WIDEN:  That is not -- that's not my decision to

19  make.  That was made by a juvenile --

20              THE COURT:  I'm asking you --

21              MS. WIDEN:  -- court, and I think that the foster

22  mother was permitted to keep the children.  I mean, I'm not --

23  I don't want to get into the facts too much, but....

24              THE COURT:  But what I'm talking about, I have to

25  look at this Complaint and read it in a plausible sense.
```

1   I have two children in a house, one of whom has died of

2   ingesting methamphetamine, and you want me to plausibly read

3   that the second child is safe in that house?  That's what

4   you're asking me to do?

5          MS. WIDEN:  Your Honor, I would agree under the

6   allegations of the Complaint --

7          THE COURT:  Which is what we're looking at.

8          MS. WIDEN:  -- that's true -- perhaps "safe" is not

9   the right word.

10          THE COURT:  I would agree.

11          MS. WIDEN:  I apologize to the Court on my misuse of

12   words.  I think what I'm trying to argue here is that there was

13   no breach of the duty alleged to the minor.

14          THE COURT:  You know, we're not at that stage.  This

15   is not summary judgment.  All I'm trying to figure out is

16   whether they stated a claim, and if your argument is that

17   having that child in that environment was not a danger, then

18   you lose that argument.

19          MS. WIDEN:  Well, that's obviously not our entire

20   argument, your Honor.

21          THE COURT:  All right, well, I'm looking for

22   something, but I'll come back to it.  I think I understand the

23   first claim.

24          Second, intimate association.  Again, with respect

25   to a sibling, what's the case authority for that?

1      **MS. deVRIES:**  *Roberts*, Supreme Court -- in the

2  Supreme Court, and *Lee* in the Ninth Circuit.  The Supreme Court

3  in *Roberts* specifically held multiple things, including that

4  intimate association includes a close group of connected

5  individuals, and certainly biological family would be included

6  in that, certainly siblings would be included in that.  That

7  was 1981, I believe, your Honor.

8      And then you have *Lee* coming out of the Ninth

9  Circuit --

10      **THE COURT:**  Have you cited those in your brief?

11      **MS. deVRIES:**  I did, your Honor, and in *Lee* in

12  particular, it has some very nice language.

13      And here's another point that I think is perhaps

14  muddied by the waters we're looking at right now.  Under the

15  Fourteenth Amendment, you can have multiple different claims,

16  of course.  You could have a claim for due process or equal

17  protection or loss of familial association or loss of family

18  integration, and under the *Lee* case, Ninth Circuit -- which of

19  course is out of 2001, certainly well established by the time

20  we're here, your Honor -- the Court specifically goes through a

21  number of claims under the Fourteenth Amendment, as well as the

22  First Amendment, and it specifically holds, in *Lee*, under the

23  First and Fourteenth Amendment right to familial association

24  analysis, that there are at least two ways to look at the

25  intimate association claim under the First or Fourteenth

1   Amendment.

2           One is interference with the companionship and

3   society of the child, and that is something that I believe is

4   being presented to this Court as being the nature of our

5   Complaint when it is not.

6           The *Lee* case further goes on to talk about, quote --

7           **THE COURT:**  Well, what is it, then?

8           **MS. deVRIES:**  What it is, it's the relationship,

9   including family relationships, that presupposed these

10  attachments and commitments to the necessarily few other

11  individuals with whom one shares not only a special community

12  of thoughts, experiences and beliefs, but also distinctively

13  personal aspects of life, and of course --

14          **THE COURT:**  Where is that in your brief?  I don't

15  see it.

16          **MS. deVRIES:**  It's probably in my brief and it's

17  certainly quoting the *Lee* case, which is at 250 F.2d -- I'm

18  sorry -- F.3d 666.

19          **THE COURT:**  Well, I see *Lee* here.  I don't see the

20  quote.

21          **MS. deVRIES:**  Okay, and the quote actually comes

22  from *Roberts v. United States Jaycees* at 468 U.S. 609, and 619

23  through 620, and of course, that's the Supreme Court, 1984.

24          And what's interesting about *Lee* coming out, of

25  course, in the Ninth Circuit, is that it goes through the

1    *Barber* case very carefully for the specific purpose of making

2    sure that there's a distinct -- a distinguishing analysis of

3    the First Amendment as having both a component of intimate

4    association for society and companionship, as the *Ward* case

5    said, the siblings don't have, and this other type of

6    relationship that is not the wrongful death companionship and

7    society, but it is something else.

8              **MR. KESSLER:**  And it is cited in our brief, your

9    Honor, on pages 8 and 9, bottom of --

10             **THE COURT:**  I see the section, 8 and 9.  I didn't

11   see the quote.  All right, a response?

12             **MS. deVRIES:**  Thank you.

13             **MS. WIDEN:**  Yes, your Honor.  As to the Fourteenth

14   Amendment claim for loss of familial association, I do believe

15   *Ward* applies to that specifically.

16             **MS. deVRIES:**  There is no such claim here.

17             **THE REPORTER:**  I'm sorry, if you're speaking for the

18   record --

19             **MS. deVRIES:**  I'm sorry.  There is no such claim

20   here.

21             **MS. WIDEN:**  I believe it's familial --

22             **THE COURT:**  Stop interrupting.

23             **MS. WIDEN:**  -- or intimate association.

24             **THE COURT:**  Counsel, do not interrupt.

25             **MS. deVRIES:**  Okay, your Honor.

1        **THE COURT:**  Go ahead.

2        **MS. WIDEN:**  For loss of familial or intimate

3    association, I do believe the *Ward* case applies to that, in

4    terms of the Fourteenth Amendment claim.

5        **THE COURT:**  Can I ask, do you have any other

6    authority other than *Ward*?  That is, is your -- when I go

7    through these claims, are you just going to say, *"Ward,"* so if

8    I read *Ward* and disagree with you, I know that I don't have to

9    do anything else?

10        **MS. WIDEN:**  Our main reliance is on *Ward*, your

11    Honor, and I would argue, at least on the First Amendment

12    claims, that *Ward* would also -- the reasoning of *Ward* would

13    apply to those claims, as well.  We did cite a case --

14        **THE COURT:**  Well, explain to me why *Roberts* and *Lee*

15    does not apply.

16        **MS. WIDEN:**  Well, I would argue that *Lee* doesn't

17    apply because it deals with the claims of a mother, which is

18    entirely consistent with *Ward*.  In *Ward*, the Court said that

19    parents have a right to -- a liberty interest, essentially, in

20    intimate and familial association with their children.

21        So that the *Lee* case does not conflict with *Ward*.

22    It's actually --

23        **THE COURT:**  Do *Roberts* and *Lee* address sibling

24    relationships?

25        **MS. deVRIES:**  I'm sorry, do what and *Lee*?

1          THE COURT:  Do *Roberts* and *Lee* address sibling

2     relationships?

3          MS. deVRIES:   *Roberts* says, and has been interpreted

4     by many courts, as having done so.  *Lee* does not specifically.

5          THE COURT:  Is there any Ninth Circuit case that has

6     extended the intimate association to siblings?

7          MS. deVRIES:  Ninth Circuit, only in an unpublished

8     decision by Judge --

9          THE COURT:  Don't cite to me unpublished decisions.

10    They are not persuasive.  If you've -- well, you wouldn't have

11    sat on the Ninth Circuit, but there are reasons why they're not

12    published.

13         MS. deVRIES:  Can you repeat your question, your

14    Honor, please?

15         THE COURT:  Is there any Ninth Circuit case that has

16    extended intimate association to siblings?

17         MS. deVRIES:  There are -- no, your Honor.

18         THE COURT:  All right.  *Roberts* was a siblings case?

19         MS. deVRIES:  *Roberts* addressed the concept of

20    siblings, as have many other cases.

21         THE COURT:  What is the best circuit court case to

22    address intimate association between siblings?

23         MS. deVRIES:  In *Patel* -- just a moment, I'll grab

24    it for your Honor -- it's a Second Circuit case.  There are, as

25    I've put in my brief, your Honor, there are several district

1  courts that have looked at this issue, including Judge Shubb,

2  Judge Chambers, Judge England, several.

3           *Patel v. Searles*, 305 F.3d 130 --

4           **THE COURT:**  So in the future, if you give me a table

5  of authorities, I won't have to scan your brief for cites.

6           **MS. deVRIES:**  Noted, your Honor.  I'll be sure to do

7  that.  This was a short brief.  I apologize for that.

8           **THE COURT:**  Okay, so what page on your brief is it

9  cited?

10          **MS. deVRIES:**  I have not cited *Patel* in my brief.

11  I gave opposing counsel notice that I may have to cite *Patel* in

12  this argument this morning at 9:30.

13          **THE COURT:**  All right, so what's the case?

14          **MS. deVRIES:**  I'm sorry, *Patel v. Searles*.

15          **THE COURT:**  How do you spell that?

16          **MS. deVRIES:**  S-E-A-R-L-E-S, 305 F.3d 130, 137,

17  Second Circuit 2002, and the quote here is,

18              "Defendant's view in that case was that intimate

19              association must exclude siblings, and the Court's

20              response was, simply put, defendant's view is

21              inconsistent with *Roberts'* statement that family

22              relationship -- excuse me -- that constitutional

23              protections for associational interest are at their

24              apogee when close family relationships are at

25              issue."

1          So here the question may be, well, how close were

2     these siblings?  And that's really where we should be, is

3     discussing whether this Complaint articulates a sufficient

4     relationship to fall within the ambit of the intimate

5     association case law of the First Amendment, and I would submit

6     that it certainly is, but I would defer to Mr. Kessler to argue

7     that, if he wishes.

8          **THE COURT:**  Any comment on *Patel*?

9          **MS. WIDEN:**  Your Honor, I have not had a chance to

10    review or research *Patel*, and if it's an important case that

11    the Court intends to consider, I would request an opportunity

12    to submit a supplemental brief on that.

13         **THE COURT:**  Okay.  Third claim, best cases for

14    expressive association.

15         **MS. deVRIES:**  The same cases, your Honor.

16         **THE COURT:**  So *Roberts* identified an intimate

17    association and an expressive association?  What is the

18    difference, in the elements?

19         **MS. deVRIES:**  The difference is the type of

20    association, in terms of the conduct.  So expressive

21    association, I think the best way to think about it, your

22    Honor, is what is expressly stated in the First Amendment,

23    speech, assembly, advocacy.

24         So for expressive, we have facts in our Complaint

25    that we have J. advocating for his sister, and would have

1    continued to do so in the foster care system, as one might need

2    to.  It's a different type of conduct that's protected, your

3    Honor.

4              MR. KESSLER:  Your Honor, if I --

5              THE COURT:  What are the elements of an intimate

6    association claim?

7              MS. deVRIES:  I brought it under both the First and

8    Fourteenth Amendment.  Here, because the cases are --

9              THE COURT:  I just asked for the elements.  Do you

10   know them or not?

11             MS. deVRIES:  The elements is that there's a family

12   relationship with a deep attachment, and then the element that

13   there was an invasion of that relationship; and of course,

14   causation and damages.  And here, we have the deliberate

15   indifference to that right.

16             THE COURT:  And what are the elements, then, for an

17   expressive association?

18             MS. deVRIES:  Again, it's similar.  We pled it under

19   the First and Fourteenth because it's -- it can be under

20   either.

21             THE COURT:  Well, ultimately, only move under one.

22   I'm not going -- it is not appropriate to have two

23   constitutional amendments which give rise to the exact claim.

24             MS. deVRIES:  I have --

25             THE COURT:  So the more specific controls -- it

```
1    would seem to me that if it is a First Amendment claim, then
2    it's a First Amendment claim.  The Fourteenth is a catch-all.
3         MS. deVRIES:  Agreed, your Honor.  There are cases
4    describing the Fourteenth Amendment as including the right to
5    family integrity, to live with your close family members, those
6    types of claims that are obviously different from loss of
7    consortium or loss of society, loss of companionship.
8         And so the Fourteenth Amendment tends to be cited in
9    many, many cases as being encompassed under this broad
10   association claim.  So that's why we put both, to make sure
11   that we covered it, but I understand matters concerned, which
12   is why the First Amendment appears on the --
13        THE COURT:  So again, the elements for an expressive
14   association.
15        MS. deVRIES:  That the -- there's a relationship,
16   that they engaged in --
17        THE COURT:  Well, how -- so the second, you said
18   there's a family relationship with a deep attachment, and at
19   two, there's an invasion, plus causation and damages, but
20   that's a given.  So how is the third different?
21        MS. deVRIES:  It's the nature of the relationship,
22   that they've engaged in some type of expressive conduct, that
23   there is an expressive conduct element, and that expressive
24   conduct has been defined by numerous cases as being anything
25   from relating to advocacy or being part of an association
```

```
1    that's involved in advocacy --
2              THE COURT:  So you don't actually have a case that
3    identifies for me the elements of your claim.
4              MS. deVRIES:  I do have a case.  I wasn't asked to
5    come to court to argue the elements of the claim --
6              THE COURT:  Well, if you don't know the elements of
7    the claim, then how can you plead them?
8              MS. deVRIES:  I believe that what is pled in this
9    Complaint -- and I do appreciate your Honor's concern --
10   satisfies the elements of this claim.
11             THE COURT:  But you can't articulate the elements.
12             MS. deVRIES:  I can certainly brief for your Honor
13   the elements that are in our Complaint under the Third Cause of
14   Action.
15             THE COURT:  Do you see where I'm going, here?
16             MS. deVRIES:  I do see where you're going, your
17   Honor.
18             THE COURT:  So I need to know what the elements are,
19   and I need to know what the legal authority is for the
20   elements.
21             MS. deVRIES:  The legal authority would be *Roberts*
22   and its progeny.
23             THE COURT:  Except that *Roberts* won't tell me what
24   the elements are, because if they were, you would have told me.
25   Right?
```

1      **MS. deVRIES:**  Well, as your Honor earlier stated,

2  constitutional law can be a little bit --

3      **THE COURT:**  Exactly.

4      **MS. deVRIES:**  -- more --

5      **THE COURT:**  So we're not exactly sure on this one,

6  it sounds like.

7      **MS. deVRIES:**  I am anticipating --

8      **MR. KESSLER:**  Can I step in and say something,

9  please?  While the Complaint perhaps could be more specific as

10  to the elements that the Court wants to see, that's fine.

11      What I want to add -- what I'm going to say is that

12  the question, I think, that -- is not whether or not there is a

13  case on point within our jurisdiction that would allow this

14  claim to go through, but is the current case law, such as

15  *Roberts* and its progeny, do they allow for us to be bringing

16  the claim that we're bringing, based on what they're saying,

17  and is there anything that would preclude us from doing so, and

18  the --

19      **THE COURT:**  You have to have a claim in order to

20  bring it.  The other side is arguing that you don't have a

21  claim.

22      **MR. KESSLER:**  Well, we do have a claim.

23      **THE COURT:**  Then what you're articulating isn't

24  based in constitutional law.  So at some point in time, at some

25  point in time I'm going to have to figure this out, because

1    I've got to instruct a jury.

2              **MS. deVRIES:**  Of course, your Honor.

3              **THE COURT:**  And frankly, I would rather figure it

4    out on the front end than I would on the back end.

5              **MS. deVRIES:**  Well, we would take --

6              **THE COURT:**  And it may be that you have some of this

7    and you don't have others.  I don't know.

8              **MR. KESSLER:**  Okay.

9              **THE COURT:**  But we are going to do the hard work

10   now --

11             **MR. KESSLER:**  Right.

12             **THE COURT:**  -- rather than later.

13             **MR. KESSLER:**  Right.

14             **MS. deVRIES:**  Great.

15             **MR. KESSLER:**  And we'll help you do whatever you

16   need us to do with regard to that.  But I do want to say that

17   what the defendant's saying is that no matter how we specify

18   the nature of the right that we know exists here, and that

19   we've alleged, perhaps not as well articulated as we should,

20   they're saying that we don't have a claim at all, no matter how

21   we frame it on this, and that's what we're arguing.  We are

22   certainly well prepared to address that issue.

23             **THE COURT:**  And I understand that argument.  There

24   are multiple layers here.

25             All right, a response.  Anything to say?

1    **MS. WIDEN:**  No, your Honor, I don't think so, not at

2    this time.  I mean, I think that you asked whether or not --

3    you know, what our case was that said that prevented this claim

4    legally, it's *Ward*, and that is the answer to that; and the

5    fact that there is no case in the Ninth Circuit that allows for

6    this specific type or has recognized an intimate association

7    claim between siblings, or a liberty interest that exists

8    between siblings as to that claim, and it's our argument that

9    the fact that the Court found in *Ward* that there is no

10   liberty -- protected liberty interests under the Fourteenth

11   Amendment would apply equally to a First Amendment claim,

12   because the interest -- the liberty interest is identical under

13   both, and we cited in our papers to that proposition the

14   *Trujillo* case, which was out of the Tenth Circuit, 1985 --

15            **THE COURT:**  It's pronounced, "tru-HEE-oh."

16            **MS. WIDEN:**  *Trujillo*.

17            **THE COURT:**  *Trujillo*.

18            **MS. WIDEN:**  *Trujillo* case.

19            **THE COURT:**  T-R-U-J-I-L-L-O.

20            **MS. WIDEN:**  The cite on that is 768 F.2d 1186, and

21   under that case, the Court considered a Fourteenth Amendment

22   intimate association claim alongside a First Amendment intimate

23   association claim, and treated them identically, and found that

24   the claims did not -- were not recognizable (sic), and these

25   involved a mother and siblings.

1          **THE COURT:**  I thought *Trujillo* held that a sibling's

2     relationship clearly falls within the protected range

3     established by *Roberts*.

4          **MS. WIDEN:**  True.

5          **THE COURT:**  *Trujillo*, jump cite 1189.

6          **MS. WIDEN:**  Then I may be mis-citing that if -- it

7     was my understanding in *Trujillo* they held that there was no

8     cognizable violation of any constitutional right, and treated

9     the liberty interest the same.

10          I could be wrong about that.  They could have found

11    that there was a right in the Tenth Circuit, but that I think

12    the fact that they treated them identically was what I was

13    pointing out in that case, and then in the Ninth Circuit, they

14    handle it differently than the Tenth Circuit.  In the Ninth

15    Circuit, in *Ward*, there is no right under the Fourteenth

16    Amendment.

17          **THE COURT:**  Response.

18          **MR. KESSLER:**  Your Honor, I'm going to say, on the

19    cause of action we're looking at right now, we do cite

20    specifically, on paragraph 87, the well-established and

21    ingrained right of siblings to be -- and their relationship to

22    be protected, that with numerous laws, in both state and

23    federal law, that are cited throughout our -- cited in this

24    section but also incorporated in paragraph 15, 16, 54 and 55 of

25    our Complaint, all of which cite the protections that are

1    guaranteed and afforded to foster care children in foster

2    homes, by the state.

3          THE COURT:  Claims for qualified immunity

4    potentially rise and fall with -- or at least, I have to

5    certainly know the answer on one, two and three before getting

6    to qualified immunity, right?  Do you agree?

7          MS. WIDEN:  I would agree with that, your Honor.  If

8    there's no constitutional violation, then there would be no

9    need to address qualified immunity, or put another way, the

10   first prong of the analysis is whether or not there was a

11   constitutional violation stated.

12         THE COURT:  Injunctive relief.  This isn't being

13   currently brought as a class action.  So what injunctive

14   relief, relative to the specific plaintiff, can I be dealing

15   with?

16         MR. KESSLER:  Well, the child is currently still a

17   foster child.

18         THE COURT:  I thought he's out of the house, and his

19   guardian *ad litem* is the person bridging the lawsuit.

20         MR. KESSLER:  That's correct.

21         THE COURT:  So what would I be enjoining the County

22   to do relative to him, given that it is not currently being

23   brought as a class action?

24         MR. KESSLER:  Two things.  First, at any moment, the

25   County can, by its own discretion, decide that they want to

1    remove him and place him into another home, with whatever

2    justification they could come up with, and then --

3              THE COURT:  With respect to that, I think in terms

4    of the Complaint, you have to actually allege that you have

5    indications of a changed circumstance.

6              MR. KESSLER:  No, what I'm trying to emphasize is

7    the County system has the power to take such action.  I'm not

8    trying to say that that is, indeed, what -- it's the next point

9    I want to get to that really, I think, addresses the Court's

10   question, and that is, he still has ongoing harm that he's

11   addressing by virtue of trauma he suffered as a result of

12   what's alleged in this Complaint.

13             The County are the ones that are in charge of his

14   care, the provisions of services he gets or doesn't get, when

15   he gets them, and to what extent the prospective adoptive

16   parent can be supported in addressing those needs along the

17   way.  Those are all ongoing concerns.  They're all tied and

18   connected and completely intertwined with the event that caused

19   this problem in the first place, leading to this lawsuit.

20             THE COURT:  And where -- let's see.  Let me look at

21   your allegations in that regard.

22             MR. KESSLER:  Well, in paragraph 73, I certainly

23   allege that there's extreme emotional trauma.

24             THE COURT:  I'm looking at your Seventh Cause of

25   Action.

1      **MR. KESSLER:**  Oh, I'm sorry.  Excuse me.

2      **THE COURT:**  At 114.

3      **MR. KESSLER:**  All right.  So it's stated quite

4  clearly in 118 through 120.

5      **THE COURT:**  Well, 117 says, a failure to respond and

6  investigate neglect or abuse of reports and referrals, and 118

7  says that's going to continue.  120 talks about training.  So

8  what you articulated, it's not clear that it's in the

9  Complaint.

10      **MR. KESSLER:**  I could give an example.

11      **THE COURT:**  I understand what you're saying.  I'm

12  just not sure it's in your Complaint.

13      **MR. KESSLER:**  Well, I mean, an example that it falls

14  within the parameters of this Complaint is that if it's a

15  potential adoptive parent is seeking help from the County, who

16  is the one who is provider of the care and authorizing such

17  care, and want certain services to happen, want some support to

18  be in place, wants an evaluation or something to happen, and

19  the County refuses or delays in it to the detriment of child,

20  and that's part of the duties that they are -- that they are,

21  in my mind, not only obligated to do, but I think there's a

22  risk that they will continue to fail to do.

23      **THE COURT:**  In paragraph 82 of your Complaint, why

24  do you have "and his sister" in brackets, in paren, given that

25  you claim that you're not asserting any claims derivatively?

1    **MS. deVRIES:**  It's a factual statement, your Honor.

2    **MR. KESSLER:**  It has no more meaning than to

3    emphasize that they were together, they were going through this

4    together, they were being treated together.  There's a lot of

5    siblings, your Honor, that one is placed in foster care, the

6    other may be with a relative or remain with a parent, or they

7    may be placed separately.  These children were together from

8    the jump, and that's --

9    **THE COURT:**  So it's somewhat superfluous.  There's

10   no --

11   **MR. KESSLER:**  It's factually but not legally

12   significant.

13   **THE COURT:**  Okay.  Have each of the individual

14   defendants answered the Complaint?

15   **MS. deVRIES:**  No, your Honor.  No, the individuals

16   and the County has not.  They filed this motion.

17   **THE COURT:**  No, I said, the individual defendants

18   I thought I had --

19   **MR. KESSLER:**  -- any of the individuals.

20             (Simultaneous colloquy.)

21   **THE COURT:**  I thought I had --

22   **MR. KESSLER:**  Yeah, Ms. Morgan --

23   **MS. deVRIES:**  Ms. Morgan has responded, your Honor.

24   **MR. KESSLER:**  Yeah.  One, is the answer.

25   **THE COURT:**  What about Maas?

1          **MS. WIDEN:**  Yes, your Honor, the two County

2    employees, Maas and May, are also parties to the present motion

3    to dismiss and have asserted qualified immunity.  So they

4    responded by virtue of the motion to dismiss, but no answers

5    have been filed on their behalf yet.

6          **THE COURT:**  Triad Family Services?

7          **MS. deVRIES:**  Yes, they answered.

8          **THE COURT:**  They answered?  Moore has answered?

9          **MS. deVRIES:**  Yes, your Honor.

10         **THE COURT:**  Okay, I'll give you a trial schedule.

11         **MS. deVRIES:**  Thank you, your Honor.

12         **THE COURT:**  Other counsel can come up, if you want

13   to be heard on this.  Spread out.  No one's going to bite in

14   this courtroom.

15         Okay.  I doubt that this motion to dismiss is going

16   to succeed, at least in some measure, so don't sit on your

17   heels.  How much discovery do you think you're going to need in

18   this case?

19         **MS. deVRIES:**  We've already conveyed that we're

20   ready to start taking depositions.  It's my understanding that

21   defense counsel needs to go to state court to do an 827 motion

22   under the California Welfare and Institutions Code to get

23   access to some records.  I understand there's some press that's

24   already done that, so I'm not sure if they've started the

25   process yet.

1    **MS. WIDEN:**  That's true, your Honor.  We do need to

2    start the 827 process in order to be able to --

3              **THE COURT:**  So I don't practice in that area.  827

4    is what?

5              **MS. WIDEN:**  It's under Welfare and Institutions Code

6    827.  All juvenile case file records, including CPS records,

7    are confidential, and if they -- it's a crime to disclose them

8    without obtaining an order from the juvenile court.

9              **THE COURT:**  Okay.

10             **MS. WIDEN:**  So it's a petition that has to be filed.

11   My experience is that different courts handle the process very

12   differently.

13             **THE COURT:**  It's here, in Alameda County?

14             **MS. WIDEN:**  Well, I think in this case we'll need

15   Alameda County as well as San Joaquin County.  I've had

16   different experiences in Alameda County Superior Court

17   depending on what the -- which judge -- well, it depends on

18   which judge gets assigned to handle it, but sometimes they'll

19   order up the entire file and review it themselves and redact

20   and do all of that.  Other times, they'll have County Counsel

21   do it.  I've had it different ways, but it usually takes a

22   little while.  In this case --

23             **THE COURT:**  I don't know what "a little while"

24   means.

25             **MR. KESSLER:**  I can maybe help everybody.

1    **MS. WIDEN:**  Yeah, I've had it take up to a year,

2    but --

3           **THE COURT:**  Oh, it will not take up to a year, if

4    I have to get on the phone myself.

5           **MS. WIDEN:**  In this case, there have been previous

6    petitions filed by other parties.  So I suspect that they will

7    have the records already gathered, and that's half of the

8    battle.  So I think it probably wouldn't take as long in this

9    case.

10          **MR. KESSLER:**  I have gone through that process, and

11   I have gone through back-and-forth hearings to have files

12   disclosed, redacted and approved by the Court, and ultimately,

13   I have what I believe now is a complete set of materials, that

14   I am unfortunately unable to disseminate by the law cited, but

15   I believe an easy mechanism to facilitate this would be if this

16   Court -- if we could come up with a protective order, and then

17   the parties can attach that protective order to a request to

18   the juvenile court, and I could tell them the specific judge

19   who went through the process with me, and that judge would

20   likely then approve a disclosure of what was provided to me, or

21   allow me to disclose to the other parties what I have, and I'd

22   be happy to do so.

23          **MS. deVRIES:**  And we've met and conferred on this,

24   your Honor, in advance of the previous CMC that was scheduled

25   by this Court.  That's why I wasn't sure if anything had

1  happened yet on defendants' end.

2      **THE COURT:**  That sounds like a good process.  I was

3  an Alameda County Superior Court Judge.  I know all the

4  judges -- not all of them, most of them.  If you have any

5  issue, you call me, and I will make a phone call.

6      **MS. deVRIES:**  Thank you, your Honor.

7      **THE COURT:**  They are very busy, but they can

8  prioritize things, especially if they get a phone call.

9      All right, so back to my original question:  How

10  much time do you need for discovery?  Once that process

11  happens, you've got -- you know, this isn't like we don't know

12  who the people are.  There are a known number of depositions.

13  I don't know what discovery you need to do, and in terms of any

14  *Monell* claims, you'll obviously get a order from me telling you

15  what's left, all or some, and then we'll move from there.

16      But how much time do you think you need?

17      **MR. ENABNIT:**  So your Honor, for Triad, I would

18  anticipate that for non-expert depositions, I would anticipate

19  perhaps, ten, twelve tops, some law enforcement, San Joaquin,

20  CPS people, the parties, and I would anticipate eight months or

21  so for that process.

22      **MS. deVRIES:**  If they move along on the 827 process,

23  that sounds about right.  My concern is only that we get

24  started sooner rather than later.  I really appreciated your

25  Honor's advance of the CMC date to have it on the same day,

1  today.

2          **THE COURT:**  So eight months would be middle of

3  October.  Does everybody agree that's enough time?

4          **MS. LANDESS:**  Well, your Honor, if I may, Elizabeth

5  Landess for Ms. Moore.

6          I think the issue is, we can't -- especially with

7  the County employees, none of them can be deposed until all the

8  827 procedures are in place.  I'm dealing with another case

9  right now in San Mateo County where we have the same issue,

10 and --

11         **THE COURT:**  I don't know the judges there, can't

12 help you.

13         **MS. LANDESS:**  That's too bad, your Honor, thank you,

14 but all those -- all of those depositions were basically sort

15 of held in abeyance, to a great degree, because they had those

16 proscriptions about disclosing all this confidential

17 information.

18         **THE COURT:**  Well, but I rarely am not here.  If we

19 have to adjust, we have to adjust.  We can do that.

20         So other concerns about eight months?

21         **MS. WIDEN:**  My preference would be for 12 months, to

22 give us a little bit more of a cushion but, you know, I guess

23 we could say eight months and come back if we have to.

24         **MR. KESSLER:**  Well, the delay won't be from our end,

25 because we're ready.

```
1          THE COURT:  Counsel?

2          MR. ZINOVYEV:  Eugene Zynovyev.  I'm co-counsel with

3    Ms. Landess.

4          THE COURT:  Okay, that's fine.  Typically, you

5    should know, I only allow one attorney to talk, but given how

6    you described your relationship with this case, I allowed both

7    of you to argue.  It's not typically what I do.  All right?

8          MS. deVRIES:  Yes.

9          MR. KESSLER:  Thank you.

10         THE COURT:  Okay.  Let's -- well, let me ask a few

11   more questions.  All right, so once your non-expert discovery

12   is concluded, what are you thinking, in terms of expert

13   discovery, how much are you going to need?

14         What I would typically do is require simultaneous

15   opening reports, then rebuttal reports, and then depositions.

16   That's typically how I do things.

17         So how much time, after the close of expert --

18   non-expert discovery, before you -- you know, before you can

19   get your experts' reports out, and what are you thinking in

20   terms of what kind of experts you're going to have?

21         MR. ENABNIT:  Your Honor, again, Ron Enabnit for

22   Triad.  I have not spoken with any of the counsel, but this is

23   a case which seems to lend itself to a psychiatric exam of

24   J.P., since that's the party who's --

25         THE COURT:  I think that's probably right, and --
```

1          **MS. deVRIES:**  Your Honor, one for all the defendants

2     or...?

3          **THE COURT:**  Well, look.  How old is he now?

4          **MS. deVRIES:**  He's five -- oh, is he six?

5          **MR. KESSLER:**  Seven now.

6          **MS. deVRIES:**  Seven.  Just had a birthday.

7          **THE COURT:**  He's seven years old.  You are all

8     ordered to meet and confer, and make sure that to the extent

9     that he is being subjected to tests and/or expert analysis,

10    that we are doing it in the most humane way possible.  I will

11    come down hard on anyone who I think is not doing that.

12         **MS. deVRIES:**  Thank you, your Honor.

13         **THE COURT:**  So my hope is that you can all agree on

14    someone who you all believe is a good expert, and have one

15    expert, rather than having him subjected to multiple experts.

16         I mean, you know, I am typically a little jaded with

17    experts because, you know, they're the hired guns, for whatever

18    side.  But perhaps we can find someone who everybody agrees on

19    and who is the consummate professional to provide an opinion.

20    I don't know.  That would be my hope.

21         **MS. WIDEN:**  It seems to me that this is a case where

22    the defense could share an expert on that, yeah.

23         **MR. ENABNIT:**  I don't anticipate a problem, your

24    Honor.  Ronald Enabnit.

25         **THE COURT:**  So, psychiatrist, what else?

1        **MR. KESSLER:**  There may be an expert social worker;

2    I'd say likely will be.

3        **MR. ENABNIT:**  For the defense, as well.

4        **MS. WIDEN:**  Yes.

5        **MS. LANDESS:**  Probably a toxicologist.

6        **MR. KESSLER:**  Yes.

7        **THE COURT:**  Okay, so half a dozen or so.  All right,

8    so 30 days after close of non-expert discovery --

9        **MS. WIDEN:**  To exchange expert reports?

10        **THE COURT:**  -- to exchange reports.

11        **MS. WIDEN:**  That's fine.

12        **THE COURT:**  And then what I would typically do is 15

13    days for rebuttal.  Does that work?

14        **MS. deVRIES:**  Depending on the holidays, your Honor,

15    if we just might be a little sensitive to that.

16        **THE COURT:**  I just want to know -- I'm totally aware

17    of the holidays.  That's why I'm trying to figure out what my

18    time intervals are.  Typically, I would do 15 days.  Yes?  And

19    then, if you're looking at a dozen depositions, then probably

20    need 21 days, to the close.

21        Okay, so in terms of summary judgment, to the extent

22    that summary judgment is brought, are you going to need expert

23    discovery?  I mean, it seems to me that in 1983 cases, summary

24    judgments brought on qualified immunity, perhaps, sometimes

25    defendants try to get summary judgment, but I find it hard to

```
 1   believe that we're going to end up, after discovery, with

 2   undisputed material facts.  I don't know.

 3            MR. ENABNIT:  On some claims, perhaps, your Honor,

 4   but Triad does anticipate bringing them on the issue of whether

 5   it's a state actor, among other issues.

 6            THE COURT:  Well, you don't need expert discovery

 7   for that.

 8            MR. ENABNIT:  I do not.

 9            THE COURT:  Have you ever been found to be a state

10   actor in a 1983?

11            MR. ENABNIT:  Not to my knowledge, your Honor.

12            THE COURT:  Have you ever -- has it ever been

13   litigated?

14            MR. ENABNIT:  I've researched the issue and I've not

15   found a case that stands for the proposition that a foster

16   family agency has been held to be a state actor for purposes of

17   1983.

18            THE COURT:  But is the opposite true?  Has it been

19   litigated where someone has found the agency not to be a state

20   actor?

21            MR. ENABNIT:  I'm not aware of a case either way,

22   your Honor.

23            THE COURT:  Are you?

24            MS. deVRIES:  I'm aware of a case that held that it

25   was not a state actor based on the particular facts of that
```

```
1    case, which we will be able to distinguish in this case.
2              THE COURT:  Okay, so you don't need expert discovery
3    for that.
4              MR. ENABNIT:  Correct.
5              THE COURT:  All right.  Any other thoughts with
6    respect to dispositive motions?  Are you going to need expert
7    discovery?
8              One of the reasons I ask the question is because
9    sometimes I will give you a schedule that allows you to bring
10   those motions before expert expenses are incurred.  That way,
11   you don't incur the expenses on either side unnecessarily.
12             MR. ENABNIT:  That would be Triad's preference, your
13   Honor.
14             THE COURT:  How about the other defendants, are you
15   going to need expert discovery?
16             MS. LANDESS:  Well, it's -- at this point, it's a
17   little bit difficult to -- since we have very little
18   information on the medical records, et cetera, I find it hard
19   to, at this point, conceive of something like that, but I guess
20   it's always possible.  I guess it's -- perhaps we could, if
21   it's something we could revisit at a later date, if --
22             THE COURT:  Well, you can ask for leave to be
23   relieved from the schedule.  We're doing the best we can, and
24   you're going to get a schedule.
25             MS. LANDESS:  Certainly.
```

1        **MS. WIDEN:**  I don't anticipate needing expert

2  testimony to support a motion for summary judgment at this

3  time, but again, there is a lot out there that we don't know

4  about this case yet, so....

5        **THE COURT:**  All right.  Well, let's do it this way,

6  then.  Non-expert discovery to close October 31st.  Summary

7  judgment motions to be filed no later than November 13th.

8        Then your expert reports, I'll have those disclosed

9  January 18th.  Opposition, February 15th.  Close of expert

10  discovery, March 7th.

11        **MS. deVRIES:**  Your Honor, if there are going to be

12  three motions for summary judgment, which may be the situation,

13  would the Court entertain a longer period for us to oppose them

14  than the two weeks, over the holiday?

15        **THE COURT:**  We'll talk about summary judgment in a

16  minute.

17        **MS. deVRIES:**  Thank you.

18        **THE COURT:**  The way my trials work, you have to

19  exchange exhibits about 28 days -- about two months before your

20  trial, because of everything that I require in terms of filing.

21  It seems to me, if this case is going to trial, you're going to

22  know it during the expert period; you can be double-tracking.

23        I can give you a trial date, let's say, April 29th.

24  Does that work?

25        **MR. ENABNIT:**  If I could just have one moment, your

1   Honor?

2           **MS. deVRIES:**  Fine for plaintiff, thank you.

3           **MS. LANDESS:**  Fine for defendant Moore, your Honor.

4           **MS. WIDEN:**  Fine for the County defendants, your

5   Honor.

6           **MR. ENABNIT:**  And for Triad, as well, your Honor.

7           **THE COURT:**  Okay, so April 29th.  That means your

8   pretrial conference will be April 12th.  You'll be placed on a

9   compliance calendar, or -- I'm sorry.

10          Your pretrial statements, then, are due -- and

11  you'll get a long order with all these dates -- March 29th.

12  Then you'll be placed on a compliance calendar for March 22nd.

13          I don't expect to see you here on that date.  What

14  I will expect is that five days prior, five business days

15  prior, you will file a joint submission that says, Judge, we've

16  looked at your standing order, we are complying, everything is

17  working, we have no issues.

18          **MS. deVRIES:**  Okay.

19          **THE COURT:**  Because there are lots of things that

20  have to happen in order to meet my filing deadlines.  If things

21  are not working, that is when I want to know.  That's why I put

22  you on a compliance calendar.  I don't want to find out weeks

23  later.  So I want to intervene early.  Okay?  That's the point

24  of that, in terms of dispositive motions.

25          **MR. KESSLER:**  Your Honor, just for clarity,

1   March 22nd is the date that we have to have it submitted to

2   you, or is that the date that we would come here if it's an

3   issue?

4             THE COURT:  It's on the calendar for the 22nd, and

5   this is a routine thing that I do, so you may see it multiple

6   times.  All that typically means is I've got it on my calendar.

7   So it's a Friday, at 9:01 a.m.  The prior Friday, you have to

8   do your filing.

9             MR. KESSLER:  Okay.

10            THE COURT:  And then I take it off calendar, if

11  everything works.

12            MR. KESSLER:  Okay, got it.

13            THE COURT:  If it doesn't, then I've got you on my

14  calendar.  But this is just a mechanism that I use to make sure

15  things happen.

16            MR. KESSLER:  Okay.

17            THE COURT:  Okay?  Dispositive motions.  I use a

18  process that's routinely used in the Southern District of New

19  York.  It is not routinely used in this district, and that is,

20  before you can file a motion for summary judgment, you must

21  come and have a conference with me.  This process is laid out

22  in my standing order.  Make sure to read it.

23            In general, whoever wants to bring a motion files an

24  executive summary, three pages, tells me what they want to do,

25  what the basis of the motion is, and give me some law.

1          The other side has to respond promptly, in three

2     days.  I get you on my calendar the following week, typically.

3     Wednesdays and Fridays are when I do not have standing

4     calendars, so I will try to fit you on in on one of those days,

5     and then we have a discussion about your motion before you file

6     it.

7          It is at that time that I figure out how most

8     effectively to do the briefing.  If I have cross-motions, what

9     we're going to do, if I have joint motions, what we're going to

10    do, how to make this as most -- as efficient as possible.

11         So the date that I gave you is the last day that you

12    can file.  Now, you need to make sure that you've come in in

13    advance, so that you can make your filing deadline.

14         In addition, you know, for something like what

15    you're suggesting, I don't know why you necessarily wait, if

16    you think -- now, you only get one motion, so maybe that's the

17    reason you wait; because once you use it, you don't get it

18    again.

19         So that could be a reason why you wait, and it gives

20    me an opportunity to kind of preview your motion.  Sometimes,

21    in some cases, plaintiff brings, let's say, 10 causes of

22    action.  By the time discovery closes, you really only have six

23    good ones.

24         This process has frequently ended up where the

25    plaintiff says, yeah, we agree, we're going to dismiss four.

```
 1    We do that with no motion work, which is not typically allowed
 2    under the Federal Rules.
 3            And there have been times when I really pushed on
 4    people about, you know, about bringing their motion, sometimes
 5    the clients require it, and in many ways, I feel like this
 6    gives the attorneys cover when I tell them, okay, you go back
 7    and tell your client, a three-page denial after you spend
 8    $80,000 on this motion, or a couple hundred thousand dollars,
 9    depending on how the big the case is.
10            If I'm trying a case, I don't make findings of fact.
11    I don't write big orders denying motions for summary judgment.
12    I am not interested in getting painted into any corner.
13            So in any event, we have a discussion.  I can't stop
14    you from filing motions, but I can have a discussion with you
15    about the motion.
16            Questions on the process?
17            Okay.  With respect to amendment of pleadings, I'll
18    decide that in the context of the 12(b)(6) motion.  At some
19    point, you're going to have to go to ADR, because I require all
20    of my cases to go to ADR, assuming it's not thrown out.
21            What do you want to do, on that front?
22            MS. deVRIES:  We've met and conferred, and in the
23    joint CMC we filed, we've agreed to go to a magistrate judge,
24    and I believe we've elected Judge Beeler, but plaintiff is open
25    to any judge that would be appropriate for this case.
```

1      THE COURT:  Yes?

2      MS. WIDEN:  Yes, that's true.  We have met and

3  conferred, and would support that referral to Judge Beeler, if

4  possible.

5      THE COURT:  How much discovery do you need before

6  meeting with her, do you think?  That is, when in this process

7  that we've laid out do you want to meet with Judge Beeler?

8      MR. ENABNIT:  From Triad's perspective, I don't

9  think we have to do any depositions before we proceed with ADR.

10  That may be a minority opinion, but....

11      THE COURT:  Well, I will give her a heads-up that it

12  is coming her way.  I don't know if she has time, if she can

13  have it early discussion with you.  Judge Beeler is very good

14  about keeping cases.  So why don't I say 90 days, and then she

15  can ask me to continue that.  I trust her judgment.

16      I will see you again, say, the late summer.  So you

17  just check in.  July 30th, is everybody going to be around?

18      MS. LANDESS:  Sure.  Why not?

19      MR. ENABNIT:  Yes, your Honor.

20      MS. LANDESS:  That's fine, your Honor.

21      MS. WIDEN:  Yes, your Honor.

22      THE COURT:  Any vacation plans?

23      MR. KESSLER:  We might have a problem here.

24      MS. deVRIES:  Would your Honor be comfortable if one

25  of plaintiff's counsel came, if there were scheduling issues?

1          **THE COURT:**  That's fine, or I can -- I mean, this an

2     arbitrary date.  I can move it a week, if that matters.

3          **MR. KESSLER:**  How about the week of the 9th, your

4     Honor?

5          **THE COURT:**  So it's on a Monday.  Give me a proposal

6     for Monday.

7          **MS. deVRIES:**  Did you say the 29th, your Honor,

8     July?

9          **THE COURT:**  July 30th is the Monday.

10         **MS. LANDESS:**  Your Honor, could we push that out one

11    week?  I'm scheduled to start a trial in San Mateo County that

12    week, a fish fork (phonetic) trial.

13         **THE COURT:**  August 6th.

14         **MR. ENABNIT:**  Your Honor, the first half of August

15    is -- I'll be on vacation, very, very probably.

16         **MS. deVRIES:**  Perhaps the last week of August, your

17    Honor?

18         **THE COURT:**  August 27th?

19         **MR. ENABNIT:**  Yes, your Honor.

20         **MS. deVRIES:**  Yes, your Honor.

21         **MR. KESSLER:**  That's fine.

22         **THE COURT:**  All right, August 27th.  Just a

23    reminder, our rules require that you file case management

24    statements.  I do read them in advance, typically.

25              With you, I was primarily looking at the 12(b)(6).

```
1    So I want an update.  If there's no reason to talk to you, then
2    I will take it off calendar and I'll issue an order saying that
3    I am taking it off calendar.
4               MS. LANDESS:  A joint statement, your Honor?
5               THE COURT:  Right.  So local rules require, anytime
6    there's a case management conference, our rules require a joint
7    statement.
8               MR. KESSLER:  And is this at 2:00 o'clock, as well?
9               THE COURT:  2:00 o'clock on Monday.  Trial day goes
10   until 1:30, my standing calendars start at 2:00.
11              Okay, anything else?
12              MR. ENABNIT:  Your Honor, Triad possesses foster
13   family records pertaining to both the plaintiff and his sister.
14   Some of the records there are probably subject to the
15   protections of an 827 petition.
16              Assuming that we can reach an appropriate
17   confidentiality proposal and order, then I would produce those
18   without the need of getting the approval of the Superior Court
19   judge in Alameda.
20              MR. KESSLER:  Okay.
21              MS. deVRIES:  Your Honor, on other cases I've
22   handled with foster children issues, like this one, we've had a
23   protective order from the Ninth Circuit, and that has been
24   sufficient for some defendants.  I don't know if that gives you
25   have any pause to --
```

1          **MR. ENABNIT:**  Yes.

2          **MS. deVRIES:**  -- to consider that.

3          **THE COURT:**  So if -- you know, I'm happy to enter

4     the protective order if that helps expedite matters, and so you

5     just --

6          **MS. deVRIES:**  So the Model Ninth Circuit?

7          **MS. WIDEN:**  Yeah, typically the model protective

8     order is what I'd like to submit, and then I find that once

9     that's been entered, if we then go to the juvenile court and

10    say we have a protective order already in place in the federal

11    litigation, that that usually helps to get what we need from

12    the --

13         **THE COURT:**  Okay.  So just get it to me.  You use

14    the standard one.  Just make sure that you change the discovery

15    portion of it to comply with my standing order.  That's the

16    primary thing that people mess up, and they also tend to mess

17    up my name.  So Gonzalez has two Zs and Rogers does not have a

18    D, and the combination of Gonzalez-Rogers is not Rodriguez.

19    Believe it or not.  (Laughter.)

20         **MS. deVRIES:**  I apologize for that, your Honor.

21    Thank you for telling me.

22         **THE COURT:**  My clerk says that we are not complying

23    with the Federal Rules in terms of the minor.  It may be

24    opposite the State rule.

25         **MS. WIDEN:**  I think it does require initials,

1    actually.

2              **THE COURT:**  So, according to 5.2, only a minor's

3    initials may be used.  So from here on out, everything needs to

4    read J.P., and unless there is an objection, I will order the

5    transcript in this case to be revised, the name that has been

6    used, to J.P.  Any objection?

7              **MR. KESSLER:**  No.

8              **MS. deVRIES:**  No, your Honor.

9              **MS. LANDESS:**  No, your Honor.

10             **MS. WIDEN:**  No objection.  I would indicate that the

11   other minor that's his sister has also been referred to by her

12   first name, so maybe she should "M."

13             **MS. deVRIES:**  Or M.M.

14             **THE COURT:**  Okay, J.P., M.M., M.

15             **MR. KESSLER:**  While I don't object to that, she is

16   deceased, and so I think the protections that the law affords

17   I don't think necessarily apply to her at this point.

18             **THE COURT:**  I haven't researched it, but I -- you

19   know.

20             **MR. KESSLER:**  Okay.

21             **THE COURT:**  The other problem is the Complaint is in

22   violation.

23             **MS. deVRIES:**  Your Honor, I'd be happy to file

24   either an amended complaint or a new version of the Complaint,

25   whatever your Honor would prefer.

1          **THE COURT:**  So I am going to seal this one.

2     Everyone has it.  It shall be sealed.  It also violates it by

3     including his birth date.  To the extent that if I deny the

4     motion, I will still instruct you to re-file the Complaint, in

5     compliance with 5.2.

6          **MS. deVRIES:**  I apologize, your Honor.  I'd be sure

7     to do that.

8          **THE COURT:**  And make sure that if that's where

9     I come out, you don't use it as an opportunity to change

10    anything else.

11         **MR. KESSLER:**  Nothing will change.

12         **THE COURT:**  I'm saying that explicitly, because I've

13    had parties say, "Yeah, but we just clarified it," and then the

14    other side yells and screams because, you know, it's different.

15         **MR. KESSLER:**  Right.

16         **THE COURT:**  So let's make sure we're in compliance.

17         **MS. WIDEN:**  Your Honor, the motion papers, I would

18    point out, also contain -- they kind of repeated what was in

19    the Complaint, so they also contained the minors' names.  They

20    might --

21         **THE COURT:**  All right, so --

22         **MS. WIDEN:**  Both the motion, the opposition and the

23    reply brief.

24         **THE COURT:**  All right, all of them are sealed.  If

25    I grant the motion, you will have to re-file them in a redacted

1    manner, so that -- because this is a public proceeding.

2              MS. LANDESS:  Unfortunately, your Honor, I think

3    everybody filed something with that name on it.  I believe our

4    Answer just repeats the same caption.  So I think we're all

5    going to have that issue --

6              THE COURT:  But does your Answer do anything other

7    than have the caption?

8              MS. LANDESS:  I apologize, I don't have it here with

9    me.  I'm uncertain about that.  We can certainly take a look at

10   it.

11             MR. ENABNIT:  And on behalf of Triad, I just don't

12   remember off the top of my head.

13             THE COURT:  So I see the decedent's name, and then

14   obviously, the caption.  So what I would ask you to do is --

15   I will seal the Answers, as well.

16             What I'm going to ask you to do is go back and check

17   your documents, and send your revised version with a red line

18   to the other side, or to all parties, and try to get a

19   stipulation -- and then get a stipulation that says, you know,

20   the parties stipulate that the attached document can be filed.

21   Let me approve the stipulation, and then file the good one,

22   okay?  But in the meantime, let's just seal the Answers, as

23   well --

24             MS. WIDEN:  Thank you, your Honor.

25             THE COURT:  -- so we can get it cleaned up, okay?

1        **MR. KESSLER:**  Should we do that right away, or...?

2        **THE COURT:**  We're going to seal them today.  So

3    I would wait on the Complaint --

4        **MR. KESSLER:**  Okay.

5        **THE COURT:**  -- until I rule on the 12(b)(6).

6        **MR. KESSLER:**  Okay.

7        **THE COURT:**  The Answers, though, I think can be

8    dealt with.

9        **MS. LANDESS:**  Thank you, your Honor.

10       **MS. WIDEN:**  What about the motion papers?

11       **THE COURT:**  I'm going to seal them all right now.

12   Let me deal with the motion to dismiss, and then I'll put what

13   to do in the order.

14       **MS. WIDEN:**  Thank you, your Honor.

15       **THE COURT:**  All right.

16       **MS. deVRIES:**  Ms. Widen, are you going to be doing

17   the protective order?

18       **MS. WIDEN:**  I can circulate it, sure.

19       **THE COURT:**  Anything else to deal with today?

20       **MR. KESSLER:**  No, I think we're good.

21       **THE COURT:**  No?

22       **MR. ENABNIT:**  Nothing.

23       **MS. LANDESS:**  Thank you, your Honor.

24       **THE COURT:**  Have a good day.

25       **MS. WIDEN:**  Thank you.

1          **MS. deVRIES:**  Thank you, your Honor.

2                                                    <u>3:58 p.m.</u>

3                          ---o0o---

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **CERTIFICATE OF REPORTER**

I, LEO T. MANKIEWICZ, a pro tem reporter in the United States Court, Northern District of California, and Certified Shorthand Reporter duly licensed in the State of California, hereby certify that the foregoing proceedings in Case No. 4:17-cv-05679-YGR,  J.P., et al. v. County of Alameda, et al., were reported by me, and were thereafter transcribed under my direction into typewriting; that the foregoing is a true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

Leo T. Mankiewicz, CSR 5297, RMR, CRR

Wednesday, March 14, 2018