Darren J. Kessler, SBN 114986
**KESSLER LAW OFFICE**
3060 El Cerrito Plaza, Suite 371
El Cerrito, CA 94530
Tel: 510-524-7750
E-mail: darren.j.kessler@gmail.com

John Houston Scott, SBN 72578
Lizabeth N. de Vries, SBN 227215
**SCOTT LAW FIRM**
1388 Sutter Street, Suite 715
San Francisco, CA 94109
Tel: (415) 561-9603
Fax: (415) 561-9609
E-mail: john@scottlawfirm.net
liza@scottlawfirm.net

Attorneys for Plaintiff

[REDACTED VERSION]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| J.P., by and through his Guardian Ad Litem, SHANNON VILLANUEVA<br><br>    Plaintiff,<br>v.<br><br>COUNTY OF ALAMEDA, DIANE DAVIS MAAS, SUE MAY, TRIAD FAMILY SERVICES, MARIA REFUGIO MOORE, and DOES 1-30, inclusive.<br><br>    Defendants. | Case No: 4:17-cv-05679-YGR<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT TRIAD'S SEPARATE STATEMENT OF MATERIAL FACTS TO MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, AND ADDITIONAL FACTS**<br><br>*REDACTED VERSION*<br><br>*An unredacted version is conditionally filed under seal.*<br><br>Date:<br>Time:         2:00 p.m.<br>Courtroom: 1, 4th Floor, 1301 Clay Street, Oakland, CA<br>Judge:        The Hon. Yvonne Gonzalez Rogers<br><br>Complaint Filed: October 2, 2017<br>Trial Date:           TBD |

Plaintiff J.P., by and through his Guardian Ad Litem, Shannon Villanueva ("J.P.") respectfully submits this opposition and additional separate statement of facts in support of his opposition to defendant Triad Family Services' motion for summary judgment, or in the alternative, partial summary judgment. To assist the Court, J.P. makes reference to exhibits simultaneously filed as follows. Exhibits identified by letter, i.e. Ex. A – Z, are attached to the declaration of Lizbeth N. de Vries. Exhibits relating to his Request for Judicial Notice ("J.P. RFJN") are identified by number, i.e., Ex. 1-3. Two other declarations are referenced, that of Amy Navarette and Shannon Villanueva, referred to by their last names only.

| Issue | Defendant's Undisputed Facts & Evidence | Plaintiff's Response & Evidence |
|---|---|---|
| Issue 1 | **Triad Fact 1.** In 2015 and at all other times relevant to plaintiff's First Amended complaint, Triad was a California nonprofit corporation, pursuant to Internal Revenue Code §501(c)(3) and California Government Code §§12586 and 12587.<br><br>Request for Judicial Notice (RJN) Exh. 2 [Triad Articles of Inc.]; Reagh Decl. of 2:13-15; Enabnit Decl., Exh. 1 [Reagh Depo 71:22-72:1-11, 95:11-17]. | Undisputed. |
| Issue 1 | **Triad Fact 2.** In 2015 and at all other times relevant to plaintiff's First Amended complaint, Triad was licensed by the State of California to act as a foster family agency and Triad contracted with counties, including Alameda County for placement of children in homes that certified by Triad. As a foster family agency, Triad was regulated by the State of California, pursuant to California Health & Safety Code §§1502,1506, 1530 and Cal. Code of Regulations, Title 22, Division 6, Chapter 8.6, §§88000 through 88087.<br><br>RJN Ex. 1 [Dkt. No. 55, Plaintiff's First Amended Complaint, 3:17-19, 6:9-21]; Enabnit Decl., Exh. 1 [Reagh Depo 71:22-72:10; 99:1-4]; Enabnit Decl., Exh. 2 [Nunn Depo 54:25-55-22]; and Reagh Decl. at 2:12-19 and 2:20-23. | Undisputed. |
| Issue 1 | **Triad Fact 3.** Foster Family Agencies, such as Triad, can contract with parents, without the involvement of county social service agencies, for the placement of children in foster homes certified by foster family agencies.<br><br>Enabnit Decl., Ex. 1 Reagh Dep 218:24-219:16. | Undisputed that a FFA could do this, however in 2015, Triad only worked with counties, not parents. Alameda represented over 50% of its income.<br><br>Bell Depo 41:14-20; 42:6-43:6 (**Ex. A**); Nunn Depo 54:25-55:1; 55:23-56:1 (**Ex. I**). |

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

| | | | |
|---|---|---|---|
| 1-9 | Issue 1 | **Triad Fact 4.** Triad certified the Maria Refugio Moore home on September 9, 2015, and Alameda County approved Maria Refugio Moore's home to receive placement of J.P. and M.M.<br><br>RJN, Exh. 1 [Dkt. No. 55, Plaintiff's First Amended Complaint ["FAC"], 6:22-24]; Enabnit Declaration, Exh. 2 (Nunn Deposition at 56:2-57:7 and 85:20-86:2 and Exh. H [Certificate of Approval]. | Disputed and undisputed. The County approved Moore's home after Triad certified and selected it as suitable. Against Triad's policy, this home was certified with an open CCL complaint against it. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓<br><br>Dupree Depo 26:4-15, 30:1-12, 79:24-82:9, 83:18-85:22 (**Ex. C**); Maas Depo 169:6-15 (**Ex. E**); May Depo 98:9-99:1 (**Ex. G**); Nunn Depo 85:20-86:6, 93:12-96:2 (**Ex. I**); Open Letters (**Ex. O**); CCL Docs, (**Ex. Z**) |
| 10-14 | Issue 1 | **Triad Fact 5.** On September 30, 2015, Alameda County involuntarily removed then five-year-old J.P. and his almost three-year-old sister M.M. from their mother's custody pursuant to Welfare & Institutions Code §§305 and/or 306, based upon an allegation of abuse and neglect while in the biological mother's home.<br><br>RJN, Exh. 1 [Dkt. No. 55, FAC at 5:9-13]. | Undisputed. |
| 15-18 | Issue 1 | **Triad Fact 6.** Sue May as Alameda County's "Placement Worker Representative" placed J.P. and M.M. in an out-of-county home through a contract between Alameda County and Triad. The Placement Agreement between Alameda County and Triad for M.M. and J.P. was signed on or about October 1, 2015.<br><br>RJN, Exh. 1 [Dkt. No. 55, FAC at 6:3-5]. | Disputed and undisputed. Sue May did not place J.P. & M.M. Niasha Dupree selected the home. The Agreements were not just for "placement"; they delineated and delegated tasks for each child while in foster care.<br><br>See Facts **14 & 15** |
| 19-22 | Issue 1 | **Triad Fact 7.** Alameda County had the ultimate responsibility and authority to ensure the safety and well-being of M.M. and J.P.<br><br>RJN, Exh. 1 [Dkt. No. 55, FAC at 5:9-20]; Enabnit Declaration, Exh. 2 [Nunn Deposition at 65:2-67:1 and Ex. C (Agency Agreement)]. | Disputed whether the County delegated these duties to Triad, and, worked jointly to fill them. |
| 23-25 | Issue 1 | **Triad Fact 8.** From September 30, 2015 to October 16, 2015, Maria Moore had physical custody, care and control of J.P. and M.M., but ALAMEDA COUNTY retained legal custody of J.P. and M.M.<br><br>RJN, Exh. 1 [Dkt. No. 55, FAC at 6:27-7:2]. | Undisputed. |
| 26-28 | Issue 1 | **Triad Fact 9.** Triad made abuse or neglect referrals to ALAMEDA COUNTY on 10/4/15, 10/5/15 and 10/6/15, because of M.M.'s hospitalization on 10/3/15. | Disputed and undisputed. Triad did *not* inform the County M.M. was hospitalized or refer orally or in writing abuse or neglect. |

| | | | |
|---|---|---|---|
| | | RJN, Exh. 1 [Dkt. No. 55, FAC at 9:8-9]. | See Facts **25;** Triad's Answer at ¶42, J.P.'s RFJN, **Ex. 1** |
| | Issue 1 | **Triad Fact 10.** On 10/6/15, the San Joaquin Human Services Agency (SJHSA) called the Department of Family & Child Services of Alameda County repeatedly, and requested a return call and, contacted a hotline to obtain a fax number for Alameda County. That day SJHSA faxed its own Suspected Child Abuse Report regarding M.M.'s methamphetamine exposure. The SJHSA assessed the referral it received on 10/4/15 as requiring a response within ten days pursuant to a statewide Emergency Response Protocol. Alameda County was legally responsible for the direct supervision and services for M.M. and J.P.<br><br>RJN, Exh. 1 [Dkt. No. 55, FAC at 9:10-16]. | Undisputed as to SJHSA's attempts to cross-report to Alameda. Disputed SJHSAs authored a SCAR; the hospital's nurse wrote it. Disputed whether the County delegated these direct supervision duties to Triad, and, worked jointly with Triad to fill them.<br><br>SCAR. |
| | Issue 1 | **Triad Fact 11.** ALAMEDA COUNTY failed to conduct an investigation, obtain independent statements from any witnesses or residents in Moore's home, and to inspect the safety of the foster home.<br><br>RJN, Exh. 1 [Dkt. No. 55, FAC at 11:4-9]. | Undisputed as to the County. Disputed whether the County delegated these duties to Triad, and, worked jointly to fill them. |
| | Issue 1 | **Triad Fact 12.** ALAMEDA COUNTY had mandatory duties to protect J.P. and M.M. to supervise and monitor the placement of J.P. and M.M. in a foster home.<br><br>RJN, Exh. 1 [Dkt. No 55, FAC at 11:23-28]. | Disputed whether the County delegated these duties to Triad, and, worked jointly to fill them. |
| | Issue 2 | **Triad Fact. 1.** Plaintiff J.P. did not observe or witness his sister M.M. ingesting (such as taking, smoking, eating or imbibing) the drug/substance which caused M.M.'s death on October 16, 2015.<br><br>Enabnit Declaration, Exh. 3 [Stipulation of Fact]. | Undisputed. |
| | Issue 2 | **Triad Fact 2.** Plaintiff J.P. has suffered extreme emotional distress damages because of the drug exposure and death of his sister M.M. Plaintiff J.P. dies not allege in his statement of damages that he suffered any bodily or physical injury.<br><br>RJN, Exh. 1 [Dkt. 55, FAC at 15:6-10]. | Undisputed. |
| | Issue 2 | **Triad Fact 3.** J.P. does not allege that he personally ingested any drug while he lived at Maria Moore's foster home.<br><br>RJN, Exh 1 [Dkt. No. 55, FAC at 14:3-15-10]. | Undisputed. |

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

| | | J.P.'s Additional Material Facts | Triad's Response and Supporting Evidence |
|---|---|---|---|
| 1 | | | |
| 2 | 1&2 | **Add'l Fact 13:** ████████████████████████████████████████████████████████████████████████████████████████████████ That same day, foster parent Maria Moore picked them up.<br><br>Maas Depo 27:6-24, 105:4-107:10 (**Ex. E**); May Depo 84:24-85:6, 85:15-86:13, 91:15-25, 101:1-102:1, 144:11-18 (**Ex. G**); Moore Depo 37: 14-25 (**Ex. H**); 10/8/15 Note (**Ex. X**). | |
| 11 | 1&2 | **Add'l Fact 14:** Between September 30 and October 1, 2015, County employee Sue May contacted Triad employee, Niasha Dupree seeking placement for J.P. and M.M. Dupree and Triad social worker Amy Navarette placed the siblings in Moore's home, exclusively selected by Dupree with notice to May. ████████████████████████████ and Dupree never heard from *any* source that drugs were accessible to the children in their mother's home.<br><br>Dupree Depo 25:19-26:1-27:4, 36:25-37:23, 38:6-41:10, 56:18-24, 70:22-72:8, 73:3-76:19, 131:12-21, 132:2-13; (**Ex. C**) May Depo 44:17-45:12, 62:10-23; 92:16-93:17, 94:17-25, 95:6-14, 102:2-12, 109:24-110:23 (**Ex. G**); Moore Depo 28:6-29:13 (**Ex. H**). | |
| 18 | 1&2 | **Add'l Fact 15:** On October 1, 2015, the County and Triad executed two state-mandated forms, one for J.P, the other, M.M. which delineated duties assigned to the County and Triad. Triad agreed to: (1) conform to applicable foster-care laws, and, (2) notify the County within 24 hours by phone followed in writing of significant changes in the child's health, behavior, significant issues, suspected physical or psychological abuse, injury, or unusual incidents. Triad understood its obligation to "move a child in the case of imminent risk to the child or family" in paragraph 9 did *not* require County permission.<br><br>Dupree Depo 91:18-92:12, 92:20-93:1, 94:9-21, 133:13-134:5 (**Ex. C**); Maas Depo 169:6-170:4 (**Ex. E**); Nunn Depo 66:8-67:2, 168:16-23 (**Ex. I**); COA-FFA Agreements (**Ex. P**); Answer ¶ 24, RFJN **Ex. 1** | |
| 27 | 1&2 | **Add'l Fact 16**: Diane Davis Maas was Alameda County's social worker assigned to these siblings. | |

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

| | | | |
|---|---|---|---|
| | | ███████████████ It entered into a written agreement with Moore delineating the required care, protection and the personal rights of the siblings in her care and the right to remove if a child is endangered or the there are concerns about the well-being of the child or home.<br><br>Dupree Depo 91:18-93:1, 135:7-18 (**Ex. C**); Maas Depo 27:6-28:24; 40:1-41:14, 60:19-63:17, 98:17-99:9, 135:5-12, 164:1-16 (**Ex. E**); May Depo 89:4-16 (**Ex. G**), Triad Policies (**Ex. N**); COA-FFA Agreement (**Ex. P**); Triad-Moore Agreement (**Ex. Q**); Answer at ¶¶ 54, 55,56, 60, J.P. RFJN **Ex. 1** | |
| 1&2 | **Add'l Fact 17:** On October 3, 2015 after 7:00 p.m. in J.P.'s presence, M.M. began hallucinating monkeys in the park, her eyes were going in circles, her heart was racing, she was contorting her hands and fingers, and was acting "very strange." Walking home, J.P. was yelling about M.M.'s screaming about a monkey and spiders. Moore took M.M. to St. Joseph Hospital's Emergency Room. Moore told the staff that M.M.'s biological mother used meth.<br><br>Cantwell Depo 84:16-85:10, 88:11-22 (**Ex. B**); Moore Depo 47:3-22, 49:22-51:10, 51:14-21, 53:24-55:15, 57:23-58:17, 59:13-60:14, 61:2-5; 98:21-99:5; 99:12-14, 119:15-24 (Ex. H); SCAR (**Ex. R**). | |
| 1&2 | **Add'l Fact 18:** Moore testified that she was only permitted to take M.M. home after "the inspectors at the hospital regarding the incident with the little girl called someone at Triad to confirm personally on the telephone that, yes, that they believed that the children had been exposed to drugs [in their biological home as opposed to Moore's]." Moore also testified that the hospital staff "talked with someone from Triad and they confirmed that I was free; that I didn't have anything to do with that."<br><br>Moore Depo 53:24-54:22, 57:23-58:17 (**Ex. H**). | |
| 1&2 | **Add'l Fact 19:** On October 4, 2015, a hospital nurse faxed its SCAR to the San Joaquin Human Services Agency (SJHSA) and called the Stockton Police stating that M.M. had methamphetamines in her system. The police determined it was an open | |

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

| | | | |
|---|---|---|---|
| 1 | | question whether M.M. was exposed to drugs in Moore's home, and, referred the case to child protective services ("CPS"). | |
| 2 | | | |
| 3 | | Shelton Depo 51:21-53:10, 56:5-22, 59:1-25, 60:18-61:7 (**Ex. L**); SCAR (Ex. R); SJHSA (**Ex. Y**). | |
| 4 | 1&2 | **Add'l Fact 20:** On October 4th at 10:30 a.m., Triad's social worker Joanne Willis went to Moore's home. Moore told Willis that M.M. was acting "funny" the day before in the park. Moore said she took M.M. to the hospital and they found amphetamines in her system. Moore gave Willis a hospital record and a Stockton police officer's card with a report number on it. Willis testified "it was my responsibility to document that the police had been out, cleared the home, and was set to go." Willis testified that "cleared the home" meant that the police determined the children were safe because the police did not remove them that night. Willis never spoke with the police or hospital staff to confirm anything Moore reported to her.<br><br>Maas Depo 73:15-18, 73:15-23 (**Ex. E**); Moore Depo 74:11-16, 75:12-18, 78:18-79:16, 126:9-127:14 (**Ex. H**); Nygaard Depo 64:25-65:13, 88:24-89:12 (**Ex. J**); Willis Depo 59:13-61:12, 70:19-71:24, 72:3-73:6, 79:20-25, 82:4-83:14, 84:2-85:9; 101:16-19 (**Ex. M**); Triad SPD card (**Ex. T**); 10/5 Fax (**Ex. S**); Notes (**Ex. V**); Navarette Decl. para. 12 | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | 1&2 | **Add'l Fact 21:** As an FFA, Triad was a mandated reporter of: (1) suspected abuse/ neglect to CPS; and, (2) incidents as defined by the California Care Licensing (CCL) for abuse in foster homes. M.M.'s exposure to amphetamines and hospitalization constituted suspected abuse and a CCL incident. Triad knew that the County and CCL would respond to abuse reports or UIRs, which could include an investigation, within 10 days. Only CCL and the County are authorized to investigate this incident.<br><br>Bell Depo 144:10-16 (**Ex. A**); Nunn Depo 61:2-24, 64:21-65:21, 162:10-13, 163:9-164:1, 207:24-208:11, 208:23-209:11 (**Ex. I**); Reagh Depo 130:3-131:11, 135:7-25, 136:6-25, 140:20-142:6 (**Ex. K**); Willis Depo 109:13-110:13 (**Ex. M**); TFS Policies (**Ex. N**) | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | 1&2 | **Add'l Fact 22:** On October 5, 2015, Willis conveyed Moore's report to Shawn Nunn, Triad's Director, who instructed her to: (1) omit reference to drug exposure or the reason for M.M.'s hospitalization from her CCL reports; and, (2) *not* complete a SCAR. Triad's policy was to only report abuse *if* you can identify the culprit. Nunn testified: "Absolutely. I mean, you have to have who you are | |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

PLAINTIFF'S OPPOSITION TO TRIAD'S SEPARATE STATEMENT OF MATERIAL FACTS

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4 | | reporting it on. God? I mean, who? I don't know who you - you got to report it on somebody."<br><br>Nunn Depo 154:21-155:24, 156:16-21, 155:5-7, 177:25-178:6; 210:20-23 (**Ex. I**); Willis Depo 15:15-18:17, 28:18-29:8, 105:6-22, 111:13-112:1, 120:23-122:17, 125:12-126:13 (**Ex. M**); Navarette Decl. | |
| 5<br>6<br>7<br>8<br>9<br>10<br>11<br>12 | 1&2 | **Add'l Fact 23:** On October 6, 2015 SJHSA cross-reported the SCAR by call and fax to Alameda County's hotline, and to Maas ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The screener told SJHSA that Alameda would "take care of it." When SJHSA called the hotline and Maas again on October 14, the screener reported the SCAR was routed to Maas.<br><br>Maas Depo 130:2-15, 135:13-137:3 (**Ex. E**); May Depo 70:14-71:10 (**Ex. G**); Nygaard Depo 19:7-9, 27:23-28:1, 53:9-54:2, 56:6-15, 57:1-19, 58:11-23, 64:25-65:13, 74:8-75:9, 78:17-20, 172:5-173:8 (**Ex. J**); SJHSA docs (**Ex. Y**) | |
| 13<br>14<br>15<br>16<br>17 | 1&2 | **Add'l Fact 24:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>Maas Depo 65:5-66:3, 72:3-8,169:6-170:4 (**Ex. E**). | |
| 18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 1&2 | **Add'l Fact 25:** Later on October 6th, Willis spoke with Maas on the telephone. Willis did *not* characterize this as abuse or neglect. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ That day Willis also shared with her supervisor Marie Hoglund and Navarette the hospital report and that M.M. was found with amphetamines in her system. Willis, Navarette, and Hogland discussed Maas's cavalier attitude and scoured Triad's records to determine if: (1) drugs were accessible in the biological home or (2) the children exhibited symptoms of drug exposure before October 3rd. Finding none, they recommended to Nunn the four children placed in Moore's home be removed, immediately, until the source of the drugs in M.M.'s system could be determined. Willis and Hoglund, workers responsible for these children, believed they | |

SCOTT LAW FIRM<br>1388 SUTTER STREET, SUITE 715<br>SAN FRANCISCO, CA 94109

PLAINTIFF'S OPPOSITION TO TRIAD'S SEPARATE STATEMENT OF MATERIAL FACTS

| | | | |
|---|---|---|---|
| 1 | | did not have authority to remove without his approval. Nunn insisted the drugs came from the biological home and refused to remove. | |
| 2 | | | |
| 3 | | Hoglund Depo 30:6-19, 75:13-77:9, 77:15-84:19; 86:19-89:11, 100:17-101:5, 118:13-121:25, 130:21-131:18 (**Ex. D**); Maas Depo 64:22-65:23, 65:24-66:3, 70:22-71:10, 72:3-73:23, 72:9-73:14, 83:2-4, 94:6-95:10, 96:4-11, 112:13-114:8, 114:15-19 (**Ex. E**); Nunn Depo 132:10-14; 159:1-7, 168:24-1 (**Ex. I**); Willis Depo 34:9-23, 92:2-93:24, 95:8-16, 102:21-103:13, 107:10-108:7, 108:21-25 (**Ex. M**); Notes re 10/6 call (**Ex. V**); Navarette Decl. para.s 13-17;  PRJN Answer at para 42, J.P. RFJN **Ex. 1** | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | 1&2 | **Add'l Fact 26:**  Triad received money for J.P. and M.M. and two other children place in Moore's home. Removing four children pending investigation would cost Triad the value of Moore's certified 4-bed home or $72,000/year.

Nunn Depo 55:19-22, 199:5-13, 200:5-19 (**Ex. I**); Navarette Decl. at para 21. | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | 1&2 | **Add'l Fact 27:**  At no time before M.M.'s death did Triad report to the County orally, or, in a written incident report required by agreement, or in a SCAR, that: ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Bell Depo 101:25-102:25, 131:10-15 (**Ex. A**); Hoglund Depo 122:8-124:10 (**Ex. D**); Maas Depo 112:13-114:8, 114:15-19, 164:1-15 (**Ex. E**); Nygaard Depo 58:3-16, 66:8-67:4, 68:13-72:7, 87:6-15, 190:25-192:5, 206:3-12 (**Ex. J**); Shelton Depo 51:21-53:10, 56:5-22, 59:1-25, 60:18-61:7 (**Ex. L**); Willis Depo 108:18-25 (**Ex. M**); Notes (**Ex. V**) | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | 1&2 | **Add'l Fact 28:** In its two UIRs to CCL, Triad omitted the material facts that: (1) on October 3rd M.M. was hospitalized, tested positive for amphetamines, and was diagnosed with amphetamine abuse and altered state of state of consciousness; (2) the Stockton Police had an open investigation to determine the source of drugs in M.M.'s system; and, (3) on October 8, 2015, Triad had confirmed with the County that M.M. had no prior drug-exposure symptoms. | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

| | | |
|---|---|---|
| | | Bell Depo 28:25-29:13, 61:22-64:10, 101:25-102:25, 122:12-123:4, 125:22-25, 131:10-133:4, 139:1-140:14, 159:7-24, 164:19-165:25, 170:10-17, 171:13-174:10 (**Ex. A**); Dupree Depo 139:23-140:7, 156:10-18, 118:16-20; 123:18-124:2 (**Ex. C**); Hoglund Depo 77:15-84:19, 99:18-101:17, 122:8-124:10, 169:5-170:12 (**Ex. D**); Nunn Depo 147:25-148:2, 194:8-10, 195:8-14 (**Ex. I**); Reagh Depo 145:6-146:1, 152:19-25, 153:25-155:5, 173:12-174:23, 180:23-182:10 (**Ex. K**); Willis Depo 86:10-13, 86:22-87:1, 108:18-25, 113:15-19 (**Ex. M**); UIRs #1 & #2 (**Ex.s U and W**); 10/8 Note (**Ex. X**). |
| 1&2 | **Add'l Fact 29:** [REDACTED] Maas Depo 63:7-17, 164:1-15 (**Ex. E**); Nygaard Depo 85:3-16, 87: 6-15, 191:13-192:5, 206:3-12 (**Ex. J**); SJHS (**Ex. Y**). | |
| 1&2 | **Add'l Fact 30:** Had *any* investigation started before the 16th, the children would have been removed. Detective Cantwell testified she expected CPS to follow up on "especially the concerning thing about Maria [Moore] saying that this was a residual from her parents, that was never validated." Det. Cantwell "expected a social worker would have been involved in that process to ensure that safety of the children." Post-death interviews revealed: (1) Moore was the only source claiming a doctor or officer posited the drugs came from the biological mother; (2) M.M. may have been exposed a third time before the 16th; (3) Moore's boyfriend frequently cared for the siblings, had been a drug user, and was a convicted drug dealer, and exhibited symptoms of being under the influence; and, (4) Moore had prior substantiated CCL findings of general neglect and inadequate supervision of foster children including allowing a foster child access to alcohol and her son to smoke marijuana in presence of foster children.<br><br>Cantwell Depo 9:9-17,24:10-19, 38:2-19, 48:2-22, 83:23-84:10, 91:10-12, 98:15-99:4; 99:9-18, 100:21-101:6, 101:15-102:13 (**Ex. B**); Dupree Depo 83:18-85:22 (**Ex. C**); Nygaard Depo 102:13-103:12, 106:12-107:6, 125:2-13 (**Ex. J**); Willis Depo 50:16-21; 107:24-108:7 (**Ex. M**); CCL docs (**Ex. Z**) | |
| 1& 2 | **Add'l Fact 31:** On October 16, 2015, J.P. was in the room with M.M. while she screamed about | |

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

- 9 -

PLAINTIFF'S OPPOSITION TO TRIAD'S SEPARATE STATEMENT OF MATERIAL FACTS

| | |  |
|---|---|---|
| | spiders, was hallucinating while sweating and convulsing, with contorted fingers, shaking and heart racing. J.P. woke up Z.C., another foster child, saying it was an emergency--something was wrong with M.M. Then J.P. woke up Moore, who stayed with M.M. and J.P. while M.M.'s symptoms persisted. Hours later, M.M. stopped responding and her body went limp while J.P. was holding her. M.M. died in J.P.'s arms. J.P. understood M.M. was "sick" like on the 3rd. By the time an ambulance came to take her to a hospital, she was cold, stiff, in rigor, and could not be resuscitated.<br><br>Cantwell Depo 34:15-24, 45:2-12, 65:13-68:14; 78:5-79:17, 82:2-5, 82:8-23, 82:25-83:22, 85:12-86:4, 87:10-17, 90:2-8, 94:22-96:15 (**Ex. B**); Massey Depo 74:11-75:6 (**Ex. F**); Moore Depo 116:8-117:11, 124:10-19, 125:13-126:8, 127:15-20, 129:18-130:7 (**Ex. G**); Willis Depo 78:13-25 (**Ex. M**); Decl. Villanueva at ¶¶ 7-9. | |
| 1&2 | **Add'l Fact 32:** After M.M.'s death, Nunn understood Triad's failures exposed it to liability. After Willis concealed what she knew from CCL investigators, again per Nunn's instructions, Triad promoted her.<br><br>Hoglund 28:11-17, 29:17-30:5 (**Ex. D**); Willis Depo 128:10-133:5, 134:22-137:16 (**Ex. M**). | |

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

Dated: June 21, 2019                                    Respectfully submitted,

**KESSLER LAW OFFICE &
SCOTT LAW FIRM**


/s/ Lizabeth N. de Vries
Lizabeth N. de Vries, Attorney for Plaintiff

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109