United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**J.P., BY AND THROUGH HIS GUARDIAN AD LITEM SHANNON VILLANUEVA,**

Plaintiff,

**vs.**

**COUNTY OF ALAMEDA, ET AL.,**

Defendants.

Case No. 4:17-CV-5679-YGR

**ORDER OF PARTIAL DISMISSAL IN LIGHT OF THE NINTH CIRCUIT'S DECISION; GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 117, 135, 163, 164, 165

Currently pending in this Section 1983 action are (I) the parties' dispute about the effect of the Ninth Circuit's decision on the claims against the County defendants (Dkt. Nos. 163, 164, 165); and (II) defendant Triad's motion for summary judgment (Dkt. No. 117). Having carefully considered the papers and the oral arguments at the September 29, 2021 hearing, and for the reasons stated below, the Court **DISMISSES** the claims against the individual County defendants and the negligence claim against Triad. The *Monell* claims against the County and Triad shall remain pending insofar as they are based on the Fourteenth Amendment claim; otherwise, the *Monell* claims are **DISMISSED**.

## I. CLAIMS AGAINST COUNTY DEFENDANTS[1]

J.P. asserted claims against the County of Alameda and its employees Diane Davis Maas and Sue May for violations of the First and Fourteenth Amendments. (Dkt. No. 36.) The Court granted in part and denied in part the County defendants' motion to dismiss, which order was appealed to the Ninth Circuit. (Dkt. No. 52.) The Ninth Circuit held that the individual County defendants are entitled to qualified immunity as to the Fourteenth Amendment claim based on state-created-danger and special-relationship theories and the First Amendment claim based on loss of familial

[1] The Court assumes the parties' familiarity with the facts of this case and therefore discusses them only as necessary to explain its decision.

United States District Court
Northern District of California

association. *See J.P. v. County of Alameda*, 803 F. App'x 106, 108–09 (9th Cir. 2020).[2] Specifically, the Ninth Circuit concluded: (A) "no law clearly established" the Fourteenth Amendment claim, and (B) "[n]o viable loss-of-familial-association claim exists for siblings under the First Amendment." *Id.* After the United States Supreme Court denied J.P.'s petition for a writ of certiorari, the parties presented to the Court their disagreement about the scope of the Ninth Circuit's decision. The Court concludes that although all claims predicated on the First Amendment should be dismissed, as should the Fourteenth Amendment claim against the individual County defendants, the same cannot be said about the *Monell* claims against the County to the extent that they are based on the Fourteenth Amendment.

The County argues that the Ninth Circuit considered the issue and found a Fourteenth Amendment claim had not been stated. This is not a precise characterization of the appellate decision. The Ninth Circuit's ruling on the Fourteenth Amendment claim reads in full:

> "To determine whether qualified immunity applies in a given case, [courts] must determine: (1) whether a public official has violated a plaintiff's constitutionally protected right; and (2) whether the particular right that the official has violated was clearly established at the time of the violation." *Shafer v. City of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017) (citation omitted).
>
> "For a right to be clearly established, case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he was doing violates federal law." *Id.* at 1117 (citations omitted).
>
> The state-created danger exception "only applies in situations where the plaintiff was *directly* harmed *by a third party*." [*Henry A. v. Willden*, 678 F.3d 991, 1002 (9th Cir. 2012) (second emphasis in the original).] Appellee alleged that the Appellants' failure to remove him from his foster home caused him emotional distress, exposing him to potential harm from drugs. Appellee never alleged any direct harm to him, only to his sibling. Our cases have not recognized a Fourteenth Amendment violation under these two exceptions for emotional distress alone, or for direct harm to another party. *See, e.g.*, *Willden*, 678 F.3d at 998–1003; *see also Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 843–47 (9th Cir. 2010). Because no law clearly established that child welfare workers could be liable to a sibling who

---

[2] Although the Ninth Circuit stated that it was reversing this Court's denial of qualified immunity for both claims, the Court only ruled on qualified immunity as to the First Amendment claim. (Dkt. No. 52.) The Court noted in its order that the individual County defendants did not assert qualified immunity as to the Fourteenth Amendment claim and therefore the Court did not decide that issue. (*Id.* at 8 n.4.)

> suffered non direct injury as a result of a state-created danger or special relationship, the defendants were entitled to qualified immunity. *See Shafer*, 868 F.3d at 1117 (holding that qualified immunity applies if no clearly established law exists on the issue); *see also White v. Pauly*, 137 S. Ct. 548, 552 (2017) (reiterating that clearly established law must not be defined "at a high level of generality" but "particularized" to the facts of the case).

*J.P.*, 803 F. App'x at 108.

The Ninth Circuit did **not** hold that a Fourteenth Amendment claim was not viable.[3] *Cf. id.* at 109 ("No viable loss-of-familial association claim exists for siblings under the First Amendment."). Instead, the appellate court determined that "no law clearly established" a Fourteenth Amendment violation. This conclusion is different from holding that no constitutional violation occurred based on the facts alleged.

Where the grant of qualified immunity "rests solely on the 'clearly established' law prong," the *Monell* claims do not automatically fail. *See Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019) ("[O]ur qualified immunity determination with respect to Officer Brice rests solely on the 'clearly established' law prong; we do not reach the question of whether Officer Brice's actions give rise to a constitutional violation."). "A municipality may be liable if an individual officer is exonerated on the basis of the defense of qualified immunity, because even if an officer is entitled to immunity a constitutional violation might still have occurred." *Id.* ("Thus, the district court could still conclude that Officer Brice did commit a constitutional violation under the

[3] The Court is mindful that the Ninth Circuit stated: "The state-created danger exception 'only applies in situations where the plaintiff was *directly* harmed *by a third party*.'" *J.P.*, 803 F. App'x at 108 (quoting *Willden*, 678 F.3d at 1002). However, the Court is unable to conclude that the Ninth Circuit purported to require plaintiffs to establish actual physical injury (as opposed to danger or risk of physical injury) by a third party when *Willden* itself did not so hold. Indeed, *Willden* reversed a district court's dismissal of a state-created-danger claim where the plaintiffs "allege[d] that Defendants knew of the danger of abuse and neglect that Plaintiffs faced in certain homes and acted with deliberate indifference by exposing Plaintiffs to that anyway. This is sufficient to state a claim under the controlling opinion in [*Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006)]." *Willden*, 678 F.3d at 1003. In any event, the Ninth Circuit did not address the viability of the other theory for recovery under the Fourteenth Amendment, the special-relationship doctrine, under these circumstances. Thus, in this Court's view, the Ninth Circuit's decision here did not preclude a finding of a Fourteenth Amendment violation (as it did with the First Amendment claim).

United States District Court
Northern District of California

now-applicable standard and, if the other requisites of *Monell* liability are met, hold the municipality liable.").[4]

Accordingly, in light of the Ninth Circuit's decision, the causes of action against the individual County defendants for violations of the Fourteenth and First Amendments, respectively, are hereby **DISMISSED**. The causes of action against the County under *Monell* are also **DISMISSED** to the extent that they are based on the First Amendment claim. However, the *Monell* causes of action survive insofar as they are premised on the Fourteenth Amendment claim.

## II. CLAIMS AGAINST TRIAD

Triad moves for summary judgment on the causes of action pending against it, namely, the causes of action under *Monell* and the cause of action for negligence. Triad asserts two grounds for summary judgment: (A) it is not a state actor for Section 1983 purposes; and (B) with respect to the negligence claim, J.P. cannot recover for emotional distress as a direct victim or a bystander.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A), (B). "[W]here evidence is genuinely disputed on a particular issue—such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment." *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (internal quotation marks omitted).

When the party moving for summary judgment does not bear the burden of proof at trial (usually the defendant), the party has the burden of producing evidence negating an essential element of each claim on which it seeks judgment or showing that the opposing party cannot

---

[4] Of course, "[i]f no constitutional violation occurred, the municipality cannot be held liable . . . ." *Long v. City and County of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007); *see also City of Los Angeles v. Heller*, 475 U.S. 795, 799 (1986) (holding that *Monell* liability will not attach "based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm").

United States District Court
Northern District of California

produce evidence sufficient to satisfy her burden of proof at trial. *See Nissan Fire & Mar. Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving party meets that burden, the non-moving party must show that a material factual dispute exists. *See California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).

**A. State Action**

Triad first seeks summary judgment on the ground that it is not a state actor under any applicable test for purposes of Section 1983 liability. To recover under Section 1983, the plaintiff's constitutional rights must be violated by a defendant acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988). The ultimate determination of whether the action of a private entity like Triad is considered the action of the state is a question of law to be resolved by the court. *See Blum v. Yaretsky*, 457 U.S. 991, 997 (1982) (describing "whether there is state action" as one of "several issues of law" for the court). However, the extent of the state involvement in the action presents a question of fact. *See Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 939 (1982) (determination of whether a private entity is a state actor is a "necessarily fact-bound inquiry"); *see also Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002) (recognizing "the fact-intensive nature of the [state action] inquiry").

The Court must begin "with the presumption that conduct by private actors is not state action." *Florer v. Congregation Pidyon Shevuyim*, 639 F.3d 916, 922 (9th Cir. 2011). It is the plaintiff's burden to prove otherwise. *Id.* (citing *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978)). However, as the moving party, Triad bears the initial burden of production either by demonstrating, with evidence, that it is not a state actor or by pointing out an absence of evidence supporting a finding of state action. *See Nissan*, 210 F.3d at 1106.

The Ninth Circuit uses four tests to determine whether a private actor is a state actor: "(1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (citation omitted). "Satisfaction of any one test is sufficient to find state action . . . ." *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747–48 (9th Cir. 2020) (internal citations omitted). At its core, "the inquiry is always whether

United States District Court
Northern District of California

the defendant has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.*

"Under the public function test, 'when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations.'" *Lee*, 276 F.3d at 554–55 (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)). "To satisfy the public function test, the function at issue must be both traditionally and exclusively governmental." *Id.* (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)). Although Triad briefs a number of functions alleged in the First Amended Complaint ("FAC") (Dkt. No. 55), J.P. focuses on "the two subject delegated duties in the agreement—[(1)] to report incidents to the County's assigned social worker for foster children and [(2)] to move children to avoid imminent risk out of an unsafe foster home[.]" (Opp. at 12.)

Both of these functions are addressed by the "Placement Agency – Foster Family Agency Agreement" between the County and Triad.[5] Triad does not actually deny that these functions in particular are "both traditionally and exclusively governmental," the fundamental question under the public function test. *See Lee*, 276 F.3d at 555. Indeed, Triad does not respond to J.P.'s assertion that "[i]f the County had directly licensed the Moore home, instead of going through Triad for

---

[5] The agreement provides:

> FOSTER FAMILY AGENCY AGREES TO . . . .
>
> 3. Notify the placing agency within 24 hours (unless there is a separate written agreement with the placing agency) by phone followed in writing of significant changes in the child's health, behavior or location as well as significant issues including suspected physical or psychological abuse, death, injury, unusual incidents, absence of a child, placement issues and school non-attendance and all items listed under Section 80061 of Title 22, Division 6. . . .
>
> 9. Give placing agency 7 day notice of intent to discharge or move this child. Notify the placing agency of any intended move of this child between certified homes prior to the move. The FFA has the authority to move a child in the case of imminent risk to the child or family. The FFA shall notify the placing agency within 24 hours of such move.

(Dkt. No. 133, Plaintiff's Additional Fact 15 (citing Ex. P, Placement Agency – Foster Family Agency Agreement, Dkt. No. 132-1 at 186–87).)

placement, the two subject delegated duties in the agreement . . . would have been the County's *exclusive* functions to fulfill . . . ." (Opp. at 12.)[6] Thus, the agreement between the County and Triad raises a genuine issue of material fact, as it reasonably suggests that the County would have performed these functions in the absence of the agreement. This finding of fact, in turn, could support the conclusion that the functions at issue are traditionally and exclusively governmental.[7] Because Triad may be a state actor under the public function test, the other tests need not be

---

[6] Instead, Triad focuses its arguments on functions not actually at issue. First, with respect to the reporting function, Triad argues that reporting abuse or neglect of a child cannot be a public function because otherwise, all mandated reporters such as "employees at private schools, employees at private day camps, commercial film processor[s], clergy member[s], etc.," would be transformed into state actors by virtue of this function. (Mtn. at 11.) However, the function at issue is not merely reporting abuse or neglect of children generally, but rather reporting such incidents involving *foster* children placed in certified homes, which none of the other actors listed can do. Foster family agencies like Triad are uniquely positioned to directly monitor the care of foster children and therefore discover harmful issues in the foster home. Therefore, a finding that the specific reporting function at issue is a public function will not lead to the outcome put forth by Triad. Similarly, Triad's argument that it is not responsible for investigating these incidents does not address the *reporting* of these incidents, which is distinct from investigation.

Second, with respect to the removal function, Triad distinguishes "between a child being forcibly removed by a law enforcement officer from his or her family, and [a child] being transferred from one certified foster home to another." (Reply at 5.) However, Triad does not explain how the difference between the two procedures bears on the fundamental question of whether the latter is traditionally or exclusively governmental in nature. Simply because a foster family agency may not be authorized to remove a child not yet designated a ward of the state from the home where he or she has been residing with his or her family, does not mean that its ability to transfer children between foster homes is any less governmental. Triad's reliance on *Martinez v. County of Kern*, No. 06-CV-1827 (LJO), 2007 WL 1079937 (E.D. Cal. April 9, 2007), does not aid its position because that case did not involve an agreement like the one here.

As stated above, Triad does not deny that the County would have performed the actual functions at issue had the County conducted the placement itself. Triad's arguments here do not suggest otherwise.

[7] Indeed, the public function test "requires close scrutiny of historical exclusivity." *Rawson*, 975 F.3d at 752 n.10 (citing *Flagg Bros.*, 436 U.S. at 158). Neither side provides their perspective on this fundamental issue. The Court decline to examine a matter on an incomplete evidentiary record and not briefed by the parties, particularly since "[f]ederal courts disagree as to whether private foster agencies that place children in foster homes conduct a public function." *D.B. v. Brewer*, No. 17-CV-1651 (CAS), 2017 WL 2766437, at *7 (C.D. Cal. June 26, 2016) (collecting cases).

considered. Accordingly, the motion for summary judgment on the *Monell* causes of action is **DENIED**.

**B. NEGLIGENCE**

Triad also seeks summary judgment on the ground that J.P. is not entitled to relief for emotional distress under his negligence cause of action.[8] In California, "there is no independent tort of negligent infliction of emotional distress[.]" *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 984 (1993); *see also* Judicial Council of California Civil Jury Instruction ("CACI") 1620 ("The doctrine of negligent infliction of emotional distress [('NIED')] is not a separate tort or cause of action. It simply allows certain persons to recover damages for emotional distress only on a negligence cause of action even though they were not otherwise injured or harm.") (citing *Molien v Kaiser Foundation Hospitals*, 27 Cal.3d 916, 928 (1980)). NIED cases are generally divided into two categories: (1) direct victim cases and (2) bystander cases. *See Burgess v. Superior Court*, 2 Cal.4th 1064, 1072 (1992). "The distinction between the 'bystander' and the 'direct victim' cases is found in the source of the duty owed by the defendant to the victim." *Id.* Triad challenges J.P.'s ability to recover under both theories, which the Court addresses in turn.

**1. J.P. AS A DIRECT VICTIM**

Triad contends that J.P. was not a direct victim of its alleged negligence. "'Direct victim' cases are cases in which the plaintiff's claim of emotional distress is not based upon witnesses an injury to someone else, but rather is based upon the violation of a duty owed directly to the plaintiff." *Wooden v. Raveling*, 61 Cal. App. 4th 1035, 1038 (1998). "The California Supreme Court has allowed plaintiffs to recover damages as 'direct victims' in only three types of factual situations: (1) the mishandling of corpses [*Christensen v. Superior Court*, 54 Cal.3d 868, 879 (1991)]; (2) the negligent misdiagnosis of a disease that could potentially harm another [*Molien*, 27 Cal.3d at 923]; and (3) the negligent breach of a duty arising out of a preexisting relationship [*Burgess*, 2 Cal.4th at 1076]." CACI 1620. J.P. proceeds under the third category, alleging that "[t]here was a special relationship between these foster siblings and [Triad]." (FAC ¶ 110; *see also* Opp. at 18.)

---

[8] J.P. concedes that he does not allege physical injury.



United States District Court
Northern District of California

Triad specifically argues that its alleged failure "to protect M.M. from the harm caused by her ingestion of methamphetamine, does not create a duty on the part of Triad to protect [J.P.] from the emotional distress he suffered because of M.M.'s death." (Mtn. at 18.) Triad relies on *Martin v. United States*, 984 F.2d 1033, 1034–35 (9th Cir. 1993), in which the plaintiff (and her mother) sued for emotional distress stemming from a government child care center's negligent supervision of the plaintiff's sister, who was abducted and raped on a field trip. The plaintiff was on the field trip with her sister, who had separated from the group. *Id.* However, the Ninth Circuit concluded that the plaintiff could not recover as a direct victim because California law does not "impos[e] a duty upon a caretaker not negligently to cause emotional distress to a relative of the child being negligently supervised." *Id.* at 1036–37 (Plaintiff's "argument that by virtue of a special relationship between young children and supervisors, the supervisor has a duty to all children under his care not to let harm occur to any of them that causes emotional distress to one of them, lacks support in California law.").

The Court agrees with Triad that *Martin* dictates a similar outcome in this case. While Triad certainly owed J.P. a duty not to supervise him negligently, J.P.'s alleged emotional distress did not arise from a breach of *that* duty.[9] Instead, the alleged distress arose from Triad's failure to supervise his sister. (FAC ¶ 116.) In other words, the tortious conduct upon which the NIED claim is based was directed toward M.M., not J.P. *Martin* precludes direct-victim liability on this basis. *See Martin*, 984 F.3d at 1036 ("When . . . negligence that causes injury to a third-party collaterally results in the plaintiff's emotional distress, but the tort is not also to the plaintiff, California courts have been reluctant to find a duty and allow recovery for the negligent infliction of emotional distress.").[10] Thus, based on the record in this case, the Court finds that, as a matter of law, J.P. was

[9] Although J.P. alleges that Triad failed to care for his emotional well-being (FAC ¶ 114), he does not explain how such a duty is independent of Triad's duty to supervise.

[10] J.P. distinguishes the instant case from *Martin* in eight ways. However, none of the distinctions support the notion that his emotional distress arose from something other than Triad's negligent supervision of M.M. (*See* Opp. at 21–22 ("Unlike the case at bar, the *Martin* defendant: (1) was a daycare service, not an FFA, (2) did not violate its reporting mandates, criminally, (3) was not delegated functions to assess and investigate risks after clear abuse or neglect at this park, (4) did not bring the children back to the same park without assessing the risks first, (5) did not initially certify the park as being safe before the first rape, (6) did not agree to encourage and not interfere

not a direct victim of Triad's alleged negligence and therefore cannot prevail under a direct-victim theory. Summary judgment is **GRANTED** on this theory.

**2. J.P. AS A BYSTANDER**

Triad also contends that J.P. cannot sustain a claim as a bystander of its alleged negligence. To recover for NIED as a bystander, the elements require that a plaintiff: "(1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that [the event] is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." *Thing v. La Chusa*, 48 Cal.3d 644, 667–68 (1989).

The parties disagree as to the second element, that is, the relevant injury-producing event. Here, Triad challenges J.P.'s showing, pointing to the undisputed fact that J.P. did not observe his sister M.M. ingest the methamphetamine which caused her death. (Joint Stipulation of Fact, Dkt. No. 117-2 at 32–33.) Triad further argues "J.P., who was then five years old when M.M. died would not have had the capacity to appreciate that the methamphetamine ingested by M.M. was causing her harm, even if he had seen her ingest it." (Mtn. at 17.) J.P. disagrees, submitting that the injury-producing event was the "'sickness' from drug toxicity" that caused M.M.'s injuries, not the placement of the drug in her mouth. (Opp. at 22 ("M.M. could have spit them out, vomited them, or

---

with both siblings' relationship, (7) was not bound to care for each sibling's emotional wellbeing independent of its supervision duties of the day; or (8) contractually agree with the County to work together to ensure these siblings' needs were met.").

J.P. also relies on *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.*, 48 Cal.3d 583, 592 (1989). There, the mothers of two boys, who were molested by a therapist treating both the mothers and their sons for intra-family problems, were permitted to maintain a cause of action for negligent infliction of emotional distress against the therapist. The California Supreme Court concluded that the therapist had a duty to the mothers, because the mothers were also his patients, were being treated by him for intra-family difficulties, and was aware of the patients' relationships. *Id.* at 585–591. When the therapist molested the boys, he breached his duty of care to the mothers as well as the boys. *Id.* at 591. The mothers' distress arose from the therapist's failure to protect their well-being. While Triad owed the same duty to J.P., his emotional distress arose from the breach of a different duty, that which Triad owed to M.M. A tort does not necessarily injure every member of a family unit in the same legal sense. Accordingly, *Marlene* is distinguishable.

United States District Court
Northern District of California

if they were contained, had them pass through her system. What caused injuries was the drugs' absorption into M.M.'s young, small body.").)

The Court finds that plaintiff cannot establish the second element under *Thing* for either asserted injury-producing event: the ingestion of the methamphetamine or its absorption into the M.M.'s bloodstream (toxification). California courts read the requirement "that a plaintiff be 'present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim' in light of the court's admonition that recovery for NIED must be limited to 'plaintiffs who personally and contemporaneously perceive the injury-producing event and its traumatic consequences.'" *Ko v. Maxim Healthcare Services, Inc.*, 58 Cal. App. 5th 1144, 1156 (2020) (quoting *Thing*, 48 Cal.3d at 666, 669). "The *Thing* Court expressly disapproved suggestions in prior cases that a negligent actor is liable to all those 'who may have suffered emotional distress on viewing or learning about the injurious consequences of his conduct,' rather than on viewing the injury-producing event itself." *Ra v. Superior Court*, 154 Cal. App. 4th 142, 148 (2007) (quoting *Thing*, 48 Cal.3d at 668).

With respect to Triad's definition of the injury-producing event as ingestion, J.P. concedes that he did not observe M.M. consuming the methamphetamine. Nor does J.P. argue that he could otherwise sensorily perceive the occurrence of this event. Therefore, J.P. necessarily could not have "witness[ed], with knowing comprehension, the 'causal connection' between accident and injury." *Golstein v. Superior Court*, 223 Cal. App. 3d 1415, 1425 (1990) (citing *Ochoa v. Superior Court*, 39 Cal.3d 159, 170 (1985)); *see id.* at 1427 ("*Thing* reaffirms *Ochoa*'s requirement of observation of the injury-causing event, the injury, and the causal connection between them.").[11] Thus, defining the injury-producing event as the ingestion of the drug, the Court finds that J.P. cannot satisfy the second *Thing* requirement for bystander liability.

---

[11] Even if J.P. had observed M.M. consume the drug, there is no evidence that "he was *then* aware" that M.M. was being injured thereby. *See Golstein*, 223 Cal. App. 3d at 1423 (criticizing holding in *Mobaldi v. Regents of the Univ. of Cal.*, 55 Cal. App. 3d 573 (1976), in which a mother, whose son died in her arms after he was negligently injected with a dangerous solution for which she was present, recovered as a bystander) ("Even accepting the injection as the 'accident,' its role in triggering the emotional trauma is meaningless because—unlike a car bearing down on one's child—the event was bereft of obvious danger."); *Bird v. Saenz*, 28 Cal.4th 910, 920–21 (2002) (disapproving of *Mobaldi*).

United States District Court
Northern District of California

Nor can J.P. do so by re-defining the injury-producing event as absorption of the drug into M.M.'s bloodstream. By its nature, toxification is invisible and therefore could not have been "a component of [J.P.'s] emotional trauma." *Id.* at 1423. "In the case of an event which cannot be perceived, distress recovery is not allowed." *Id.* at 1427 (concluding that plaintiffs, parents of child who received excessive dose of radiation, which is invisible, could not have witnessed the same and therefore had not "experience[d] a contemporaneous sensory awareness of the causal connection between the negligent conduct and the resulting injury"); *see also Jansen v. Children's Hospital Medical Center*, 31 Cal. App. 3d 22, 24 (1973) (injury-producing event "must itself be one which can be the subject of sensory perception").[12] Therefore, the Court's conclusion is not changed by characterizing the injury-producing event as drug absorption.

In sum, the Court finds that, as a matter of law, J.P. was not "present at the scene of the injury-producing event at the time it occur[red] and [was] then aware that it [was] causing injury" to M.M. *See Thing*, 48 Cal.3d at 667–68. Thus, J.P. cannot establish NIED liability as a bystander.

---

[12] J.P. argues that "[w]hen an injury-producing event's effects are dramatic, visible, ongoing and slowly continue to injure a third party, the bystander need not observe the initial event. Nor must a bystander plaintiff perceive sensory or contemporaneous observations of the injury producing event when he experiences a progressive killing." (Opp. at 23 (citing *Zuniga v. Housing Authority*, 41 Cal. App. 4th 82 (2011); *Ortiz v. HPM Corp.*, 234 Cal. App. 3d 178 (2011); and *Walsh v. Tehachapi Unified School District*, No. 11-CV-1489 (LJO), 2013 WL 4517887 (E.D. Cal. Aug. 26, 2013)).)

However, the injury-producing event in each of the cited cases (the burning building in *Zuniga*, the pressing of the molding machine in *Ortiz*, and the dangling from a noose in *Walsh*), while still in progress, were "not necessarily hidden from the understanding awareness of" the plaintiff-bystanders. *See Keyes v. Alta Bates Summit Medical Center*, 235 Cal. App. 4th 484, 489 (2015); *see also Bird*, 28 Cal. 4th at 918 ("Such an accident, and its injury-causing effects, would not lie beyond the plaintiff's understanding awareness."). Conversely, M.M.'s adverse physical reaction, while also in progress, "carried no clear information to" J.P. that his sister was exposed to a harmful substance. *See Bird*, 28 Cal. 4th at 917 ("The earlier call for a thoracic surgeon over the hospital's loudspeaker system may seem full of portent in retrospect, but it carried no clear information to a bystander in the waiting room about the progress of a particular surgical procedure."). "The impact of personally observing the injury-producing event in most, although concededly not all, cases distinguishes the plaintiff's resultant emotional distress from the emotion felt when one learns of the injury or death of a loved one from another, or *observes pain and suffering but not the traumatic cause of the injury*." *Ko*, 58 Cal. App. 5th at 1153–54 (quoting *Thing*, 48 Cal.3d at 666) (emphasis supplied).

United States District Court
Northern District of California

Because J.P. cannot recover for emotional distress either as a direct victim or a bystander of Triad's alleged negligence, the motion for summary judgment on this cause of action is **GRANTED**.

## III. CONCLUSION

In light of the Ninth Circuit's decision, the individual County defendants, as well as the *Monell* causes of action to the extent that they are based on the First Amendment, are **DISMISSED**. The motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**, such that the cause of action for negligence is **DISMISSED**. The only causes of action that remain are those under *Monell* against the County and Triad to the extent that they are based on the Fourteenth Amendment.[13] The Court hereby **SETS** a compliance deadline for **December 10, 2021**. **Five (5) business days** before the compliance deadline, the parties must meet and confer and file a joint proposed schedule as to the remaining claims, including the deadline by which the County must file its responsive pleading. If compliance is complete, the compliance deadline will be taken off calendar.

This Order terminates Docket Numbers 117 and 135.

**IT IS SO ORDERED.**

Dated: **November 19, 2021**

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[13] In deciding the motion for summary judgment, the Court did not rely on matters which were filed with a request to seal. Thus, while the Court **GRANTS** the motion to seal (Dkt. No. 135), it does so only given the procedural context. The parties should not assume that the material will be sealed at trial. Likewise, the Court did not consider the evidence submitted by plaintiffs in opposition to the motion for summary judgment and therefore need not consider Triad's objections thereto. (Dkt. No. 138-2.)