Darren J. Kessler, SBN 114986
**KESSLER LAW OFFICE**
3060 El Cerrito Plaza, Suite 371
El Cerrito, CA 94530
Tel: (510) 524-7750
E-Mail: darren.j.kessler@gmail.com

Lizabeth N. de Vries, SBN 227215
Kelly K. Dixon, SBN 191078
**DE VRIES LAW, P.C.**
1388 Sutter Street, Suite 715
San Francisco, CA 94109
Tel: (415) 909-4009 // Fax: (628) 280-6514
E-Mail: liza@devrieslawsf.com

Attorneys for Plaintiff J.P. by and through his
Guardian *ad litem,* Shannon Villanueva

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA — SAN FRANCISCO

| | |
|---|---|
| J.P., by and through his Guardian Ad Litem, SHANNON VILLANUEVA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF ALAMEDA, DIANE DAVIS MAAS, SUE MAY, TRIAD FAMILY SERVICES, MARIA REFUGIO MOORE, and Does 1-30 inclusive,<br><br>Defendants. | Case No.: 3:17-cv-05679-LB<br><br>**J.P.'S NOTICE AND PETITION FOR ORDER APPROVING: (1) MINOR'S COMPROMISE WITH DEFENDANT COUNTY OF ALAMEDA AND DEFENDANT TRIAD FAMILY SERVICES; (2) PAYMENT OF ATTORNEYS' CONTINGENCY FEE AND COSTS; AND, (3) GOOD-FAITH SETTLEMENT DETERMINATION**<br><br>Date:<br>Time:<br>Location:<br>Judge:       Hon. Laurel Beeler<br><br>Complaint Filed:   October 2, 2017<br>Trial Date:        November 7, 2022<br>Status:            SETTLED |

1

**J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp. …(2) Payment of … fees; and, (3) Good-faith settlement determination -- CASE NO. 3:17-cv-05679-LB**

PLEASE TAKE NOTICE that as soon thereafter as the matter may be heard in Courtroom C, 15th Floor of the above-entitled Court, located at 450 Golden Gate Ave., San Francisco, California, plaintiff J.P. by and through his guardian ad litem Shannon Villaneuva will and does petition this Court for an order approving of a compromise of the above-noted action as against defendants COUNTY OF ALAMEDA and TRIAD FAMILY SERVICES ("Defendants").

This motion will be made on the grounds that the Court is required to safeguard the interests of litigants who are minors by conducting its own inquiry to determine whether the settlement serves the minor's best interests. *See Robidoux v. Rosengren*, 638 F.3d 1177, 1181 (9th Cir. 2011). In addition the settlement is believed to be in good faith pursuant to Code of Civil Procedure section 877.

The motion is based on this notice of motion, the accompanying memorandum of points and authorities and two declarations of counsel, and on such other evidence as may be presented at or before the court if there is any hearing on this motion.

Dated:  June 30, 2023                    /s/Darren Kessler/s/ Lizabeth N. de Vries
                                         Darren Kessler and Lizabeth N. de Vries

2

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

**PETITION FOR APPROVAL OF MINOR'S COMPROMISE**

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

J.P., by and through his Guardian Ad Litem, Shannon Villanueva ("Plaintiff") brought this action to recover damages for injuries sustained at the hands of County of Alameda, Triad Family Services, and now-dismissed defendants Diane Davis Maas, Sue May, and Maria Refugio Moore. The matter was set for trial on November 7, 2022; the parties participated in a second all-day Mandatory Settlement Conference presided over by the Honorable Magistrate Laurel Beeler; and the case was conditionally settled on July 14, 2023, subject to this Court's approval of this compromise and determination that it was made in good faith. Plaintiff presents this Petition after years of litigation in the District Court, Ninth Circuit, and United States Supreme Court. This case is a tragic story about two young foster children who were neglected in foster care.

Plaintiff previously settled with Moore for $150,000, which was the subject of two prior court orders approving that minor's compromise and good-faith settlement determination. (See, *Order Approving Minor's Compromise and Good-Faith Settlement Determination* Dkt. 110 filed on 1/28/19.) The Parties have since reached a final settlement with the two remaining defendants, Triad Family Services and County of Alameda ("Defendants") for $3,500,000 with the formal written agreement executed on June 27, 2023.

Plaintiff now seeks an order approving this settlement with Defendants based on this Memorandum of Points and Authorities and Declarations of Darren Kessler and Lizabeth de Vries, both of which are incorporated by reference for all purposes.

The total settlement is $3,500,000. As described in the parties' Settlement Agreement, the anticipated breakdown would be as follows, subject to this Court's approval. The County of Alameda will pay $2,250,000.00 and Triad $1,250,000.00.  After attorney's fees and costs, J.P., the minor Plaintiff, will receive a net recovery from this settlement of $2,100,000, paid as follows. The amount of $200,000 will be placed in a minor's trust and remainder amount of $1,900,000.00 will be placed in an annuity or annuities paying out to Plaintiff in multiple installments both prior to and

3

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

after age 18 and continuing to pay to Plaintiff over the course of his lifetime. Settlement Payments to be paid out as further detailed out below:

    (1)    Triad will pay $1,250,000.00 to Kessler Law Office IOLTA Trust.

    (2)    County of Alameda will pay $350,000.00 to Kessler Law Office IOLTA Trust.

    (3)    County of Alameda will pay $1,900,000.00 to fund the structured settlement annuities with Pacific Life Insurance Company, an A+XV rated Life Insurance Company and Metropolitan Tower Life Insurance Company, an A+XV rated Life Insurance Company as detailed out in Addendum No. 1 to this Petition and Order.

In addition and separate from the $3,500,000, plaintiff may also recoup a portion of the settlement proceeds from the settlement his counsel previously negotiated with Maria Moore that have been deposited and retained for his benefit in counsel's trust account relating to any possible Medi-Cal lien. In March 2019, counsel were advised a lien may issue in the amount of $33,859.10. Since then, plaintiff's attorneys' advocacy resulted in a reduced Medi-Cal lien from an undisclosed amount that was alleged to exceed $300,000 to $0. It is anticipated that plaintiffs' counsel will be reimbursed for their outstanding costs, in the amount of $22,760.57, by deducting that amount from the $33,859.10 retained from the Moore settlement, for a distribution to plaintiff for $11,098.53.

## II.    FACTUAL BACKGROUND

### A.    Facts of this Case

Plaintiff alleged and intended to put in his case in chief as follows.

On September 30, 2015, defendant County of Alameda ("COA") removed five-year old J.P. and his then-two-year-old sister M.M. from their biological mother's home. At 3:00 p.m. the children were brought to the COA's Assessment Center to be medically evaluated and cleared for placement. On October 1, 2015, the COA contracted with defendant Triad Family Services ("TRIAD") to locate a safe foster home to place these children, which it did with Maria Moore.[1] The COA delegated its duties to TRIAD to monitor, supervise, and remove J.P. and M.M. in the face of an imminent risk of harm.

At 6.30 p.m. on October 3, 2015, for the first time, Moore observed M.M. "acting

---

[1] At the prior Mandatory Settlement Conference in September 2018 before Magistrate Laurel Beeler, the plaintiff settled with foster mother Maria Moore who has since been dismissed.

4

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

strangely"— M.M. was hallucinating. A urine test taken on October 4 confirmed M.M.'s diagnosis— *Amphetamine Abuse* and *Altered Level of Consciousness.* A Suspected Child Abuse Report (SCAR)[2] was prepared by a healthcare worker memorializing this toddler's drug exposure and this information was communicated to both defendants. But neither did anything to investigate Moore or her foster home's safety until *after* M.M. died of methamphetamine toxicity on October 16, 2015.

**The question left unanswered was how and when did M.M. get the drugs she had obviously ingested that were in her system on October 4, 2015 which could have killed her or any other young child including J.P. in that foster home?**

Had these facts been investigated *before* M.M. ingested more drugs and died without any medical care on October 16, 2015, defendants would have had to acknowledge their reckless assumption that M.M. ingested the drugs in her biological home rather than the foster home was not only unlikely, it was illogical. At no time between 3:00 p.m. on September 30th and 6:30 p.m. on October 3 did M.M. (or J.P.) exhibit any symptoms of being under the influence.

It is a fiction that either the COA or TRIAD relied on anything the Stockton police or San Juaquin CPS agents determined because they never communicated with either defendant before M.M.'s death. This hide-behind-other-agencies' inaction defense was a red herring.

Rather, between October 4 and 16, 2015 defendants did *nothing* to protect J.P. from harm by failing to investigate M.M.'s drug exposure which according to every witness deposed to date constituted *severe* neglect and required an in-person investigation within ten days. As described below, a jury would be instructed that the COA and TRIAD flouted multitudes of duties and mandates to timely assess this October 3, 2015 drug exposure of a just three-year old, investigate it, and take immediate steps to prevent further harm, certainly within ten days.

The COA's PMQ Svetlana Lesovo recently testified about what the COA *should have* done in response to this SCAR: (1) designated this report as severe neglect; and, (2) required an immediate in-person response by the Emergency Response Field Investigation Unit which would have included interviewing the children, caretakers, TRIAD workers, medical staff, and police. Instead, the COA

---

[2] A Suspected Child Abuse Report required to be filed by mandated reporters. A SCAR is a form used by mandated reporters to report suspected child abuse or neglect. It is also referred to as a "11166 cross report."

5

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

implemented an illegal referral[3] matching/routing policy that recklessly exposed any foster child in out-of-home care to ongoing abuse or neglect in a foster home for all new reports like this one "cross-reported" to Dependency Investigation workers. Maas, her supervisor Nygaard, and the COA's PMQ testified unequivocally that they and all Dependency social workers were trained and understood the COA's out-of-home-placement policy was that they as Dependency workers *could not* investigate any new claim of abuse in a foster home. Through cross examination and supplemental written discovery, Plaintiff discovered that COA implemented this unlawful policy by having a box with note cards that would record how, upon COA receiving reports of a new injury to foster children, COA would systematically bypass required protocol that mandated investigation and protection of J.P., M.M. and other foster children similarly situated. Instead, COA relied on others, including foster family associations such as TRIAD who also contended that they could not investigate this new report either. A jury would have held both defendants accountable for inaction.

And TRIAD's response here was equally outrageous. Three TRIAD workers scoured available records and concluded J.P. and M.M. should be moved from the foster home immediately, during the week of October 5, 2015.[4] But TRIAD's Director, Shawn Nunn, overrode their recommendations and instructed his team to conceal information relating to this drug exposure, instead. As TRIAD's final decision maker, Nunn ratified his own inaction and fraud by instructing his team to hide: (1) his team's recommendations from the County; (2) the existence of drugs in M.M.'s system from the regulatory agency charged with investigating abuse or neglect in foster homes, Communicate Care Licensing (CCL); (3) that the sole source of allegations by the hospital or police that the drugs could have come from the biological mother's home came from Moore herself; (4) the Stockton police continued to keep their investigation open as to Moore's home's safety, deferring to CPS to investigate this further; and (5) its knowledge about Moore's history of allowing foster children in her home be exposed to drugs.

TRIAD's response was not just inadequate; it was reckless. Evidence of a cover-up by

---

[3] A "Referral" is a report of abuse, neglect or exploitation of a child.
[4] Joanne Willis so testified through tears at her deposition. Willis's supervisor Marie Hoglund did as well. Amy Naverette, another social worker at TRIAD, submitted a declaration to this effect.

6

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

TRIAD is blatant and appears to be motivated by money. TRIAD had just taken over Moore's home which had four children—two from Alameda and two from San Juaquin. This "asset" was new; Triad certified Moore's four-bed home on September 9, 2015—and it was worth approximately $72,000 per year to TRIAD. Eradicating that foster home's license would be costly. And the COA's referrals constituted over 50% of TRIAD's income. Nunn contends in this litigation that TRIAD's (unlawful) policy was that it could not remove these children without the COA's authorization.

And there is more. Neither TRIAD nor the COA reevaluated the suitability of Moore's foster home in terms of its safety for J.P. or M.M. prior to M.M.'s death. Yet the COA delegated this duty to TRIAD, the Foster Family Agency which certified the home and knew that the foster mother already had several complaints against her arising out of her personal misconduct relating to drugs in her home. Testimony on this point is outstanding. But the conflicts that already exist preclude summary judgment on this issue as well.

Plaintiff expected the witnesses to provide trial testimony consistent with their depositions with conflicting descriptions about what *should have* happened in response to reports of M.M.'s first hospitalization and exposure to drugs. Everyone will say someone else should have done something—protecting J.P. and his sister was not their job.

### B.     The Retention and Fee Agreement, Case Costs and Liens

On April 24, 2017, J.P., through his Guardian ad Litem, retained private counsel from two different firms to represent J.P. The original attorney-client fee agreement between petitioner, as J.P.'s Guardian ad Litem, and his attorneys, Law Offices of Darren J. Kessler and the Scott Law Firm was amended on December 21, 2021 wherein Petitioner retained the Law Offices of Darren J. Kessler and substituted the Scott Law Firm with De Vries Law, P.C., with the support and assignment of all rights under the arrangement by John Scott to Ms. de Vries. (de Vries Decl. Ex. 1.)

The retainer agreement between J.P. by and through his Guardian ad Litem and his attorneys sets the fees for attorneys' services at 40% of the gross recovery. This equates to a fee of $1,400,000. A 40% fee for litigated civil-rights matters is usual and customary in the Bay Area. The fee is reasonable given the difficulty of litigating this matter which presented a set of very complex Constitutional challenges including standing, what constitutes harm relating to a Constitutional

7

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

violation, polices and procedures which violate foster-children's civil rights, how foster children enjoy protections under the Fourteenth and First Amendments, state negligence and negligent supervision nuances, navigating standing and wrongful-death issues when the death of M.M. was so critical to the entire case, and making new law to protect foster children nationwide—some of which was overturned by the Ninth Circuit, but not all.  The expertise and experience of counsel, duration and complexity of litigation, and the risks taken due to the contingent nature of the fee were essential to this settlement. (See de Vries Decl., generally; Kessler Decl., generally.)

Additionally, Plaintiff and his attorneys incurred outstanding costs totaling $14,764.95 (Kessler Decl, Ex. 1) and $7, 995.62 (de Vries Decl, Ex. 2) $22,760.57 in this matter, for which they seek reimbursement from the gross settlement proceeds as set forth pursuant to the fee agreement. (de Vries Decl.., Ex. 3) Accordingly, plaintiff's attorneys' fees and costs equal $ 1,422,760.57.

Plaintiff's potential Medi-Cal lien against the entire settlement of this litigation was estimated to be over $300,000 by the manager of the Medi-Cal recovery unit department. After negotiating with Medi-Cal for over ten months recently, and many months in 2019, that total lien was waived, in its entirety. However in late 2019 when J.P. settled with Defendant Moore, Medi-Cal provided an estimated preliminary lien figure of $33,859.10.  J.P.'s attorneys have retained the entire $33,859.10 in counsel's IOLTA account to satisfy that lien when the case finally concluded.

Accordingly, J.P. seeks an order that once all payments from the settlement are distributed, the balance in J.P.'s attorneys' trust account originally deposited if needed to pay a Medi-Cal lien may now be transferred to fund J.P.'s Minor's Trust.

### C. Procedural Background

J.P. filed his *Complaint for Damages and Declaratory and Injunctive Relief* against multiple defendants on October 2, 2017.  J.P. filed his *First Amended Complaint for Damages and Declaratory and Injunctive Relief* on May 15, 2018 following pleading practice involving a motion to dismiss.

Claims against Maria Refugio Moore settled in 2019.

The Ninth Circuit dismissed claims against Diane Maas Davis and Sue May based on qualified immunity in 2020.

8

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

The history of the many phases of litigation, in this Court, the Ninth Circuit, and the United States Supreme Court, is summarized in the accompanying declaration of Lizbeth N. de Vries and is incorporated herein by reference.

Claims against Defendants Triad Family Services and County of Alameda settled on July 14, 2022, subject to this compromise petition and finding the settlement was made in good faith.

### D. Settlement and Net Recoveries to Minor

The total settlement is $3,500,000, with County of Alameda paying $2,250,000.00 and Triad paying $1,250,000.00. After attorneys' fees and costs, J.P., the minor Plaintiff, will receive a net recovery of $2,100,000. The amount of $200,000 will be placed in a minor's trust and remainder $1,900,000.00 will be placed in an annuity or annuities paying out to Plaintiff in multiple installments both prior to and after age 18 and continuing to pay to Plaintiff over the course of his lifetime. Settlement Payments to be paid out as further detailed out below:

(1) Triad will pay the amount of $1,250,000.00 payable to Kessler Law Office IOLTA Trust.
(2) County of Alameda will pay the amount of $350,000.00 payable to Kessler Law Office IOLTA Trust.
(3) County of Alameda will pay the total amount of $1,900,000.00 to fund the structured settlement annuities with Pacific Life Insurance Company, an A+XV rated Life Insurance Company and Metropolitan Tower Life Insurance Company, an A+XV rated Life Insurance Company as further detailed out in Addendum No. 1 to this Petition and Order.

(Settlement Agreement, dated June 27, 2023 (de Vries Decl., Ex. 3.)

In addition, counsel request an order that they may pay themselves the amount of reimbursement for costs ordered by this Court and requested to be $22,760.57 by deducting that amount from the $33,859.10 now withheld in a trust account for a Medi-Cal lien they negotiated to zero. Further, counsel seek an order to deposit the balance of $11,098.53 from their trust account to J.P.'s Minor's Trust.

### E. J.P.'s monies will be protected for him in a structured settlement.

While the settlement was being evaluated, Plaintiff's counsel and the Guardian Ad Litem consulted with Sage Settlement Consulting to devise a settlement plan that would best serve

9

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

Plaintiff's interests. The structured settlement payments provide Plaintiff with financial security to meet his ongoing therapeutic and educational needs, while also providing Plaintiff with sufficient funds at pivotal life stages when he has the maturity to handle such funds. His Guardian Ad Litem anticipates these lump sums could assist him as he prepares to enter the work force, settles down in a residence and potentially starts a family or business. It will also provide a steadily growing monthly lifetime income that will guarantee Plaintiff has access to therapy, medical coverage, and any other support systems he needs to overcome the injuries sustained as a result of Defendants' negligence.

Based on the above, the Settlement Amount of $3,500,000, and a net recovery by Plaintiff of $2,100,000 (which will fund a Minor's Trust and annuities), is fair and reasonable and services the best interests of the minor Plaintiff.

### III. LEGAL ARGUMENT

#### A. The Court has a special duty to ensure this settlement is fair and reasonable and in the interests of minor J.P

"District courts have a special duty, derived from Federal Rule of Civil Procedure 17I, to safeguard the interests of litigants who are minors." (*Robidoux v. Rosengren*, 638 F.3d 1177, 1181 (9th Cir.2011).) In evaluating a settlement, the Court evaluates the fairness of the minor plaintiff's net recovery without regard to the proportion of the total settlement value designated to other plaintiffs and/or counsel. (*Robidoux,* 638 F.3d at 1182 [internal citations omitted].) Generally, courts should approve settlement so long as the net recovery to the minor plaintiff is fair and reasonable in light of their claims and average recovery in similar cases. (*Id.*) However, the primary focus of the court's review is whether the settlement serves the best interests of the minor plaintiff. (*Id.* at 1181-82.)

#### B. The facts, law and multi-court advocacy that led to this settlement demonstrate this settlement should be approved.

First, J.P.'s recovery is reasonable under the factual and legal circumstances of this case.

To begin, J.P. had to overcome the standing hurdles presented by the fact that as M.M.'s sibling, he was not entitled to either wrongful-death or loss of association rights under the Fourteenth Amendment. *Ward v. San Jose,* 967 F.2d 280 (9th Cir. 1991). Instead, he alleged claims under the Fourteenth Amendment under the danger-creation and special-relationship doctrines and First Amendment loss-of-association rights. These matters were heavily litigated in the Northern

10

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

District, Ninth Circuit, and brought to the attention of the United States Supreme Court. Although the District Court issued a reasoned and logical decision overruling a motion to dismiss based on qualified immunity, the Ninth Circuit overruled that decision to dismiss the primary individual defendants from this matter, Maas and May, in its March 2020 decision.

Plaintiff was also able to overcome motions for summary judgment based on the evidence adduced and legal reasoning that were unique and creative. *First*, Plaintiff established material disputed facts whether private-entity defendant TRIAD could be found by a jury to be a state actor, creating protections for foster children nationwide whose care and custody depend on delegated State duties to private foster family agencies. At the time no other published decision had found state action by a foster family agency that either party or the Court could identify. *Second*, Plaintiff's advocacy allowed the District Court to correctly interpret the Ninth Circuit's less-than-clear dicta supporting its dangerous ruling that a foster child's risk of severe emotional harm did not then trigger a foster child's civil rights based on "clearly established law" to avoid qualified immunity. 11/19/21 order. *Third,* Plaintiff methodically deposed persons most knowledgeable and specific case workers in the County of Alameda to uncover the "duplicate" policy that has since been changed (on information and belief in part thanks to this litigation) which recklessly did not investigate any allegation of child abuse or neglect that a particular worker deemed to be duplicative or prior allegations. This was the policy that would have been "on trial". *Fourth,* to establish TRIAD's liability, Plaintiff adduced much evidence from prior employees and assembled that evidence to ensure state action was confirmed and overcome summary judgment on liability.

Given the ruling by the Ninth Circuit and the risks it presented were Plaintiff to obtain a verdict which then was likely subject to post-trial motion practice and diminution of damages, it appeared likely that the attorneys' fees at a Lodestar calculation after trial would have likely exceeded whatever amount J.P. would recover on a net basis rendering this settlement far more beneficial to J.P. (and not to his attorneys).

While it is difficult to find any comparable cases similar to the one at bar, petitioner and her counsel believe this net recovery is fair and reasonable under the circumstances and in light of the challenges and risks associated with trying the case. Moreover, after this settlement was agreed upon

in July 2022, J.P.'s counsel negotiated with Medi-Cal for over ten months to reduce a potential lien of over $300,000 down to zero.

Therefore the settlement proceeds will provide Plaintiff with certainty of recovery for J.P., as opposed to the uncertainty, trauma related to revisiting the incident, and risks and potential continued delay associated with a jury verdict. It also provides sufficient funds to cover J.P.'s current and future anticipated therapeutic needs, medical needs, educational support and tuition and provide supplemental lifetime income to support J.P.'s lifelong needs. The net recovery to Plaintiff of $2,100,000 is a fair and reasonable net recovery in this matter.

### C. The attorneys' fee and request for cost reimbursement are reasonable.

District courts should "limit the scope of their review to the question whether the net amount distributed to each minor plaintiff in the settlement is fair and reasonable in light of the facts of the case, the minor's specific claim, and recovery in similar cases," and should "evaluate the fairness of each minor plaintiff's net recovery without regard to the proportion of the total settlement value designated for the adult co-plaintiffs or plaintiffs' counsel—whose interests the district court has no special duty to safeguard." *Robidoux*, 638 F.3d at 1181-82 (citations omitted). "So long as the net recovery to each minor plaintiff is fair and reasonable in light of their claims and average recovery in similar cases, the district court should approve the settlement as proposed by the parties." *Id.* at 1182.

In this case, the fee agreement provides that J.P.'s counsel will be paid a contingency fee of thirty-three percent (33 1/3 %) of the total monetary recovery should the matter resolve before a trial date is set, and, forty percent (40%) of the total monetary recovery after the case is set for trial. This fee will be allocated by J.P.'s two counsel between themselves. The fee agreement also provides that litigation costs will be deducted from J.P.'s percentage of the total monetary recovery. These terms are usual and customary for similar types of contingency fee agreements for similar types of cases initiated in the Northern District of California and the San Francisco Bay Area, in general. The case was set for trial on April 29, 2019 and then appealed, motion practice began anew, and the case was set for trial again on November 7, 2022 triggering the 40% contingency fee.

///

12

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

Counsel's services and fees should be analyzed in the context of the Rule of Court 7.955(b) factors, as follows:

1. Circumstances of minor with a disability: From psychological testing conducted in July 20, 2016, J.P. was diagnosed to have Post Traumatic Stress Disorder, Major Depressive Disorder, unspecified, with anxious distress, Attention-Deficit/Hyperactivity Disorder, combined presentation, provisional and Specific Learning Disorder, provisional. It is hoped that, with time and the extra support to be provided to J.P. and paid from the Defendants' settlement funds, that J.P. will learn coping strategies that will help him mitigate the damages he suffered at the hands of Moore (and others), such that his emotional and psychological needs will diminish over time as he grows into an adult.

2. Fee proportionate to services: The resulting legal fee of $1,400,000 for two lawyers and firms to litigate for over five years is abundantly reasonable. Counsel took 18 depositions, litigated in three courts the dockets of which they seek this Court take judicial notice, and spent well thousands of hours litigating this matter. With their experience in the San Francisco marketplace, counsel would be able to seek a Lodestar fee award of well over the amount being requested as a contingency fee.

3. Novelty/difficulty of questions/skills required: The legal questions presented in this case are novel and present legal theories that are legally and factually complex. J.P.'s counsel expended significant resources and provided extensive legal services to conduct due diligence, perform legal research, and formulate colorable legal and factual theories that have withstood challenge by defendants in two courts. This is a complex and legally-significant case. Petitioner's counsel obtained orders from this Court making new law to protect not only J.P. but foster children nationwide from private state actors.

4. Results achieved compared with amount sought: Because of the complexity of the case, the extensive advocacy involved, the Ninth Circuit's decision's potential for law of the case post-trial rulings diminishing J.P.'s net recovery, petitioner believes that the results obtained as against the municipal defendants are significant and the maximum amount that might be offered pre-trial where a trial would likely result in a plaintiff's verdict but possibly a higher recovery for the attorneys than the minor, and, more than what is being requested here, given the circumstances.

5. The time limitations imposed by the circumstances are due to J.P.'s current need for extra support and counseling services, especially those needed to assist him in fully accessing his education.

6. There is no extraordinary nature or length of professional relationship between J.P.'s counsel and his Guardian ad Litem.

7. J.P.'s lawyers are both experienced trial counsel, specializing in the areas implicated in this case. Darren J. Kessler has been practicing almost forty years as a child advocate, dependency lawyer, former deputy-district attorney, civil-rights, and criminal-defense lawyer. Lizabeth N. de Vries has been practicing civil-rights law representing children and elders since 2003, specializing in Section 1983 litigation and related public-policy cases and statutory schemes which involve elder and dependent adult abuse, police misconduct, and disability discrimination, at the trial and appellate levels.

8. Due to the complexity of the legal theories presented, that defendants are individuals, governmental entities, private organizations acting as state actors, and the sensitivity of the facts of holding defendants legally responsible for the harm caused to the surviving sibling for the drugging and death of a child in their care and custody, this case has consumed an extraordinary amount of time and labor.

9. Petitioner J.P.'s mother and Guardian ad Litem consented to the attorneys' fees requested. In the Declaration of Guardian Ad Litem, Shannon Villanueva, In Support of Minor's Compromise, Ms. Villanueva stated as follows in paragraph 7:

> I specifically and fully support my attorneys' request to receive 40% of the recovery, which I wholeheartedly believe they earned in this case. I believed this to be fair compensation when I initially retained my attorneys, which was agreed in our legal services agreement. Ultimately, Mr. Kessler and Ms. de Vries worked far beyond what I anticipated, overcoming significant challenges and achieving a successful settlement. Accordingly, I emphatically encourage this court to approve a legal fee of 40% of the overall recovery.

10. Petitioner is a is a sophisticated client with a clear understanding of the risks and benefits of the settlement amount proposed and the attorneys' fees requested.

11. Petitioner is aware of the significant time and effort expended by J.P.'s counsel. Petitioner is aware that counsel do not confine their efforts on J.P.'s behalf solely to work hours or a traditional attorney's work day. She, herself, has communicated with them by phone, email, and text at all hours of the day and evening, including weekends. Petitioner is aware that the flexible availability of J.P.'s counsel has impinged on the time available to them to work on other matters and also on their personal lives. Petitioner and counsel are all committed to J.P. and his well-being.

12. The fee agreed upon by petitioner and counsel is a contingency fee agreement, as described, above.

13. The entire risk of loss in the case, including costs incurred in the amount of $22,760.57, has been borne solely by J.P.'s counsel. Mr. Kessler has worked on this case without compensation since late 2015 other than a de minimus payment from the Moore settlement. Ms. de Vries has worked on this case since late 2016 without receiving compensation other than a de minimus payment from the Moore settlement. They have relentlessly pursued the case, through appeal to the Ninth Circuit and United States Supreme Court, and were prepared to go to trial if necessary, with the same vigor with which they have pursued it, thus far, advancing costs as necessary.

There are no statutory requirements for representation agreements applicable to this particular case or claims, or type of case or claims. While in the past there have been local rules governing the maximum percentage of attorneys' fees deemed reasonable in minor's cases, those local rules have been preempted by the California Judicial Counsel and are no longer precedential.

In light of the signed contingency agreement, tenacious advocacy across multiple courts and

14

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

Medi-Cal, and cautious approach to litigation costs and efforts to not retraumatize J.P. throughout the litigation process, particularly considering all that was done to continue advocating despite the many obstacles, this fee is reasonable.

Accordingly, Petitioner requests an Order authorizing payment of $1,400,000 from the Defendants' settlement amount to the client trust account of Law Offices of Darren J. Kessler for payment of the attorneys' fees due to Law Offices of Darren J. Kessler and De Vries Law, P.C. under the Fee Agreement.

### D. **Request for reimbursement of attorney's costs.**

To date, J.P.'s counsel advanced and incurred litigation costs above and beyond those already considered in the Moore settlement in the total amount of $22,760.57. Specifically, the Law Offices of Darren J. Kessler has advanced and incurred costs in the amount of $14,764.95**.** (See, Kessler Decl., Ex. 1**),** De Vries Law, P.C. has advanced and incurred costs in the amount of $7,995.62. (de Vries Decl., Ex. 2).

Petitioner requests an Order authorizing reimbursement of costs incurred from the Defendants' settlement amount after payment of such attorneys' fees authorized by this Court in the amount of $14,764.95, to Law Offices of Darren J. Kessler and $7,995.62 to De Vries Law P.C.

### E. **The parties all agreed that this was a good-faith settlement.**

All parties agree that this the court issue an order that the terms of this settlement are made in good faith, pursuant to California Code of Civil Procedure Section 877.6, so as to bar all equitable indemnity claims against the settling defendants.

## IV.   CONCLUSION

Based on the above, Petitioner and Plaintiff respectfully request the court approve the settlement reached by the Parties, and distribution of the funds to J.P.'s Minor's Trust and a structured settlement annuity for the benefit of Plaintiff J.P., a minor.

### **PRAYER**

Petitioner respectfully requests an Order of this Court:

1. Finding that notice on this **PETITION FOR ORDER APPROVING: (1) MINOR'S COMPROMISE WITH DEFENDANT COUNTY OF ALAMEDA AND**

15

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

**DEFENDANT TRIAD FAMILY SERVICES; (2) PAYMENT OF ATTORNEYS' CONTINGENCY FEE AND COSTS; AND, (3) GOOD-FAITH SETTLEMENT DETERMINATION** was given as required by law and that no further or other notice is required;

2. Finding that the settlement of plaintiff J.P.'s claims against Defendants County of Alameda and Triad Family Services in exchange for payment to J.P. of $3,500,000 is in the best interest of plaintiff J.P. and the result of a good-faith settlement pursuant to California Code of Civil Procedure Section 877.6, so as to bar all equitable indemnity claims against the settling defendants;

3. Authorizing the payment of $1,400,000 from the settlement amount received to Law Offices of Darren J. Kessler and De Vries Law, P.C. as reasonable compensation for attorneys' services rendered to J.P. by his counsel from this settlement with these two defendants;

4. Authorizing the reimbursement of costs advanced by Law Offices of Darren J. Kessler and De Vries Law Firm, P.C. on behalf of J.P. in the total amount of $22,760.57 from the funds in counsel's trust account retained to resolve any Medi-Cal lien that has been negotiated down to zero from funds belonging to the Guardian Ad Litem from the Maria Moore settlement monies amount after payment of all attorneys' fees authorized by this Order;

5. Setting a compliance hearing in this Court in six months' time, which will be taken off-calendar if Guardian ad Litem Shannon Villanueva files proof that the net settlement funds due to J.P. have been deposited to his Minor's Trust and proof of annuity funding; and,

6. For such further or other relief the Court deems necessary and proper under these circumstances.

Respectfully Submitted,

**KESSLER LAW OFFICE**

Date: June 30, 2023      */s/ Darren J. Kessler*
Darren J. Kessler, Attorney for Plaintiff J.P., by and through his GAL, SHANNON VILLANUEVA

**DE VRIES LAW, P.C.**

Date: June 30, 2023      */s/ Lizabeth de Vries*
Lizabeth N. de Vries, Attorney for Plaintiff J.P. by and through his GAL, SHANNON VILLANUEVA

**Former Counsel for J.P.'s approval as to the proposed fee split and assignment of any fee due to the Scott Law Firm to be assigned to De Vries Law, P.C.**

**SCOTT LAW FIRM**

Date: June 30, 2023      */s/ John H. Scott*
John H. Scott, FORMER Attorney for Plaintiff J.P. by and through his GAL, SHANNON VILLANUEVA

**ELECTRONIC CASE FILING ATTESTATION**

I, Lizabeth N. de Vries, am the ECF user whose identification and password are being used to file the foregoing documents. Pursuant to Civil Local rule 5.1(i), I hereby attest that concurrence in the filing of these documents has been obtained from each of its signatories.

**DE VRIES LAW, P.C.**

Date: June 30, 2023          By: */s/ Lizabeth N. de Vries*
                                  Lizabeth N. de Vries
                                  Attorney for Plaintiff J.P. by and through his
                                  GAL, SHANNON VILLANUEVA

18

J.P.'S Not. And Pet. For Order Approving: (1) Minor's Comp., etc.

DE VRIES LAW, P.C.
1388 Sutter Street, #715
San Francisco, CA 94109