1  Darren J. Kessler, SBN 114986
   **KESSLER LAW OFFICE**
2  3060 El Cerrito Plaza, Suite 371
   El Cerrito, CA 94530
3  Tel: (510) 524-7750
   E-Mail: darren.j.kessler@gmail.com
4

5  Lizabeth N. de Vries, SBN 227215
   Kelly K. Dixon, SBN 191078
6  **DE VRIES LAW, P.C.**
   100 Pine Street, Suite 1250
7  San Francisco, CA 94111
   Tel: (415) 909-4009 // Fax: (628) 280-6514
8  E-Mail: liza@devrieslawsf.com

9  Attorneys for Plaintiff J.P. by and through his
   Guardian *ad litem,* Shannon Villanueva
10

11                **UNITED STATES DISTRICT COURT**

12        **NORTHERN DISTRICT OF CALIFORNIA — SAN FRANCISCO**

13

14

15  J.P., by and through his Guardian Ad Litem,   Case No.: 3:17-cv-05679-LB
    SHANNON VILLANUEVA,

16              Plaintiff,                        **DECLARATION OF LIZABETH N. DE
                                                  VRIES IN SUPPORT OF PETITION
17        v.                                      FOR MINOR'S COMPROMISE AND
                                                  APPROVAL OF GOOD-FAITH
18  COUNTY OF ALAMEDA, TRIAD FAMILY               SETTLEMENT**
    SERVICES, and Does 1-30 inclusive,
19                                                Date:
              Defendants.                         Time:
20                                                Courtroom:
                                                  Judge:          Hon. Laurel Beeler
21

22

23

24

25

26

27

28

DE VRIES LAW, P.C.
1388 Sutter Street, #715, San Francisco, CA 94109

I, Lizabeth N. de Vries, declare as follows:

1.     I am an attorney at law duly admitted to practice before all the courts of the State of California and an attorney of record herein for the plaintiff, J.P. by and through his guardian ad litem, Shannon Villaneuva. I have personal knowledge of the matters stated herein, and, if called as a witness, could and would testify to them. I offer this declaration in support of the plaintiff's petition to approve a minor's compromise and determined the parties' good-faith settlement resolving all outstanding claims, and request for approval of attorneys' fees of 40% of the recovery obtained and for reimbursement of costs.

2.     Everyone knew that this case would potentially make new law due to: (1) its graphic and unheard-of-allegations of drugging a three-year old foster child twice, the second to death, in an out-of-county placement; and, (2) difficult legal posture with anticipated finger-pointing between parties to ensure no one would be "liable" for the harm suffered by J.P.

3.     This was a case of national importance and interest. The press came out in droves, starting with our first hearing (at least three television channels and two print journalists appeared). At that first hearing, the Honorable Yvonne Gonzales-Rogers grilled the attorneys to ensure they had adequate experience and commitment to this "significant" and "very important" case. In my then-fourteen years of experience regularly appearing at first case-management-conference hearings in federal civil-rights cases, never before had I experienced or witnessed a judge be so adamant that adequately experienced and tenacious attorneys represent a plaintiff in a lawsuit. Our appellate practice also revealed the nationwide importance by virtue of nine amici supporting plaintiff's cause.

4.     This case was hardly a legal "slam dunk." M.M.'s tragic October 16, 2015 death was actionable by M.M.'s intestate heir, which was not J.P. Rather, M.M.'s sibling J.P. enjoyed no state-based wrongful-death or federal Fourteenth Amendment loss of familial association rights. Assessing and adducing evidence to name *only* those defendants against whom a claim could be established was only the first step. Step two was to draft a complaint and all subsequent motions and appellate briefs to avoid immunity and a panoply of finger-pointing legal and factual minefields. This required J.P.'s counsel craft and present untested viable legal theories to recover for a foster sibling's Constitutional harms with creativity, courage, and commitment.

DE VRIES DECL ISO MINOR'S COMPROMISE, CASE NO. 3:17-cv-5679-LB

DE VRIES LAW, P.C.
1388 Sutter Street, #715, San Francisco, CA  94109

5.      The result of our analysis, legal research, investigation, pointed discovery, and drafting is demonstrated by this Court's orders. The first was its denial of the County Defendants' motion to dismiss on April 25, 2018. The County defendants appealed this ruling to the Ninth Circuit and review of the ultimate decision was denied by the United States Supreme Court in 2020. Although this Court acknowledged a siblings' First Amendment Right to associate with his foster sibling, the Ninth Circuit overturned that finding. After the appeal, this Court correctly parsed out the Ninth Circuits' memorandum in its second important order dated November 19, 2021. This Court correctly denied the defendants' summary-judgment motions to acknowledge J.P.'s and all foster children's Constitutional rights to emotional wellbeing under the Fourteenth Amendment. Critically, this Court also acknowledged that under the facts of this case, uniquely and the only <u>one</u> in the nation at the time which I could find, that a jury would have to decide whether a foster-family agency was a state actor, exposing this private-entity defendant to civil-rights liability.

6.      *J.P.'s counsel pursued and prevailed on first-in-the-nation theories and findings which protect foster children's civil rights, nationally. This case is not just important to J.P. and his family, but similarly situated foster children whose rights have been violated by those entrusted to protect them.*

7.      Counsel engaged in almost daily if not weekly conferences to brainstorm, divide labor, avoid duplication, implement new strategies, and benefit from each other's strengths. Sensitive to the fact that this litigation could have *easily* incurred costs in the high six-figures, J.P.'s attorneys litigated this case as cost-efficiently as possible spending under $50,000 before the second Mandatory Settlement Conference. The result speaks volumes about not only the merits of this case, but, also, the tenacity, hard work, and intentionality of J.P.'s legal team's strategies from Day 1.

- Mr. Kessler provided his immense experience and knowledge of dependency law and practice, and familiarity with foster-children's Case File documents specifically to lock the defendants into a position as to facts and procedure. Mr. Kessler also nurtured a beautiful relationship with young J.P. as he grew up with this lawsuit, constantly balancing an exquisite emotional intelligence to protect J.P. from the rigors of any litigation we could while extracting necessary information about J.P.'s development to ensure we could work with his treaters and experts, should the matter have to go to trial, or, should J.P. have to be deposed. We were ever mindful and educated ourselves on a constant basis to understand the risks involved with re-traumatizing J.P. and our monumental efforts managing experts, defendants, the litigation process, and everything about it in service of our steadfast and absolute desire to *never* do that.

- Mr. Scott brought his decades of civil-rights trials (over 120 to verdict) to the table and consistently provided the 500-foot view of significant legal hurdles and tactical challenges by brainstorming issues du jour and relevant to trial or appeal. He made suggestions about how to approach discovery and motion practice to prepare for trial, keeping the concept of what a jury would have to decide front and center in every discussion. He also reviewed and edited draft pleadings, weighed in on settlement decisions, timing, and strategy. Mr. Scott also regularly offered insights into possible motivating factors before, after, and during two settlement conferences. Finally, Mr. Scott generously offered input and contributions until this matter resolved, *even after January 1, 2020, when he assigned his entire attorney fee to my firm.*

- My role was somewhere in the middle of these two focused practitioners' scopes. I took the lead in researching, writing, and drafting all written advocacy. I also conducted most oral advocacy with opposing counsel, informal witnesses who were not deposed, all amici and their counsel, and before all courts involved with the litigation. In that sense, my contributions were to circumvent the unusual non-wrongful-death procedural posture of this plaintiff to ascribe liability to each named defendant under 42 U.S.C. section 1983, crafting first-in-the-nation arguments which ultimately prevailed in part relating to a sibling's First Amendment association rights (which the Ninth Circuit took away), a foster child's Fourteenth Amendment rights to emotional safety and security (which the Ninth Circuit chipped away at but did not deny and this Court wisely clarified), and a foster-family-agency's exposure to state-action liability. I also offered my expertise on the trajectory of a child's development with special needs to help locate, interview, work with, provide materials for, set entire strategic plans for, and prepare consultants and experts to testify at trial to establish causation and J.P.'s damages. In short, I provided experienced advocacy for this case of great importance, as Judge Gonzales Rogers deemed was critical for J.P.'s representation.

8.    To say that counsel for J.P. worked day-and-night to acquire evidence and present substantive and public-policy oriented advocacy would be a gross understatement. It was common practice for us to circulate fifteen (or thirty) drafts of papers and outlines due to the very complex nature of this litigation. Below is a summary of each litigation phase.

### PHASE ONE – DEPENDENCY COURT TO DISTRICT COURT – THE PLEADINGS

9.    The first phase of this litigation was hard-fought on all fronts.

10.    Discovery through the dependency matter began *prior to* the filing of the civil-rights complaint in this Court. It started in December 2015 when my esteemed co-counsel Darren Kessler investigated this matter and consulted with me informally for almost one year. On May 19, 2016, the dependency court of the County of Alameda appointed Mr. Kessler as special counsel for J.P. to investigate his sister's death and the possibility of legal process to follow. Mr. Kessler procured extensive documentation including J.P.'s and his deceased sister's voluminous Juvenile Case Files which underlie this civil lawsuit. Mr. Kessler procured, reviewed, and distilled over 4,000 pages of

records from numerous public entities including but not limited to the County of Alameda, the County of San Juaquin, the Stockton Police Department, healthcare providers, and numerous other sources. To do so, he engaged in dozens of court appearances, off-line discussions and negotiations with County Counsel and other related entities, advocated to comply with the strict Welfare & Institutions section 827 processes.

11.     By the end of 2016, J.P.'s Guardian Ad Litem, former foster mother, and eventual adoptive mother, Shannon Villanueva formerly retained Mr. Kessler and I as co-counsel to prosecute J.P.'s civil rights. Note that Ms. Villanueva retained the Scott Law Firm, not my current firm, as I was then an employee at the Scott Law Firm, owned by John Houston Scott.

12.     The Complaint as drafted focused on J.P.'s personal rights as a foster child under the Fourteenth and First Amendments as well as state-based remedies of negligence as against the private entity named, Triad.

13.     While Triad answered, the County Defendants, including the County of Alameda, Diane Davis-Maas, and Sue May, jointly filed a motion to dismiss. This Court partially denied and granted that motion in April 2018. The County Defendants filed an interlocutory appeal as to qualified immunity.

14.     The Honorable Laurel Beeler presided over the first Mandatory Settlement Conference on September 25, 2018. The County Defendants had sought a stay of all proceedings pending their appeal of this Court's denial of their motion to dismiss. The Honorable Laurel Beeler presided over this MSC. Plaintiff ultimately settled only with defendant Maria Moore, her being judgment-proof and having significant insurance-coverage issues, at that first MSC.

### PHASE TWO – ADVOCACY IN THE DISTRICT COURT TO OPPOSE TRIAD'S MSJ #1, AND, NINTH CIRCUIT & SUPREME COURT WITH NINE CHILDRENS' RIGHTS AMICI

15.     It is common for civil-rights defendants to seek qualified immunity, appeal orders denying such immunity, and staying proceedings pending resolution by the Ninth Circuit. But here, the District Court retained jurisdiction to consider the non-appealing defendant Triad Family Services' (first) summary-judgment motion pending the Ninth Circuit's review of the County Defendants' appeal.

DE VRIES LAW, P.C.
1388 Sutter Street, #715, San Francisco, CA  94109

5

16.     Accordingly, in October 2018, plaintiff's counsel was litigating in two courts—the Northern District and the Ninth Circuit--but was forced to conduct his discovery by litigating *around* the County, receiving no written discovery or opportunity to depose its employees due to the stay, prior to Motion practice in 2019. The County Defendants motion in the Ninth Circuit was filed over the holidays on December 21, 2018. J.P.'s inability to procure evidence and depose key percipient witnesses from the County complicated the trajectory of all advocacy for J.P. Motion practice relating to this ongoing discovery dispute was required along with a motion to compel, for plaintiff to be granted the right to take (only) three County employee depositions to preserve their testimony prior to the appeal's resolution.

17.     And those three depositions were explosive. Despite the fact that the parties' use initials rather than names was sufficient to protect privacy rights at stake, particularly since J.P.'s were being waived and M.M. was deceased, the County Defendants' counsel disagreed requiring J.P.'s counsel to jump through many more "hoops" to present evidence to this Court.

18.     Discovery and motion practice in this litigation was thus infused with a layer of complexity into every aspect while the County Defendants stonewalled J.P.'s efforts to procure discovery during their appeal. The legal and procedural hurdles involved in every single discussion, email, filing, deposition, interview, declaration, filing, and argument were significant, complex, uncharted in terms of the levels of possible issues, and required significant critical thinking and strategic approaches to all filings.

19.     In this phase, plaintiff participated in **fifteen depositions** of: *Patrick Bell (Triad's Chair of the Board); Sophie Cantwell (Stockton County law enforcement officer); Niasha Dupree (Triad employee); *Marie Hogland (Triad's former employee); Diane Davis-Maas (named County defendant); Jeremey Massey (Stockton hospital nurse); *Sue May (County defendant); *Maria Moore (foster-parent defendant); Shawn Nunn (Triad's Director); *Christine Nygaard (County defendant Maas-Davis's supervisor); *Nancy Reagh (Triad's CEO); Douglas Sheldon (Stockton law enforcement); Beverly Stevens (mother-in-law to foster-parent defendant Moore); Shannon Villaneuva (our client deposed by Triad since the County took the position that it's involvement had to remain stayed pending appeal); and, Joanne Willis (Triad employee).

6

DE VRIES LAW, P.C.
1388 Sutter Street, #715, San Francisco, CA  94109

20.     Out of these fifteen depositions, I took six* and attended eleven. My attendance was critical to providing contemporaneous input about possible theories of liability as the testimony unfolded, tracking inconsistencies, and ensuring follow-up on voluminous testimony and records. In lieu of paying for videotapes, my participation allowed me to incorporate my nuanced observations into the ensuing strategy decisions and motion practice in advance of and for trial preparation.

21.     During this period, I also tracked down and obtained statements from former employees of Triad, including Amy Navarrette, a critical witness to support our theories of liability against that private agency. I obtained a declaration from Ms. Navarette which provided substantial evidence to oppose Triad's first motion for summary judgment, without the need for her deposition.

22.     In January 2019, we filed the Appellee's response in the Ninth Circuit, which was followed by numerous updates to the Ninth Circuit as we were on the cutting edge of the issue as to how First Amendment sibling association rights was considered in other matters. I also personally worked with our nine amici counsel and efforts to file briefs and present arguments that were designed to protect J.P.'s and all foster-children's and foster siblings' rights, nationwide.

23.     In June 2019, we prepared significant filings to oppose Triad's first motion for summary judgment (seven very complicated arguments and evidence) *and* a sizeable motion to seal. Indeed, most of the evidence referred to in the opposition papers were based on testimony that was (unnecessarily) designed "confidential" under the operative Protective Order which required hundreds more hours of effort on the part of the attorneys to comply. Indeed, the memorandum of points and authorities itself had to be filed under seal, along with a tome of evidence.

24.     This Court did not render a decision on the pending motion until after the Ninth Circuit ruled on the filed appeal, given that in July 2019, oral arguments were considered. I personally argued before the Ninth Circuit and worked with amici to attend the hearing, though they opted to not argue, as well, because they would have just said "what she said!"

**PHASE THREE—POST-NINTH CIRCUIT 03/02/20 DECISION AND ADVOCACY**

25.     Regrettably the Ninth Circuit's decision was not a model of clarity. The Ninth Circuit overruled *one* of this Court's findings and dismissed the individually named defendants, Diane Davis-Maas and Sue May, based on qualified immunity.

DE VRIES LAW, P.C.
1388 Sutter Street, #715, San Francisco, CA  94109

7

26.     In a split opinion, the presiding Justice issuing a scathing dissent agreeing with Judge Yvonne Gonzalez Rogers, the majority held J.P. sufficiently alleged claims of danger creation and special relationship violations under the Fourteenth Amendment, but this situation did not present "clearly-established" law to justify qualified immunity and dismissal of the individual defendants. It also overturned the District Court on First Amendment liability, creating an appealable issue of whether these facts alleged a foster sibling's violation of the right to associate with his sister.

27.     In response, we spent approximately one year, from March 2020 to March 2021, seeking review by the United States Supreme Court by filing a motion for rehearing en banc, which was denied, and, a Petition for Certiorari, which was also denied, on March 8, 2021.

### PHASE FOUR—*MONELL* DISCOVERY, TRIAL PREPARATION, AND MSC #2

28.     We then returned to the District Court and the parties had distinctly different perspectives on the procedural posture of the case and the "scope" of the Ninth Circuit's decision. The County and Triad asserted that the Ninth Circuit ruled that the case should be dismissed. After many attempts between counsel to reach any stipulation the dispute had to be briefed and decided by this Court between August through November 2021. I was the lead for those discussions, interpretations of how the Ninth Circuit's ruling specifically applied to the facts, briefs pursuing these theories, and oral argument that ensued on these issues as they were presented by the County on their face, and, Triad in the context of its previously-filed motion for summary judgment. In its wisdom, this Court issued its second important order on November 19, 2021, allowing the case to proceed under municipal liability theories under 42 U.S.C. Section 1983.

29.     It was time to turn our attention, finally, to the County's municipal liability to reveal how this tragedy could have possibly occurred given the many mandatory duties and requirements imposed to protect J.P. while he was in foster care. To conduct this *Monell* discovery, given the paucity of evidence we previously procured in terms of *who* were the key witnesses to be deposed as those names were *never* disclosed in the initial 6,000+ pages produced through the juvenile court process, we brainstormed and implemented a plan to uncover evidence through Rule 30(b)6 deposition notices to ferret out the testimony and evidence required to establish municipal liability.

///

DE VRIES LAW, P.C.
1388 Sutter Street, #715, San Francisco, CA 94109

DE VRIES LAW, P.C.
1388 Sutter Street, #715, San Francisco, CA 94109

30.     In that second phase, plaintiff sent out numerous subpoenas for third-party depositions for which our oral advocacy and informal investigations yielded the information we needed before trial without expending judicial resources in advance of trial. Plaintiff ultimately engaged in only **seven depositions**: Ben Bogner (County supervisor of emergency response services); Svelana Lesovo (County-produced PMQ); Laura Lodes (County emergency response worker); *Michelle Love (County's Agency Director); Michelle Moore (County social worker in hotline unit); Vicky Radigue (County's late-disclosed worker in the hotline unit); Brittany Walker-Pettigrew (County-produced PMQ).

31.     Out of these seven depositions, I took one* and attended all seven for the same reasons I did so in the prior discovery blast, particularly since these witnesses were *exclusively* focused on not individual liability since the social workers were dismissed on qualified immunity grounds, but to establish *Monell* liability. I also engaged, again, as I had with Triad, in an effort to track down and informally interview all social workers and witnesses who were non-County employees to fill in the "blanks" for the County, at trial, if needed.

32.     We were on a mission to answer the ultimate factual questions.

- **Why did no defendant investigate how and when M.M. obtained the drugs she had obviously ingested that were in her system on October 4, 2015 which could have killed her or any other child including J.P. in that foster home?**

- **Why was nothing done to intervene and protect the children in that home, or remove them while that investigation was conducted?**

33.     We had already adduced evidence that between October 4 and 16, 2015 defendants did *nothing* to protect J.P. from harm by failing to investigate M.M.'s drug exposure which according to every witness deposed constituted *severe* neglect and required an in-person investigation within ten days. Defendants flouted multitudes of duties to timely assess, investigate, and take steps to prevent further harm in response to reports about an October 3, 2015 drug exposure of a just three-year old.

34.     The County witnesses provided conflicting testimony about what *should have* happened. But the theme across over a dozen depositions was consistent: *Someone else should have done something—protecting J.P. and his sister was not their job.* We uncovered a policy, custom and practice that we believe has since changed *because of our advocacy* which failed to comply with the letter and spirit of

9

State rules, regulations, and mandatory duties--the County merged new neglect and abuse reports with prior reports by following a "duplication" policy by which subsequent reports of abuse or neglect of a foster child placed in a foster home *were not processed* as new reports. A hotline worker was permitted to elect to not process or investigate those reports *at all*. This allowed reports about M.M. and J.P. to "slip through the cracks."

35. Triad's response was a simple but heartbreaking story of reckless neglect and ratification by virtue of its director instructing his team to conceal information from State authorities and the County engaging in what we sincerely hope are practices that have also been remedied.

36. On this record, the defendants could not avoid an explosive trial.

37. By June 2022, we exchanged expert disclosures and the parties were preparing for trial. There was no doubt that this case had the potential for one of two verdicts—a very small verdict for J.P. with a seven-figure attorney-fee award, or a very high verdict for J.P. with a seven-figure attorney fee award.

38. Before conducting the final pre-trial efforts, the parties returned to the Honorable Laurel Beeler who graciously made time in her calendar to preside over a second Mandatory Settlement Conference between the remaining parties. On Bastille Day, July 14, 2021, the parties agreed to the judge's proposed settlement. Then they had to execute the settlement papers, and, critically, determine whether any Medi-Cal lien would be pursued. J.P.'s attorneys had to put on yet another advocacy hat to recover additional funds for J.P.

## PHASE 4 – MEDI-CAL

39. My Medi-Cal advocacy began in 2018, in conjunction with the first settlement with Maria Moore, at which time a lien was "negotiated" down but was agreed was only a conditional amount dependent on what happened in the end.

40. Starting in July 2022 through May 2023, I personally engaged in dozens of telephone calls, letters, emails and advocacy efforts to finally be in touch with a manager who could make a decision in this matter at Medi-Cal. My advocacy resulted in the reductio of what promised to be a lien that was *at least* $300,000 to one that was determined to be zero $0, placing an additional $300,000 to be used for J.P.'s benefit, with no additional contingency fee due to his attorneys.

DE VRIES LAW, P.C.
1388 Sutter Street, #715, San Francisco, CA 94109

1

### REASONABLE CONTINGENCY FEE

2     41.     In this matter, counsel believes the negotiated 40% contingency fee is justified and

3 reasonable to be applied throughout this litigation, beginning with this settlement with one

4 defendant, due to the substantial risk counsel took on by accepting and prosecuting this legally and

5 factually complex civil-rights case, for seven years. As the Court is aware, the legal matters in this

6 litigation are highly specialized, confidential and subject to numerous protections, and require unique

7 skills to navigate litigation in a way that also protects J.P.'s and his family's dignity.

8     42.     Once the April 29, 2018 trial was assigned, the legal fee increased from 33% to 40%.

9 Despite the fact that the attorney-fee percentage increased to 40% to prepare for trial in 2018, and

10 the fact that the case has since been to the Ninth Circuit, United States Supreme Court, and back to

11 the District Court, the attorneys have not and do not seek to increase their percentage from 40%.

12 With the exception of an interim *de minimus* payment from a settlement negotiated and approved in

13 2019 with foster parent Maria Moore, the attorneys have borne all risks and advanced all costs.

14     43.     On January 1, 2020, I launched my law firm and took this matter with me which

15 resulted in an amended legal services agreement. Attached as **Exhibit 1** is a true and correct copy of

16 the agreement between Shannon Villaneuva as J.P.'s guardian ad litem, the Law Offices of Darren

17 Kessler, and my firm, the De Vries Law, P.C. Notably, John Scott, as the owner of the Scott Law

18 Firm, assigned his rights to any attorney fee recovery to my firm.

19     44.     In addition to risk, the amount of time required to litigate a contingency-fee case is

20 relevant to the payment of legal fees date. In this case, I believe that the 40% fee is justified and

21 more than reasonable. I and John Scott have personally devoted well over 1,250 hours to the

22 detriment of other matters he and I could have been handling and paid for.

23     45.     From 2015 until December 31, 2019, I provided these services while at the Scott

24 Law Firm, devoting my time without contemporary payment at a great risk to the firm's viability.

25 From January 1, 2020, to the present, I have devoted my own firm's resources to this matter. My

26 firm is a small boutique practice, launched on the eve of the COVID-19 pandemic, and for which

27 continuing to provide services without payment was a risk to my venture's potential sustainability. I

28 had to forego pursuing my other practice focus, elder-abuse litigation. to attend to this matter.

DE VRIES LAW, P.C.
1388 Sutter Street, #715, San Francisco, CA  94109

11

DE VRIES LAW, P.C.
1388 Sutter Street, #715, San Francisco, CA  94109

46.     My new firm faced substantial risk in accepting and litigating this case due to its complexities and that liability and damages were voraciously disputed, and, gutted, by the Ninth Circuit. Yet I elected to pursue this case as it required tenacious advocacy, as communicated quite clearly by Judge Gonzalez Rogers at the first case-management conference years earlier.

47.     To assist this Court in evaluating the possible comparison of my lodestar fee, I provide the following biographical information. I graduated from the University of San Francisco School of Law in May 2003, *cum laude*. On December 1, 2003, I was admitted to practice in the State of California. Shortly thereafter, I was also admitted to practice in the United States District Court for the Eastern, Southern, Central, and Northern District of California and the United States Court of Appeals for the Ninth Circuit. I have worked in private practice doing civil-rights and elder-abuse litigation since December 16, 2003. I have been involved in hundreds of state and federal trial-level and appellate cases. I have devoted my practice to prosecuting claims involving Constitutional violations, the California Fair Employment & Housing Act, the False Claims Act, the Elder Abuse & Dependent Adult Civil Protection Act, and other public-policy-driven matters. I have participated in or taken hundreds of depositions, over a dozen trials, dozens of appeals, and contributed to over eleven published decisions. Prior to law school, I was a paralegal and an investigative reporter.

48.     Through December 14, 2018, the costs and expenses incurred by my office in connection with this case total $7,995.62. A summary of the claimed expenses is attached to the Petition as **Exhibit 2**.

49.     Attached as **Exhibit 3** is a true and correct copy of the Settlement Agreement dated June 27, 2023, which was negotiated only after negotiating with Medi-Cal and structured-settlement advisors as well as all counsel and the parties to ensure J.P. would receive the maximum benefit from this settlement.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this **30th** day of June 2023 in San Francisco California.

Date:   June 30, 2023                          By:   s/Lizabeth N. de Vries/
                                                     Lizabeth N. de Vries

DE VRIES DECL ISO MINOR'S COMPROMISE, CASE NO. 3:17-cv-5679-LB

# Exhibit 1

Lizabeth N. de Vries | liza@devrieslawsf.com

DE VRIES *
LAW, P.C.

100 Pine Street, Suite 1250 | San Francisco CA 94111
Phone (415) 909-4009 | Fax (628 280-6514 | devrieslawsf.com

### ATTORNEY-CLIENT CONTINGENCY FEE AGREEMENT
### CLIENT: SHANNON VILLANEUVA, AS FIDUCIARY FOR HER SON
### JEREMYAH PALACIOUS ("J.P.")

This is the attorney-client fee agreement between the Kessler Law Firm and De Vries Law, P.C. ("Attorneys" or "We" or the "Firm") and Shannon Villanueva as the Guardian ad Litem for her adopted son, Jeremiah Palacious in the pending matter of *J.P. v. County of Alameda*, reference below (referred to as "Client" or "You"). This document is the written fee contract that California law requires lawyers enter into with their clients.

This agreement supersedes our previous written agreement as specified below effectively removing John H. Scott and the Scott Law Firm from representing you in this matter henceforth.

#### 1.    SCOPE OF SERVICES.

You are retaining Attorneys to represent you in your fiduciary capacities to your son, J.P. We are not agreeing or obligated to represent you in any other capacity, including your individual capacity or for any different scope of services, unless we enter into a separate written fee agreement.

The scope of services includes Attorneys' representation of you as Guardian ad Litem for J.P. in Alameda County Superior Court Case No. OJ11017735, filed on March 14, 2017, now pending in the matter now styled *J.P. v. County of Alameda, et al*, now pending in the United States District Court for the Northern District of California in Case No. 4:17-cv-05679-YGR (and its related appeals to both the Ninth Circuit and United States Supreme Court).

This Agreement supersedes the prior Attorney-Client Contingency Agreement signed by you on April 24, 2017, between you, the Law Offices of Darren J. Kessler, John H. Scott and the Scott Law Firm. John H. Scott and the Scott Law Firm transferred their entire interest to any fees or award in this matter and pursuant to prior legal-services agreements to the De Vries Law, P.C., all future services rendered in this matter shall no longer involve, John H. Scott and the Scott Law Firm. Consequently, neither John H. Scott nor the Scott Law Firm shall retain any interest to any fees, recovery or award obtained in relation to this matter.

You acknowledge that we have been providing services to you prior to the execution of this Agreement. We agree to provide legal services reasonably required to represent you for this scope of services. We will take reasonable steps to keep you informed of progress and to respond to your inquiries.

*Please be advised that we do not provide tax advice.*

#### 2.    CLIENT'S DUTIES & RESPONSIBILITIES.

You agree to be truthful with us, disclose all material facts and evidence, to cooperate with us, to keep us informed of developments, to abide by this Agreement, and to keep us advised of your current contact information.

You have been advised that your role in this matter will necessarily require you set aside your emotional attachment to your son, and approach these matters from a more objective and fiduciary perspective to ensure the safety and well-being of J.P.

3.   **FEES FOR LEGAL SERVICES.**

Attorneys' fees in matters of this nature are negotiable and not set by law. You have been informed and acknowledge that Attorneys' usual hourly legal fees for cases with similar issues to yours are as follows: $525-$850 for Darren Kessler, $475-$650 for Lizabeth N. de Vries; $345-$575 for associate attorneys; and, $150-$300 for paralegals.

For purposes of this Agreement, attorneys have offered you a contingency fee of 40% percent of any Recovery obtained henceforth. Client agrees that Attorney shall have a lien on Client's Recovery, or on any property received by Client as a result of this representation and shall have the right to require a sale of the property, if necessary, to secure payment of Attorney's fees.

In exchange for the Attorneys' agreement to prosecute this matter based on a pure contingency fee, and, to advance all costs required to litigate this complicated matter, Client acknowledges that Attorneys may be entitled to seek a fee award from a Court to recover legal fees from other party(ies) as authorized by law. If Attorneys are successful in recovering their legal fees from any third party, Client agrees that the Attorneys shall be entitled to the total amount of the applicable percentage contingency fee of your total monetary recovery, less any attorneys-fee award actually recovered from the defendant(s). In that scenario, Client agrees to pay all costs associated with obtaining such an attorney-fee award, which may include hiring another attorney to litigate the underlying fee motion.

Client further agrees that litigation costs and any liens asserted against the total monetary recovery will be deducted from the Client's percentage of the total monetary recovery. Client also agrees that the Attorneys have a lien in an amount as set forth herein on any monetary recovery to assure payment of the Attorneys' contingency fee and litigation costs. Client expressly agrees to assign the Attorneys the amount of fees and costs as set forth herein from any monetary recovery.

In the scenario where Attorneys' fees are at issue, Client acknowledges that this would raise a potential conflict of interest because Attorneys may be required to negotiate for both Client's damages and Attorneys' fees. Client has the right and is advised to consult with independent counsel regarding this particular provision. Client acknowledges that Client is waiving this potential conflict of interest regarding Attorneys' negotiation for both Client's damages and Attorneys' attorneys' fees. As a result, Client authorizes Attorneys to negotiate for both Client's damages and the attorneys' fees.

Because the real-party-in-interest plaintiff is a minor, any amount of monies paid to the Attorneys will ultimately have to be approved of by a Court and deemed to be reasonable in an amount not to exceed the terms of this Agreement. Should the Court order or You agree to a structured or installment settlement or judgment payment, then the attorney fees shall be in the above-stated percentages figured on the present value of the gross settlement and is payable at the time of the settlement at the discretion of the Attorneys.

You are represented by the two separate law firms referred to above. Neither of the law firms is the principal law firm, and both shall equally share responsibility for pursuing Client's interests. Client is free to communicate with either of the law firms. However, each Attorney shall be free to share information provided by the Client to the other Attorney. The Kessler Firm and De Vries Law, P.C. shall undertake the work necessary to pursue the Client's case as they in their discretion deem appropriate to promote the Client's best interests. Pursuant to Attorney's ethical obligations, Attorney hereby notifies Client that any legal fee earned for the performance of the legal services provided shall be divided commensurate with work performed as agreed by Your Attorneys between the two law firms referred to above.

Prior counsel of record John H. Scott and the Scott Law Firm transferred their entire interest to any fees or award in this matter and pursuant to prior legal-services agreements to the De Vries Law, P.C. All future services rendered in this matter shall no longer involve, John H. Scott and the Scott Law Firm and, consequently, neither John H. Scott nor the Scott Law Firm shall retain any interest to any fees, recovery or award obtained in relation to this matter.

By signing this agreement, Client has read and understands the above and confirms her consent to the terms of the association of counsel and division of fees.

## 4.   RECOVERY DEFINED.

For the purpose of this Agreement, and for the calculation of Attorney's fees, Client's "Recovery" shall mean and refer to any property, or its cash or non-cash equivalent, that Client obtains as a result of the lawsuit styled in *J.P. v. County of Alameda, et al,* now pending in the United States District Court for the Northern District of California in Case No. 4:17-cv-05679-YGR whether pursuant to a settlement between the relevant parties or pursuant to an adjudication of the merits of the case. "Recovery" shall also include, mean and refer to the "amount recovered" or any similar or related term used in this Agreement.

If, in lieu of a cash transfer, Client shall instead receive a transfer of an annuity, deferred payment of assets, real property, personal property, or any other similar non-cash consideration, the Recovery shall be determined by the fair market value of such transfer to Client. If Attorney and Client do not agree on the fair market value such property, Client agrees to pay a one-half share of the cost of an appraisal, by an appraiser selected by mutual agreement of Attorney and Client, of the property for the purpose of determining the fair market value of the property. If Attorney and Client cannot mutually agree on an appraiser then they each shall select one appraiser, and those appraisers shall select a third appraiser who shall determine the fair market value by selecting either of the appraisals submitted to him or her by the appraisers selected by Attorney and Client.

If the transfer consists of payments to be made over time the Recovery shall be determined based on the present cash value of the payments as determined by generally recognized accounting and appraisal standards. (For example, if the recovery consists of $500,000 payable at $100,000 per year over 5 years, its present cash value may be approximately $363,210 depending on the appropriate interest rate.) The Attorney's fees shall be paid out of the first funds or property received by Client.

If, by reference to the foregoing provisions, Attorney and Client still cannot agree on the fair market value of any non-cash settlement, then the matter will be submitted to binding arbitration. The arbitration shall be administered in San Francisco, California, by J.A.M.S./Endispute ("JAMS") in accordance with its then pertaining Rules of Practice and Procedure with an arbitrator mutually acceptable to Attorneys and to Client. The arbitration shall be limited to two days and the Arbitrator's authority shall limited to deciding whether to accept the value presented by the Client or the Attorney. Attorney and Client shall each bear a one-half share of the costs and fees of the arbitration.

## 5.     COSTS & EXPENSES.

Client is responsible for all litigation costs if there is a monetary recovery and agrees to reimburse the Attorneys for all litigation costs out of any this recovery. Client authorizes Attorneys to pay costs associated with this matter as necessary. These costs may include: process-servers fees, filing fees or other fees fixed by law or assessed by courts or other agencies, recordation fees, court reporters' fees, experts fees, travel expenses including transportation, meals, lodging and all other costs of any necessary out-of-town travel by Attorneys' personnel, investigations, long-distance telephone calls, messenger and other delivery fees, in-office photocopying at the rate of twenty cents ($0.20) per page, parking and other similar items. They will also include experts, jury consultant fees, deposition transcript fees, travel fees as needed, and other litigation-related expenses.

Client understands and agrees that if Client does *not* prevail in this pending litigation, typically a court would order Client to pay all or part of the litigation costs and expenses requested by the other party(ies). However, Attorneys would oppose any such order as against the Client in her role as Guardian Ad Litem. Similarly, if Client prevails and Attorneys are able to recover any of Client's litigation costs, any amount paid by the opposing party(ies) will be credited to Client's account if Attorneys have already been paid in full for such expenses.

## 6.     DISCHARGE AND WITHDRAWAL.

Client may discharge Attorneys at any time for any reason. Attorneys may withdraw with Client's consent or for good cause. Good cause includes Client's breach of this Agreement, Client's misrepresentation or failure to disclose material facts, Client's refusal to cooperate with Attorney or follow Attorney's advice on a material matter, Client's failure to pay fees and costs in a regular and timely manner and any other fact or circumstance that would render Attorney's continuing representation unlawful or unethical. Notwithstanding Attorney's withdrawal or Client's notice of discharge, and without regard to the reasons for the withdrawal or discharge, Client will remain obligated to pay Attorney for all fees and costs incurred under this Agreement prior to the termination.

7. **DISPOSITION OF CASE FILE.**

After the Firm's services conclude and upon your request, Attorneys will deliver the physical file to you. If you do not request the physical file within 30 days, Attorneys may elect to destroy the physical file without further notice. The Firm will retain electronic copies of some or all portions of the physical file for a period of five years after the matter is closed. At any point during the five-year period, you may request an electronic copy of the file, and the Firm shall thereupon arrange to provide an electronic copy. If you do not request an electronic copy of the file before the end of the above five-year period, the Firm will have no further obligation to retain an electronic copy of the file and may delete it without further notice.

8. **GOVERNING LAW.**

This Agreement shall be governed by and construed according to California law.

9. **FEE DISPUTE AND ARBITRATION.**

You agree that in the unlikely event that any dispute arises between Attorneys and Client with respect to any claim of professional negligence or a fee dispute, Attorneys and Client agree to attempt to resolve the matter informally in good faith. If the dispute cannot be resolved informally, Attorneys and Client both agree that the dispute shall be submitted to binding arbitration in San Francisco, California.

10. **DUTIES UPON CONCLUSION OF SERVICES.**

Attorneys will have no further duty to inform you of future developments or changes in the law as may be relevant to the services set forth in Paragraph One if Attorneys are no longer actively involved in your representation because: (1) Attorneys have completed the services set forth in Paragraph One, (2) Client discharges Attorneys, or, (3) Attorneys withdraw from representing Client. Further, Attorneys will have no further duty to monitor deadlines that may arise from the matter(s) for which Attorneys originally had been retained by you.

11. **ENTIRE AGREEMENT.**

This Agreement contains the entire agreement of the parties. Any changes to any terms of this Agreement must be in writing and signed by the parties to the Agreement.

12. **SEVERABILITY IN EVENT OF PARTIAL INVALIDITY.**

If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and entire Agreement will be severable and in effect.

13. **MODIFICATION BY SUBSEQUENT AGREEMENT.**

This Agreement may be modified by subsequent agreement of the parties only by an instrument in writing signed by both of them or an oral agreement only to the extent that the parties carry it out.

14. **INSURANCE.**

Attorneys carry professional-liability insurance.

15. **NO GUARANTEE.**

Nothing in this Agreement and nothing in Attorneys' statements to Client will be construed as a promise or guarantee about the progression and resolution of this matter. Attorneys make no such promises or guarantees. Attorneys' comments are only expressions of opinion.

16. **CLIENT ACKNOWLEDGEMENTS.**

Client has read, understands, and agrees to the terms and conditions set forth in this Agreement. Client further acknowledges having received a copy of this Agreement concurrently with Client's execution of it.

17. **RIGHT TO REVIEW BY INDEPENDENT COUNSEL.**

Attorneys advised you that you have the right to have this Agreement reviewed by independent counsel and encourages you to seek such review.

*Signatures by PDF, copies or facsimile shall be deemed to be originals.*

I HAVE READ, UNDERSTAND AND AGREE TO THE FOREGOING TERMS AND PROVISIONS GOVERNING THE LEGAL SERVICES TO BE PROVIDED BY AND THE PAYMENT OF FEES AND COSTS. I ACKNOWLEDGE THAT BEFORE SIGNING THIS AGREEMENT I AM ENTITLED, AND HAVE BEEN GIVEN A REASONABLE OPPORTUNITY, TO SEEK THE ADVICE OF INDEPENDENT COUNSEL.

Dated: December **21**, 2021

Shannon Villanueva

Dated: December __, 2021

Darren Kessler
**KESSLER LAW**

Dated: December __, 2021

Shannon Villanueva - LSA
December 20, 2021
Page 7

Lizabeth N. de Vries
DE VRIES LAW, P.C.

**ACCEPTED AND AGREED:**

Dated: December __, 2021

John H. Scott, as an individual and principal of the
SCOTT LAW FIRM

# Exhibit 2



# DE VRIES · LAW, P.C.

100 Pine Street, Suite 1250
San Francisco, CA 94111
Phone: (415) 909-4009
devrieslawsf.com

**INVOICE**

Date: 06/06/2023

Shannon Villaneuva
1430 Rueben's Meadow
Brentwood, CA 94513

## J.P. civil rights

| Date | Notes | Quantity | Rate | Total |
|------|-------|---------:|-----:|------:|
| 04/30/2020 | Copies made in office: April 2020 in-house copies made. | 100.00 | $0.20 | $20.00 |
| 07/10/2020 | Court Filing Fee: Application to USSC for LND | 1.00 | $200.00 | $200.00 |
| 11/09/2021 | Copies made in office: Copies made in office (September 2021) | 161.00 | $0.20 | $32.20 |
| 03/29/2022 | Court reporter: Laura Lodes deposition j(transcript) | 1.00 | $2,128.95 | $2,128.95 |
| 04/18/2022 | Postage: Postage for delivery of Chamber's copies of (1) Stip and Order to Continue hearing dates and D/Ls as well as (2) Opposition to Def COAs request for prefiling Conference for MSJ | 1.00 | $28.67 | $28.67 |
| 04/29/2022 | Copies made in office: Copies made in office (April 2022) | 83.00 | $0.20 | $16.60 |
| 05/10/2022 | Court reporter: Deposition of Svetlana Lesova (transcript) | 1.00 | $1,453.50 | $1,453.50 |
| 05/16/2022 | Court reporter: Deposition of Brittany Walker Pettigrew (transcript) | 1.00 | $1,024.00 | $1,024.00 |
| 05/24/2022 | Court reporter: Veritext Invoice for Shawn Nunn's 09/18/2018 Deposition Video Tape | 1.00 | $335.00 | $335.00 |
| 06/02/2022 | Court reporter: Deposition of Vicky Radigue (transcript) | 1.00 | $1,411.05 | $1,411.05 |
| 06/24/2022 | Court reporter: Deposition of Michelle Love (transcript) | 1.00 | $1,301.85 | $1,301.85 |
| 06/30/2022 | Copies made in office: In-house copies made in June 2022 | 219.00 | $0.20 | $43.80 |

| Time Keeper | Quantity | Rate | Total |
|---|---|---|---|
| | | **Subtotal** | **$7,995.62** |
| | | **Total** | **$7,995.62** |

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 336 | 06/06/2023 | $7,995.62 | $0.00 | $7,995.62 |
| | | | **Outstanding Balance** | **$7,995.62** |
| | | | **Amount in Trust** | **$0.00** |
| | | | **Total Amount Outstanding** | **$7,995.62** |

Please make all amounts payable to: De Vries Law, P.C.

Payment is due upon receipt.

100 Pine Street, Suite 1250
San Francisco, CA 94111
Phone: (415) 909-4009
devrieslawsf.com

**INVOICE**

Date: 06/06/2023



## Pay your invoice online

**To pay your invoice, open the camera on your mobile device and place the QR code in the camera's view.**

Or, **click here** if you're viewing on a computer or smartphone.

# Exhibit 3

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

*J.P. v. County of Alameda, et al.*
Case No. 4:17-cv-05679-YGR (LB)
United States District Court for the Northern District of California

### PARTIES TO THE AGREEMENT

This settlement agreement and general release ("Agreement") is entered into by Plaintiff J.P., by and through his Guardian ad Litem Shannon Villanueva ("Plaintiff"), Defendant County of Alameda ("County") and Defendant Triad Family Services ("Triad") ("Party," or collectively, the "Parties").

### RECITALS

This Agreement is made with reference to the following facts:

A.      Plaintiff filed a complaint in the United States District Court for the Northern District of California on October 2, 2017, entitled *J.P., by and through his Guardian ad Litem, Shannon Villanueva, Plaintiff v. County of Alameda, Diane Davis Maas, Sue May, Triad Family Services, Maria Refugio Moore, and Does 1-30, inclusive,* Case No. 4:17-cv-05679-YGR (LB) (the "Action). Defendants Diane Davis Maas and Sue May have been dismissed by the Court, and Defendant Maria Refugio Moore has also been dismissed with prejudice following a settlement. The claims alleged in this case arise out of Triad's placement of Plaintiff and his sister M.M. in foster care with Defendant Moore, while Plaintiff and M.M. were detained by the Juvenile Court who vested temporary care with the County. M.M. died while in foster care and Plaintiff alleges injuries as a result of her death.

B.      The Parties participated in a Mandatory Settlement Conference with Magistrate Judge Laurel Beeler on June 27, 2022. Although the case did not settle at that time, Judge Beeler made a "mediator's proposal," which was accepted by the Parties on July 14, 2022. Judge Beeler entered an order on July 15, 2022 confirming the settlement, pending approval by County's Board of Supervisors, which was obtained.

C.      The settlement is contingent on the Court's confirmation that the settlement is in good faith, pursuant to Code of Civil Procedure sections 877 and 877.6, and approval of the minor's compromise.

NOW THEREFORE, in consideration of the covenants and promises herein set forth, the Parties hereto agree as follows:

### TERMS

1.      **Incorporation of Recitals.** Paragraphs A through C of the Recitals are incorporated as though fully set forth herein.

*J.P. v. County of Alameda, et al.,*
Case No. 4:17-cv-05679-YGR (LB)
1 of 8

Initialed by the GAL, Shannon Villanueva

2.    <u>Settlement Amount and Payments.</u>  In consideration for the mutual covenants and promises herein contained and other good and valuable consideration, County shall pay Plaintiff the sum of $2,250,000.00 (Two Million, Two Hundred Fifty Thousand Dollars and No Cents); and Triad shall pay Plaintiff the sum of $1,250,000.00 (One Million, Two Hundred Fifty Thousand Dollars and No Cents), for a total settlement amount of 3,500,000.00 (Three Million, Five Hundred Thousand Dollars and No Cents). This sum represents upfront cash and the cost to fund the future periodic payments described in the Addendum hereto as well as costs advanced by Plaintiff, and attorneys' fees as further described herein. Plaintiff elects to allocate all sums set forth herein which are to be distributed to Plaintiff as damages on account of personal injuries and sickness, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended. County and Triad take no position on this issue and make no representation as to the allocation of the settlement payments, or the tax consequences of this settlement and its contemplated distributions. The settlement payments will be made as follows:

(a)  A check in the amount of $1,250,000 will be made by Triad or on its behalf to "Kessler Law Office IOLTA Trust" for payment of attorneys' fees in full to both Darren Kessler and Liza de Vries, if the request for attorneys' fees in the amount of $1,400,000 is approved by the Court. This payment will be sent to 3060 El Cerrito Plaza, Suite 371, El Cerrito, CA 94530. If an amount less than $1,400,000 is approved by the Court for attorneys' fees, the remaining balance will be paid into the "Kessler Law Office IOLTA Trust" for the benefit of J.P., as described in subparagraph (c) below;

(b)  A check in the amount of $150,000 will be made by County or on its behalf payable to "Kessler Law Office IOLTA Trust" for payment of attorneys' fees in full to both Darren Kessler and Liza de Vries, if the request for attorneys' fees in the amount of $1,400,000 is approved by the Court. This payment will be sent to 3060 El Cerrito Plaza, Suite 371, El Cerrito, CA 94530. If an amount less than $1,400,000 is approved by the Court for attorneys' fees, the remaining balance will be paid into the "Kessler Law Office IOLTA Trust" for the benefit of J.P., as described in subparagraph (iii) below;

(c)  A check in the amount of $200,000 will be made by County or on its behalf payable to "Kessler Law Office IOLTA Trust" for distribution to Plaintiff and his Guardian ad Litem Sharon Villanueva. This payment will be sent to 3060 El Cerrito Plaza, Suite 371, El Cerrito, CA 94530;

(d)  Checks in the remaining amount of $1,900,000 will be made by County or on its behalf to fund the qualified assignments in favor of Plaintiff, as set forth in Addendum No. 1 to this Agreement.

The payments listed above, totaling $3,500,000.00, are conditioned upon receipt by County and Triad of Plaintiff's fully executed Agreement, a W-9 for Plaintiff's attorneys Darren Kessler and Liza de Vries, and the Court's approval of the minor's compromise.

3.    <u>Dismissal of litigation.</u>  Ten (10) business days after confirmed receipt and clearing of funds by Plaintiff's counsel of all settlement payments, Plaintiff's counsel will request the Court to dismiss the entire action with prejudice. The Parties will also withdraw or

dismiss any other claim, grievance, or charge that they have served, lodged, or filed against each other as a result of the Action and underlying facts.

4.   **Attorney fees and costs.**  Except as set forth above in Paragraph 2, each party shall be responsible for the payment of his/its own costs, attorneys' fees, and all other expenses incurred in connection with the above-described litigation and any matter or thing relating to this Agreement and the Released Claims.

5.   **Release of all claims by Plaintiff.**  In consideration of the covenants undertaken herein, Plaintiff shall be deemed to have fully, finally, and forever released County, Triad, and all of their departments, officers, employees, insurers, attorneys, agents, and any other person acting by, through, or in concert with any of the Defendants in the Action, whether a party to this Agreement or previously dismissed ("Plaintiff's Released Parties"), from any and all claims, charges, grievances, complaints, allegations, and causes of action for compensation, damages, injunctive relief, declaratory relief, costs, attorneys' fees or any other form of relief of any nature whatsoever, whether the existence, nature or extent of the released claim is known or unknown, suspected or unsuspected, which Plaintiff has or might have, or which Plaintiff at any time heretofore had or might have had, claimed to have or may claim to have against Plaintiff's Released Parties arising out of, or in connection with, the Action, as well as any claims that could have been brought as a result of the acts and omissions alleged in the Action ("Plaintiff's Released Claims").

6.   **Release of all claims by Defendants County and Triad.**  In consideration of the covenants undertaken herein, County and Triad shall each fully, finally, and forever release each other, and all of their departments, agencies, subsidiaries, officers, employees, insurers, attorneys, agents, and any other persons acting by, through, or in concert with them ("Defendants' Released Parties"), from any and all claims, charges, grievances, complaints, allegations, and causes of action for compensation, damages, injunctive relief, declaratory relief, costs, attorneys' fees or any other form of relief of any nature whatsoever, whether the existence, nature or extent of the released claim is known or unknown, suspected or unsuspected, which County or Triad at any time heretofore had or might have had, claimed to have or may claim to have against Defendants' Released Parties arising out of, or in connection with, the Action, as well as any claims that could have been brought as a result of the acts and omissions alleged in the Action ("Defendants' Released Claims").

7.   **Waiver of California Civil Code Section 1542.**  Plaintiff, County, and Triad recognize and acknowledge that factors which have induced them to enter into this Agreement may turn out to be incorrect or to be different from what they had previously anticipated, and Plaintiff, County, and Triad each hereby expressly assumes any and all of the risks thereof and further expressly waives, and assumes the risks of waiving, the rights provided by California Civil Code section 1542, which provides:

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

*J.P. v. County of Alameda, et al.,*
Case No. 4:17-cv-05679-YGR (LB)
3 of 8

SV

8.    **No admissions.**  This Agreement affects claims and demands which are disputed, and by executing this Agreement, no Party admits or concedes any of the claims, defenses, or allegations which were raised or could be raised by any Party or any third party.  Neither this Agreement nor any part of this Agreement shall be construed to be an admission of liability or violation of law by any Party, nor shall this Agreement nor any part of it, nor any settlement negotiations or earlier drafts of this Agreement, be admissible in any proceeding as evidence of such an admission.  This document may be introduced in a proceeding solely to enforce the terms of this Agreement and may be pleaded as a full and complete defense to any action, suit or other proceeding that has been or may be instituted, prosecuted, or attempted with respect to any of the Released Claims.

9.    **Warranty of non-assignment.**  The Parties warrant that they have not assigned any of the claims or portions of the claims that are the subject of this Agreement.

10.    **Liens and other interests.**  Plaintiff agrees that the satisfaction of any bills, and existing or future liens or reimbursement or subrogation interests (whether statutory, equitable, or contractual) shall be his sole responsibility.  This includes, but is not limited to, any interests asserted by any insurer, or any other healthcare, service, or equipment provider.  This also includes any liens, all federal or state rights of recovery, subrogation, recapture liens or claims for reimbursement asserted by any hospital, physician, insurance company, health plan, Medicare, Medi-Cal, health insurers, health care providers, Employment Retirement Income Security Act (ERISA) qualified plan or program, Social Security, other third parties, or any other liens or claims.

11.    **Warranty regarding governmental benefits.**  The Parties understand there are no governmental liens in this case, but should any exist or arise, Plaintiff acknowledges that the consideration provided by this Agreement is conditioned upon Plaintiff's agreement to reimburse any Governmental Authority Third-Party Payors or Providers for any funds that Governmental Authority Third-Party Payors or Providers would otherwise be entitled to recover pursuant to applicable law, including, but not limited to, those funds which Centers for Medicare & Medicaid Services ("CMS") may be entitled to recover under the Medicare Secondary Payer ("MSP") statute at 42 U.S.C. § 1395y(b)(2) or which the Department of Health Care Services ("Medi-Cal") may be entitled to recover under California law, assignment, or otherwise.  To the extent required by law, Plaintiff agrees to satisfy the requirements of the California Welfare and Institutions Code, including without limitation section 14124.76, for notification of the Director of the Department of Health Care Services of the settlement and to seek agreement with the Director as to what portion of the settlement represents payment for medical expenses and medical care provided under the Medi-Cal program, if any.  "Governmental Authority Third Party Payors/Providers" shall include CMS (including Federal Medicare ("Medicare"), each State and/or Territory Medicaid agency ("Medicaid") and Medi-Cal, the U.S. Department of Veterans Affairs ("VA"), the U.S. Department of Defense, TRICARE, Indian Health Services, the Social Security Administration, state and federal Departments of Health and Human Services (or equivalents), and individual state, regional, county, or local government programs, services or funds, as well as any applicable foreign government equivalents.

*J.P. v. County of Alameda, et al.,*
Case No. 4:17-cv-05679-YGR (LB)
4 of 8

SV

12.    **Indemnification and hold harmless.** Plaintiff and his attorneys expressly agree to defend, indemnify and hold harmless the Plaintiff's Released Parties, their agents, and insurers from any and all lawsuits, claims, liens, reimbursement or subrogation interests asserted (or which may be asserted in the future) arising from or related to this Dispute, including but not limited to claims by Medicare, Medi-Cal, or any other third party.

13.    **No unwritten representations.** Each party represents that in executing this Agreement, the party does not rely upon and has not relied upon any representation, promise, or statement not expressly contained herein.

14.    **Complete agreement.** This Agreement is the complete agreement among the Parties and supersedes any prior agreements or discussions among the Parties.

15.    **Tax consequences and benefits.** The Parties make no representation as to the tax consequences of the settlement or this Agreement and make no representation as to Plaintiff's eligibility for public or private benefits. Plaintiff, by and through his Guardian ad Litem, understands and agrees that he is solely responsible for and legally bound to make payment of taxes, if any, which are determined by any taxing authority to be owed by him as a result of this Agreement. Plaintiff agrees and understands that County and Triad have not made any representations regarding the tax treatment pursuant to this Agreement and Plaintiff agrees that he is responsible for determining the tax, auditing, and/or financial consequences to him, if any.

16.    **Selection of Structured Settlement Planner and Annuity Providers.** Plaintiff and his attorneys are solely responsible for the selection of the structured settlement planner and structured settlement annuity providers. County and Triad have had no input into, or involvement with, the selection of Plaintiff's structured settlement planner or the structured settlement annuity providers and are not responsible for any damages that might arise due to the selection of each of those entities, or the performance of their obligations.

17.    **California law.** This Agreement is executed and delivered in the State of California, and the rights and obligations of the Parties hereunder shall be construed and enforced in accordance with the laws of the State of California.

18.    **Interpretation and construction.** Any ambiguities or uncertainties herein shall be equally and fairly interpreted and construed without reference to the identity of the Party or Parties preparing this document or the documents referred to herein, on the understanding that the Parties participated equally in the negotiation and preparation of the Agreement and the documents referred to herein or have had equal opportunity to do so. This Agreement has been arrived at through negotiation and none of the Parties is to be deemed the Party which prepared this Agreement or caused any uncertainty to exist within the meaning of Civil Code section 1654. The headings used herein are for reference only and shall not affect the construction of the Agreement.

19.    **Breach, waiver and amendment.** No breach of this Agreement or of any provision herein can be waived except by an express written waiver executed by the Party waiving such breach. Waiver of any one breach shall not be deemed a waiver of any other

SV

breach of the same or any other provision of this Agreement. This Agreement may be amended, altered, modified or otherwise changed in any respect or particular only by a writing duly executed by the Parties hereto or their authorized representatives.

20.    **Authority to execute.** Each Party hereto warrants to the other Parties that he/it has the full power and authority to execute, deliver and perform under this Agreement and all documents referred to herein.

21.    **Counterparts.** This Agreement may be executed by the Parties in any number of counterparts, all of which taken together shall be construed as one document. Any facsimile or electronic signature shall be valid and acceptable for all purposes as if it were an original.

22.    **Effective date.** The effective date of this Agreement shall be the date Plaintiff signs the Agreement through his Guardian ad Litem.

23.    **Duty to act in good faith.** The Parties shall act in good faith and use their reasonable good faith efforts after the execution of this Agreement to ensure that their respective obligations hereunder are fully and punctually performed. The Parties shall promptly perform any further acts and execute and deliver any other documents or instruments that may be reasonably necessary to carry out the provisions of this Agreement.

24.    **Binding on successors and assigns.** This Agreement and all documents referred to herein shall bind and inure to the benefit of each of the Parties hereto, their spouses, domestic partners, children, siblings, heirs, estates, administrators, representatives, executors, attorneys, successors and assigns.

25.    **No third party beneficiaries.** Except as expressly provided herein, this Agreement is not for the benefit of any person not a party hereto or any person or entity not specifically identified as a beneficiary herein or specifically identified herein as a person or entity released hereby. The Agreement is not intended to, and does not, constitute a third-party beneficiary contract.

26.    **Agreement signed knowingly and voluntarily after opportunity to consult with counsel.** Each Party understands and agrees to this settlement agreement and to the terms and conditions contained herein and enters into this Agreement knowingly and voluntarily. Plaintiff has been advised that he has the right to seek legal advice with respect to this Agreement, including the release, and has consulted with his legal counsel regarding this Agreement. The Parties have investigated the facts pertaining to this Agreement and all matters

/
/
/
/
/
/
/
/

SV

pertaining thereto as deemed necessary.  The Parties have relied on their own judgment, belief, knowledge, understanding and expertise after consultation with their counsel concerning the legal effect of the settlement and its terms.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Settlement Agreement and Release:

Dated: 6.14.23

Plaintiff J.P., By and through his Guardian ad Litem
SHANNON VILLANUEVA

Dated: June 27, 2023

President of the Board of Supervisors
Defendant COUNTY OF ALAMEDA

Dated: 6-16-23

Patrick Bell
Triad Family Services Board of Directors President
Defendant TRIAD FAMILY SERVICES

**APPROVED AS TO FORM:**

KESSLER LAW FIRM

Dated: 6-14-2023

DARREN J. KESSLER
Attorneys for Plaintiff J.P.

DE VRIES LAW FIRM, P.C.

Dated: June 14, 2023

LIZABETH DE VRIES
Attorneys for Plaintiff J.P.

HAAPALA, THOMPSON & ABERN

Dated: June 16, 2023

JODY STRUCK
Attorneys for Defendant COUNTY OF ALAMEDA

J.P. v. County of Alameda, et al.,
Case No. 4:17-cv-05679-YGR (LB)
7 of 8

SV

MATHENY SEARS LINKERT & JAIME, LLP

Dated: _____

**RON ENABNIT**
Attorneys for Defendant TRIAD FAMILY SERVICES

# ADDENDUM No. 1

Consideration:

By way of settlement, the "County of Alameda", through its Insurers have offered to pay the following sums to the minor Claimant JEREMYAH VILLANEUVA, aka J.P.:

A.  Future periodic payments to the **J.P. Trust** (Payee) on the dates and in the amounts indicated hereafter (the "Periodic Payments"):

> $2,000.00 payable monthly, guaranteed for 6 year(s), beginning on 04/02/2024, with the last guaranteed payment on 03/02/2030.

Future periodic payments to **Jeremyah Villanueva** (Payee) on the dates and in the amounts indicated hereafter (the "Periodic Payments"):

> $45,000.00 payable annually, guaranteed for 5 year(s), beginning on 05/29/2029 (age 19), with the last guaranteed payment on 05/29/2033.

> $4,035.99 for life, payable monthly, guaranteed for 30 year(s), beginning on 05/29/2034 (age 24), increasing at a rate of 2.00% compounded annually, with the last guaranteed payment on 04/29/2064.

> $100,000.00 guaranteed lump sum payable on 05/29/2034 (age 24).

> $250,000.00 guaranteed lump sum payable on 05/29/2037 (age 27).

> $500,000.00 guaranteed lump sum payable on 05/29/2040 (age 30).

Assignment: The obligation to make the periodic payments described above in Section A shall be assigned to Pacific Life & Annuity Services, Inc. through a Qualified Assignment and funded by an annuity contract issued by Pacific Life Insurance Company, rated A+XV by A.M. Best. To fund the periodic payments, the County of Alameda, by and through their Insurer will issue a check(s) in the amount of $1,400,000.00 payable to Pacific Life & Annuity Services, Inc. and execute the Qualified Assignment Form.

B.  Future periodic payments to **Jeremyah Villanueva** (Payee) on the dates and in the amounts indicated hereafter (the "Periodic Payments"):

> $1,400.00 payable monthly, guaranteed for 5 year(s), beginning on 03/29/2030 (age 19), with the last guaranteed payment on 02/28/2035.

> $1,000.00 for life, payable monthly, guaranteed for 30 year(s), beginning on 05/29/2034 (age 24), increasing at a rate of 2.00% compounded annually, with the last guaranteed payment on 04/29/2064.

> $50,000.00 guaranteed lump sum payable on 05/29/2034 (age 24).

> $50,000.00 guaranteed lump sum payable on 05/29/2037 (age 27).

> $358,382.98 guaranteed lump sum payable on 05/29/2040 (age 30).

Assignment: The County of Alameda's obligation to make the periodic payments described above in Section B shall be assigned to MetLife Assignment Company, Inc. through a Qualified Assignment and funded by an annuity contract issued by Metropolitan Tower Life Insurance Company, rated A+XV by A.M. Best. To fund the periodic payments, the County of Alameda will issue a check in the

amount of $500,000.00 payable to MetLife Assignment Company, Inc. and execute the Qualified Assignment Form.

All sums set forth herein constitute damages on account of personal physical injuries or sickness, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

Payee acknowledges that the Periodic Payments cannot be accelerated, deferred, increased, or decreased by the Payee; nor shall the Payee have the power to sell, mortgage, encumber, or anticipate the Periodic Payments or any part thereof, by way of assignment or otherwise.

Any payments to be made after the death of Jeremyah Villanueva shall be made to the Estate of Jeremyah Villanueva. After the age of majority, Jeremyah Villanueva may submit a change of beneficiary in writing to the Assignees. The designation must be in a form acceptable to the Assignees.

The future periodic payment amounts outlined in Sections A and B above are guaranteed based upon a projected annuity purchase date of July 31, 2023. Any delay in funding the annuity may result in a delay of the payment dates or change in payment amounts and shall be recorded in the settlement agreement and release, qualified assignment document and annuity contract without the need of obtaining an amended Court Order up to 90 days after the original purchase date.