Darren J. Kessler, SBN 114986
**KESSLER LAW OFFICE**
3060 El Cerrito Plaza, Suite 371
El Cerrito, CA 94530
Tel: (510) 524-7750
E-Mail: darren.j.kessler@gmail.com

Lizabeth N. de Vries, SBN 227215
Kelly K. Dixon, SBN 191078
**DE VRIES LAW, P.C.**
100 Pine Street, Suite 1250
San Francisco, CA 94111
Tel: (415) 909-4009 // Fax: (628) 280-6514
E-Mail: liza@devrieslawsf.com

Attorneys for Plaintiff J.P. by and through his
Guardian *ad litem,* Shannon Villanueva

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA — SAN FRANCISCO

| | |
|---|---|
| J.P., by and through his Guardian Ad Litem, SHANNON VILLANUEVA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF ALAMEDA, TRIAD FAMILY SERVICES, and Does 1-30 inclusive,<br><br>Defendants. | Case No.: 3:17-cv-05679-LB<br><br>**DECLARATION OF DARREN KESSLER IN SUPPORT OF MINOR'S COMPROMISE**<br><br>Date:<br>Time:<br>Courtroom:<br>Judge: Hon. Laurel Beeler |

I, Darren Kessler, declare as follows:

1. I am an attorney at law duly admitted to practice before all the courts of the State of California. I have also been admitted to practice in the Commonwealth of Pennsylvania. And I am an attorney of record herein for the plaintiff, J.P. by and through his guardian ad litem, Shannon Villaneuva. I have personal knowledge of the matters stated herein, and, if called as a witness, could and would testify to them. I offer this declaration in support of the plaintiff's petition to approve a compromise with defendants, County of Alameda and Triad Family Services, and request for approval of attorneys' fees of 40 percent of the recovery obtained.

2. In late 2015, I was contacted by the biological grandmother of J.P. relating to the death of J.P.'s sister in foster care. After an initial inquiry and investigation, I was requested by the J.P.'s dependency attorney to be appointed as special counsel pursuant to Welfare and Institutions Code, Section 317, subdivision (e), to investigate the merit of a civil claim by J.P. Ultimately, I was so appointed by the Alameda County Superior Court as special minors counsel therein.

3. I agreed to accept appointment even though I was informed that the court would not compensate me for my legal services that require many court appearances, motions, meetings with my client and caretakers and overall investigation to determine whether there were viable civil claims for J.P.

4. My initial scope of services involved interviews of treatment providers, social workers and attorneys involved in the dependency case as well as others to determine the existence and extent of supporting evidence, the scope of injuries, and possible liability theories.

5. I drafted and delivered juvenile record demands to Alameda County and San Juaquin County per Welfare and Institutions code §10850.4 based on a child fatality and engaged in follow-up correspondence and conferences with representatives of those respective counties to obtain those records.

6. I filed motions for disclosure of juvenile court records pursuant to Welfare and Institutions Code §827 and filed multiple supplemental motions in the San Joaquin Superior Court and Alameda Superior Court to get a comprehensive set of juvenile-case-file records. This required numerous court appearances at hearings on these motions. Facing opposition, this effort involved

1  several supplemental motions, requests for court orders and extensive negotiation and drafting of
2  stipulations with counsel.
3          7.      I also sought and obtained records from law-enforcement agencies, hospitals, state-
4  licensing agencies, and mental-health professionals. I drafted and delivered "do not destroy" letters
5  to all entities having evidence relevant to a potential lawsuit.  I had extensive communication with
6  counsel representing these agencies in order to obtain the required information for my review and
7  consideration.
8          8.      Through my effort at seeking juvenile court file information pursuant to Welfare and
9  Institutions Code, §827, I was finally provided with a set of records exceeding 4,000 pages.   I closely
10 reviewed the entire set of these records.  In conjunction with this effort, I conducted significant legal
11 research into the current law, state-mandated guidelines, and both federal and state laws relating to
12 siblings' rights and foster children.  After finding evidence supporting a civil right lawsuit, I began an
13 ongoing task of organizing this evidence for future litigation.
14         9.      I engaged in extensive communication and negotiation with medical staff and their
15 administrative and legal representatives at St. Joseph's Hospital in Stockton, CA, to preserve the
16 urine sample of J.P.'s deceased sister and to obtain related reports regarding testing of this sample.
17 Consulted with toxicologists and other testing laboratories to retest the sample and/or serve as
18 consultants to establish how the amphetamine levels supported the alleged claims based on
19 time/date of drug ingestion. Prepared legal memorandum and engaged in extensive communications
20 to establish that HIPAA regulations did not preclude production of this information and
21 cooperation with me as minor's counsel.
22         10.     I submitted record requests to Community Care Licensing and conferred with agents
23 and legal counsel for that agency relating to the scope of my request and future cooperation in
24 litigation.
25         11.     I sought and obtained all therapy records relating to this case from West County
26 Children's Center and, specifically, the therapist that had been working with J.P. and his sister, M.M..
27 I conferred with this the assigned therapist and her supervisors on multiple occasions to assess the
28 childrens' status prior M.M.'s death.  I further sought information to assess the extent of J.P.s

1  injuries, whether further psychological testing was necessary and what immediate remedial steps J.P.
2  needed. After obtaining extensive psychological records from WCCC, I conducted a close review of
3  those records and engaged in further communications WCCC therapists and independent
4  consultants to assess the evidence and its probative value to the civil claims. I organized all of these
5  records with key parts identified and labeled for use at depositions and trial.

6  12.    Upon obtaining, reviewing and organizing the voluminous records that I obtained
7  thus far, I conducted extensive legal research into the potential civil claims. This research included a
8  close review federal and state law as well as the rules, regulations, policies, procedures and guidelines
9  surrounding the protection of foster children placed in foster home and when they are injured or
10 killed.

11 13.    After concluding that I was able to identify sufficient evidence to bring a civil rights
12 action on behalf of J.P., I prepared and filed government claims against potential municipal
13 defendants. including the County of Alameda and the Stockton Police Department.

14 14.    I also prepared and submitted a claim to the Foster Family Home and Small Family
15 Home Insurance Fund of the California Department of Social Services to recover funds for the
16 injuries sustained by J.P. due to the unlawful and negligent actions of his foster mother causing harm
17 to him and his sister while in foster care.

18 15.    Further, I sought and obtained orders appointing a guardian ad litem to best pursue
19 J.P.'s interests and authorize the necessary activities to pursue a civil claim. Later, I had to petition to
20 replace that guardian ad litem with a person better suited to protect J.P.'s interests.

21 16.    I petitioned for more comprehensive access to information relating to J.P. which
22 included drafting and obtaining a court order permitting me to confer with other attorneys and
23 experts and to use the information gathered from the juvenile file for any future civil action. I then
24 consulted with experts including social workers, psychologists, police, hospital personnel,
25 toxicologists, and other professionals.

26 17.    I consulted with attorneys who specialize in civil-rights litigation for the purposes of
27 forming a team of co-counsel with skills complimentary to my own.  Eventually, I arranged a
28 meeting with John H. Scott, his associate Liza N. de Vries, to discuss the case and possible

association. Both Mr. Scott and Ms. de Vries confirmed my assessment of the case and agreed to join me in helping J.P.

18. In December 2016, John Scott and Liza de Vries, of the Scott Law Firm, formally associated with me to represent J.P., GAL, Shannon Villanueva then retained me and the Scott Law Firm as co-counsel to pursue this action.

19. Attached as Exhibit 2 to the Petition is a true and correct copy of our legal services agreement in this matter. At this time, with an April 29, 2018 trial date, the agreement sets forth a 40% contingency fee.

20. To date, the attorneys have borne the risk of this litigation and advanced all costs, only a portion of which was reimbursed through the settlement involving co-defendant, Maria Moore.

21. Our representation was coordinated according to our strengths. I was fact-focused, on the front line of sifting through the discovery and conducting the overall investigation and initial witness interviews. I applied my expertise and knowledge of dependency law and the surrounding rules and procedures of the juvenile court along with my familiarity of the foster care system, juvenile case files and the general duties of social worker relating to foster children. In coordination with co-counsel and with efficient task splitting to avoid duplication of effort, I applied this background when we drafted the extensive written discovery to strategically obtain the information that would support our allegations in the complaint.

22. I served as lead counsel. Mr. Scott assisted with strategy, contributing his extensive experience with civil rights cases. Ms. de Vries became the one most actively involved in the law-and-motion matters and coordination of discovery. Throughout our association, we carefully divided labor to avoid duplication of effort and maximize efficiency and effectiveness.

23. With co-counsel, I participated in drafting the complaint, opposing the motion to dismiss, responding to, and proactively propounding and reviewing discovery, and compiling the massive initial FRCP 26 disclosures plaintiff produced.

24. Concurrently, I prepared comprehensive summaries and memoranda to decipher and simplify the evidence. I also closely reviewed all disclosures, conducted supplementary factual

investigation and research, and I located and interviewed prospective witnesses. With co-counsel, we continued to craft case strategy including preparing for a settlement conference which ultimately resulted in a partial settlement with Maria Moore.

25. Also, I met with J.P. on numerous occasions, taking the time required to establish a relationship with this young child who has profound challenges. I repeatedly visited with him to assess his ongoing needs, the extent of his trauma and other emotional injuries, his recollection of the events underlying this lawsuit and to prepare him for participating in an independent medical examination and testifying, if necessary.

26. To date, I have conducted fourteen of eighteen depositions noticed by plaintiff and defended the deposition of J.P.'s guardian ad litem, Shannon Villanueva.. To prepare for depositions I reviewed all records disclosed by the defendants. I referenced the State Department of Social Services mandatory guidelines, the Child Welfare Services Manual, Community Care Licensing rules, and the policy and practice manuals of defendant Triad and organized related exhibits to be used at the depositions.  I also compiled excerpts from the juvenile records, police reports, coroner's report, medical reports, psychological evaluations and treatment records to be used as exhibits. Deponents included individuals identified by the defendants as Persons Most Knowledgeable relating to the customs, policies, and procedures to establish *Monell* liability. For these depositions, I developed lines of inquiry and isolated relevant documents to determine whether and how defendants failed to follow these policies and procedures.

27. I also conferred with experts to better understand: (1) how social workers from the County of Alameda and Triad would interact with foster parents such as Maria Moore; (2) causation for J.P.'s significant emotional harm, and the extent of his injuries, and (3) how to best assess J.P.'s injuries and emotional harm to meet his future needs and for the purposes of this lawsuit.  I conferred with numerous professionals that might serve as consultants and possible designated experts including social workers, psychologists, psychiatrists, and other mental health professionals. This included conferring with an expert that plaintiff retained to review all of J.P.'s records and prior assessments to address conclusions of the defense psychiatric expert.

28. In an attempt to obtain the critical witnesses from San Joaquin County Human Services Agency that processed the initial reports related to the two drug exposures of M.M., I engaged in extensive negotiation with their county counsel and a teleconference with prospective witnesses. I drafted stipulated orders to enable its witnesses to testify in this case.

29. I participated in the drafting of extensive briefing of this case that, in addition to motions to dismiss and motions for summary judgment and settlement conference statements, laborious briefing was necessary to preserve our claims in the Ninth Circuit Court of Appeals, an En Banc Petition for Review and an appeal to the United States Supreme Court. Through this extraordinary time and effort, we were able to successfully establish a legal basis for liability which, along with the damming evidence uncovered at depositions and otherwise through discovery, ultimately led to the successful settlement of this case.

30. I assisted co-counsel, Ms. De Vries, in her tortuous and tireless effort to obtain the information we needed from the California Department of Healthcare Services related to the existence and amount of MediCal lien that needed to be included in our settlement agreement. Through multiple phone conversations, legal memoranda, letters, and the production of records to that agency, we were able to convince them not to impose any lien in this matter.  It is noteworthy that, at one point, this agency claimed that the lien would be in excess of $300,000.

31. All of the above-described work by counsel was conducted without any compensation to investigate, preserve, and pursue J.P.'s civil rights.

32. In this case, I believe that the 40 percent fee requested is justified and more than reasonable. I have devoted over 1850 hours to this case to date, to the detriment of other matters I could have been handling and paid for in advance. I am a sole practitioner. My firm faced substantial risk in accepting and litigating this case due to its complexities on all fronts and that both liability and damages were vigorously disputed.

33. To assist this Court in evaluating the possible comparison of my lodestar fee, I provide the following biographical information. I graduated in 1983 with a J.D. degree from Southwestern University School of Law.  I have been in private practice since 1989.  My law practice is located in El Cerrito, California.  At least 70% of my practice is devoted to litigation in both state

1  and federal courts.  I practice in many areas of law, but I specialize in criminal defense, civil rights,
2  and juvenile dependency.  Attached hereto and incorporated herein as Exhibit A is a copy of my
3  resume.

4       34.     Prior to 1989, I served as a deputy district attorney in Contra Costa County.  From
5  1984 to 1989 I litigated at least 60 jury trials. Before leaving to open my own practice, I was
6  promoted and assigned to prosecute the most serious repeat sexual assault offenders, serving in that
7  position for over 1.5 years.

8       35.     Upon leaving the district attorney's office, I continued my jury- and court-trial work
9  during my thirty-three years in private practice. I have represented numerous clients in federal courts
10 involving civil rights, Americans with Disability Act, and other federal claims.  I have tried civil
11 claims, including a medical-malpractice suit, in state court and two civil rights jury trials to verdict in
12 federal court. I have also represented criminal defendants in numerous jury trials, court trials,
13 preliminary hearings, evidentiary hearings, as well as all other stages of pre-trial litigation.  I have
14 written and argued numerous criminal appeals in the California Court of Appeal resulting in
15 unpublished reversals and published opinions in People v. Rios, 15 Cal.App.4th 1509 (1992) and
16 People v. Nelson, 200 Cal. App. 4th 1083 (2011).

17      36.     I have represented minors in hundreds of dependency and delinquency cases.  Many
18 were contested hearings and numerous court trials, many involving complex issues and technical
19 facts (e.g. Severe injuries to infants including brain hemorrhaging, blunt force traumas, and other
20 non-accidental traumas.).  As a result, I often teach topics related to representing children at the
21 university level and during attorney training seminars for organizations such as the San Francisco
22 Bar Association, the Contra Costa Bar Association, and the National Institute for Trial Advocacy,
23 among others.  In one trial, was certified and testified as an expert witness on juvenile dependency
24 trial law and competency of counsel in juvenile dependency cases.  In 2005, I was selected by the
25 San Francisco Bar Association and Superior Court of San Francisco to serve on a special committee
26 tasked with developing the basic qualifications and continuing education requirements of court
27 appointed attorneys for minors in family court.  I also represent foster children in civil rights cases
28

stemming from serious abuse and neglect.  I have conducted several continuing education seminars for lawyers in relation to the civil rights and tort remedies if children in foster care.

37. Fee awards from federal courts for services comparable to mine in San Francisco would justify my lodestar hourly rate of at least $650.00 per hour.

38. Through December 10, 2018, the costs and expenses incurred by my office in connection with this case total 14,874.43.  From the settlement with co-defendant, Maria Moore, I was reimbursed in the amount of $6379.48 for costs advanced at that point. I also hired experts/consultants that have invoiced their services in an amount totaling $6,270. Therefore, the total amount from the recovery that I seek for these costs and expenses is **$14,764.95**.  A summary of these costs and expenses is attached to the Petition as Exhibit 4.  This summary is a true and accurate account of the expenses that my law firm is seeking at this time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of June, 2023 in El Cerrito, California.

Date:   June 29, 2023                    By:  *Darren Kessler*
                                              Darren Kessler